1

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

2

3

4

5

*Attorneys for Plaintiff Dan Eller*

6

7

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

8

9

DAN ELLER, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

VISTAGEN THERAPEUTICS, INC., SHAWN K. SINGH, and JOSHUA PRINCE,

Defendants.

Civil Action No.: 26-cv-00427

**CLASS ACTION**

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Dan Eller ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Vistagen Therapeutics, Inc. ("Vistagen" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Vistagen's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Vistagen common stock between April 1, 2024 and December 16, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.       Defendants provided investors with material information concerning Vistagen's plan to develop and commercialize its drug fasedienol, an investigational pherine candidate in development for the acute treatment of social anxiety disorder (SAD). Defendants' statements included, among other things, Vistagen's positive assertions of fasedienol's future trial success based on the prior positive results associated with the PALISADE-2 clinical trial, in addition to notable enhancements and operational changes made to the execution of the PALISADE-3

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

clinical trial supported a strong likelihood of Phase 3 success and positioned it as a confirmatory study.

3.    Defendants provided these overwhelmingly positive statements to investors while at the same time, disseminating false and misleading statements and/or concealing material adverse facts concerning its Phase 3 PALISADE-3 trial study of fasedienol. This caused Plaintiff and other shareholders to purchase Vistagen's common stock at artificially inflated prices.

4.    The truth began to emerge on December 17, 2025, when Vistagen issued a press release announcing that the PALISADE-3 Phase 3 study of intranasal fasedienol for the acute treatment of social anxiety disorder did not demonstrate a statistically significant improvement on the primary endpoint of change on the Subjective Units of Distress Scale (SUDS). In pertinent part, Defendants announced the trial did not achieve its primary endpoint and there was no treatment difference between fasedienol and placebo for the secondary endpoints.

5.    Investors and analysts reacted immediately to Vistagen's revelation. The price of Vistagen's common stock declined dramatically from a closing market of $4.36 per share on December 16, 2025 to $0.86 per share on December 17, 2025, a decline of more than 80%.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Vistagen is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **THE PARTIES**

11.      Plaintiff purchased Vistagen common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Vistagen is attached hereto.

12.      Vistagen Therapeutics, Inc. is a Nevada corporation with its principal executive offices located at 343 Allerton Avenue, South San Francisco, CA 94080. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "VTGN."

13.      Defendant Shawn K. Singh ("Singh") was, at all relevant times, the President and Chief Executive Officer of Vistagen.

14.      Defendant Joshua Prince ("Prince") was, at all relevant times, the Chief Operating Officer of Vistagen.

15.      Defendants Singh and Prince are sometimes referred to herein as the "Individual Defendants." Vistagen together with the Individual Defendants are referred to herein as the "Defendants."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.    The Individual Defendants, because of their position with the Company, possessed the power and authority to control the contents of Vistagen's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of the Individual Defendants.

17.    Vistagen is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Vistagen under respondeat superior and agency principles.

### SUBSTANTIVE ALLEGATIONS

### Company Background

19.    Vistagen is a clinical-stage biopharmaceutical company focused on the development and commercialization of therapies for neuropsychiatric and neurological disorders. The Company's product pipeline includes Fasedienol, an investigational pherine nasal spray for the treatment of anxiety in adults with social anxiety disorder.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**The Defendants Materially Misled Investors Concerning
the Viability of Vistagen's Phase 3 PALISADE-3 Study**

*April 1, 2024*

20.     On April 1, 2024, Vistagen issued a press release announcing enrollment of the first patient in its PALISADE-3 Phase 3 trial of fasedienol, an investigational pherine candidate in development for the acute treatment of social anxiety order (SAD). In particular, the press release detailed the study as follows:

> PALISADE-3, similar to PALISADE-2, is a randomized, double-blind, placebo-controlled Phase 3 study designed to evaluate the efficacy, safety, and tolerability of the acute administration of fasedienol to relieve anxiety symptoms in patients with SAD induced by a public speaking challenge conducted in a clinical setting. The primary outcome measure is the patient self-rated Subjective Units of Distress Scale (SUDS). The U.S. multi-center study is planned to randomize approximately 236 adults ages 18 through 65. Patients will be randomized in a 1:1 ratio to fasedienol or placebo. Patients who complete PALISADE-3 will have an option to enroll in an open-label extension. Vistagen plans to initiate PALISADE-4, which will be a replicate of PALISADE-3, during the second half of 2024.

21.     As part of the press release, Defendant Shawn Singh stated, in relevant part:

> Initiating PALISADE-3 is another major milestone in our plan to develop and commercialize fasedienol as the first treatment of its kind for social anxiety disorder. We look forward to initiating PALISADE-4 in the second half of this year and advancing our innovative pherine pipeline to deliver pioneering neuroscience to patients affected by mental health disorders and unsatisfied with current treatments.

*June 11, 2024*

22.     On June 11, 2024, Vistagen published fiscal year 2024 financial results and corporate update. As part of the press release, Defendant Singh stated, in relevant part:

> Vistagen's fiscal 2024 proved to be a year full of remarkable accomplishments. Most notably, with our PALISADE-2 trial of fasedienol, we became the first company to report positive results of a Phase 3 trial for the acute treatment of social anxiety disorder, a mental health disorder affecting the lives of over 30 million adults in the U.S for which there is no FDA-approved acute treatment option. In addition, we recently initiated our PALISADE-3 Phase 3 trial, which, if successful, has the potential to complement PALISADE-2 in support of a fasedienol U.S. New Drug Application submission. Our primary focus is on the high-quality execution of our registration-directed PALISADE Phase 3 program

5

for fasedienol in social anxiety disorder, as well as the further progression of our non-systemic, neurocircuitry-focused pherine development programs involving itruvone for major depressive disorder and hormone-free PH80 for menopausal hot flashes. We are well-positioned on a path toward achieving multiple potential value-creating catalysts during the year ahead as we pursue our mission to develop and commercialize differentiated neuroscience therapies to improve patients' lives worldwide.

23.     Also as part of the press release, Vistagen provided details of its PALISADE-3 Phase 3 trial and corporate updates, in pertinent part:

- **Initiated PALISADE-3 Phase 3 Trial; Preparation for PALISADE-4 Phase 3 Trial Underway.** In the fourth quarter of fiscal 2024, Vistagen launched its PALISADE-3 Phase 3 trial of fasedienol for the acute treatment of SAD. With PALISADE-3 initiated, the Company is now preparing to launch its PALISADE-4 Phase 3 trial in the second half of calendar 2024. PALISADE-3 and PALISADE-4 are designed similarly to PALISADE-2, including an open-label extension for a period of up to 12 months with subjects able to use fasedienol up to 6 times per day in their everyday lives prior to anxiety-provoking social and performance stressors.

*      *      *

- In the third quarter of fiscal 2024, Vistagen closed an underwritten public offering, providing the Company with cash runway to execute critical milestones in its registration-directed PALISADE Phase 3 program for fasedienol in SAD and across other programs in its neuroscience pipeline.

24.     During the same day earnings call, Defendant Singh discussed details about the Company's PALISADE-3 trial specifically mentioning "notable enhancements" and "operational changes" to help optimize quality enrollment, stating, in pertinent part:

*While the public speaking challenge design of PALISADE-2 and the use of the subjective units of distressed scale, or SUDS, is the primary efficacy end point in the studies and are unchanged, we've built some notable enhancements into PALISADE-3 and PALISADE-4 and made some operational changes we believe will help optimize quality enrollment*, enhanced surveillance and control potential variability as well as drive rigorous protocol adherence through an execution of PALISADE-3 and PALISADE-4, all against the backdrop of what is now a far more favorable and stable clinical research environment than at any time during the pandemic.

*      *      *

*We believe success in either PALISADE-3 or PALISADE-4, combined with the positive results from PALISADE-2 and additional open-label safety data from all fasedienol clinical trials to be completed next year, may provide substantial*

> *evidence of fasedienol's effectiveness and safety to support submission of a potential U.S. new drug application for the acute treatment of SAD during the first half of 2026 which, if approved, could be the first approval of its kind.*
>
> *As a reminder, the FDA has granted Fast Track Designation for our development of fasedienol for the acute treatment of SAD.*

(Emphasis added).

25.     During the question-and-answer portion of the same day earnings call, Defendant Singh and Defendant Prince elaborated on the PALISADE-3 enrollment cadence compared to prior studies, stating, in pertinent part:

> <Unknown Analyst> In PALISADE-3, how many patients have you enrolled so far? And is the enrollment cadence looking stronger or slower than the first couple of studies, and then also if you don't mind commenting on the screen failure rate and how that compares to the prior studies as well?
>
> <A: Defendant Singh> But what I can tell you is what I emphasized during the prepared remarks, which is *we're very happy with the way that PALISADE-3 has kicked off. We've been able to build in some really important efficiencies not only throughout the execution of the study, but upfront even, between lead generation and actual enrollment through visit 1 and the screening.*
>
> *We've been able to achieve a lot of the things that reflect and leverage the lessons learned through the course of the prior execution of studies of this particular design, leading all the way back to Phase II time.* So I think our team is extremely well positioned to continue this study on track and the same will be the case for PALISADE-4 with the ability to achieve the readouts right around the time that we've guided, which would be mid-'25 and then near the end of '25 for PALISADE-4.
>
> *           *           *
>
> <Q: Julian Pino – Stifel, Nicolaus & Co. – Analyst> You described a couple of notable enhancements that you made, things like operational changes, enhanced surveillance, et cetera. Do you mind just providing a little bit more color on what exactly you're doing and why that gives you greater confidence as you continue enrolling PALISADE-3 and soon PALISADE-4?
>
> <A: Defendant Singh> So just to be clear right up front, the public speaking challenge design will remain the same across PALISADE-2, PALISADE-3 and PALISADE-4 as well as SUDS is the primary efficacy end point. So no changes there, those will continue, again, to remain consistent throughout the development of fasedienol for the acute treatment of SAD. And that's been the case all the way back to Phase II.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*So the refinements that we made to PALISADE-3 and PALISADE-4 really are based again on experience that we have, very unique and extensive experience, scaling up to a large Phase III study that come from our observations of the conduct of the PALISADE Phase III program from, again, the early, through the late stages of the pandemic, in particular. So the enhancements to PALISADE-3 and PALISADE-4 apply primarily to ensuring that we've got optimal subjects in the study, real extensive, precise and universally applied screening, inclusion/exclusion criteria and that the public speaking challenge protocol is administered properly and consistently with limited variability.*

<A: Defendant Prince> I mean it's really around changing our approach to both study monitoring and our staffing model, right? So it gives us rigorous training of sites and then oversight of study conduct. So if you think about where we are with PALISADE-3 compared to PALISADE-1 or PALISADE-2, we had an in-person investigator meeting for PALISADE-3. So we have that face-to-face, in-person training of PIs, raters, study coordinators, which we couldn't do in PALISADE-1 and PALISADE-2.

(Emphasis added).

### *August 13, 2024*

26.    On August 13 2024, Vistagen issued a press release reporting the Company's first quarter 2025 financial results and corporate update. As part of the press release, Vistagen published update on the PALISADE-3 Phase 3 trial, stating, in relevant part:

- Vistagen's **PALISADE-3 Phase 3 trial** remains on track to produce top-line results in 2025, in line with previous guidance.

- There is no FDA-approved acute treatment for SAD. Vistagen's PALISADE-3 and PALISADE-4 Phase 3 trials are designed similarly to the Company's positive PALISADE-2 Phase 3 trial of fasedienol for the acute treatment of SAD reported in 2023. With PALISADE-2, Vistagen became the first company to report a positive Phase 3 trial of a new drug candidate for the acute treatment of SAD. Vistagen believes either PALISADE-3 or PALISADE-4, if successful, together with the positive results from PALISADE-2, may establish substantial evidence of the effectiveness of fasedienol in support of a potential fasedienol U.S. New Drug Application (NDA) submission to the FDA for the acute treatment of anxiety in adults with SAD.

27.    During the same day earnings call, Defendant Singh remained confident in fasedienol's potential efficacy noting that the PALISADE-3 trial was similarly designed to the PALISADE-2 trial which achieved positive results, stating, in pertinent part:

Last year with our PALISADE-2 Phase III trial of fasedienol, we reported the first ever positive Phase III trial of a drug candidate for the acute treatment of SAD.

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Earlier this year, we launched another Phase III trial, PALISADE-3, designed similarly to PALISADE-2 with the objective of replicating the success of that study. Enrollment in the PALISADE-3 study is on track, and we are also on track to initiate our PALISADE-4 Phase III study in the second half of this year, as we previously guided. That study will have the same design as PALISADE-3 and the same objective of replicating the positive results from PALISADE-2. Both of these Phase III studies as well as an exploratory Phase IIa repeat dose study will read out next year.

We believe either PALISADE-3 or PALISADE-4, if successful, and together with PALISADE-2, may establish the substantial evidence of the effectiveness of fasedienol in support of a potential U.S. New Drug Application submission to the FDA, which, if approved, could establish fasedienol as the first ever FDA-approved acute treatment of SAD.

*       *       *

So again, our U.S. registration-directed PALISADE Phase III program for fasedienol for the acute treatment of SAD is our top priority, and we are on track and well funded to do what's necessary to put us in a position with the potential to achieve that important and very valuable goal for patients and for our stockholders.

28.      During the question-and-answer portion of the earnings call, Defendants reiterated that the enrollment cadence for PALISADE-3 appeared on track, stating in relevant part:

<Q: Lin Tsai – Jefferies LLC – Equity Analyst> So first one for PALISADE-3. Are you by chance seeing higher screen failure rates compared to PALISADE-1 and 2? And is there anything else that you might be seeing in real time that gives you that extra boost of confidence you are doing the right thing, enrolling the right patients and executing the study even more rigorously than last time?

<A: Defendant Prince> *I think at this point, what we've seen in terms of screen failure rates in terms of those that have a high enough score in the first public speaking challenge in terms of an anxiety score to move on to the second public speaking challenge, we've been pleasantly surprised that those rates have come in consistent with our projections.* So we're seeing, again, progress of the study that's in line with expectations towards the targets that we've established. And so I think in general, really things going as expected there.

<Q: Lin Tsai – Jefferies LLC – Equity Analyst> And then can you remind us how long it took for you to start in PALISADE-1 and 2 -- I guess -- maybe PALISADE-1 and whether the enrollment cadence for PALISADE-3 is looking stronger or faster than the first study?

<A: Defendant Singh> The question -- the enrollment cadence is on track with what we've guided. I mean look, obviously, the black swan and the pandemic

9

impacted a lot of activity in 1 and 2, although we've been so pleasantly surprised by -- *not really surprised but expected and happy to see, is how normative the clinical development environment is now and how we are able to have a lot more predictability on the things that caused fits and starts in prior studies during the pandemic, especially PALISADE-1. So I can tell you that we're comfortable with the cadence and we're on track.*

<A: Defendant Prince> I think that captures it. *The one thing I should have mentioned before was the -- there's just a reminder that we have 2 public speaking challenges, right? So a key part of this study is the screen out in -- at visit 2 and the first public speaking challenge of those subjects who don't have a high enough anxiety level to really show improvement. It's one of the things that differentiates our study.* And it's not inclusion/exclusion, but it's a key piece of making sure that we have the right subjects moving forward to the randomization portion of the study. And those rates, those are critical for study execution. Those rates have been similar to what we observed in PALISADE-1 and PALISADE 2.

(Emphasis added).

*November 7, 2024*

29.    On November 7, 2024, Vistagen published a press release announcing the Company's second quarter 2025 financial results and corporate update. As part of the press release, Defendant Singh, stated, in relevant part:

We are actively recruiting for both our PALISADE-3 and PALISADE-4 Phase 3 trials and remain primarily focused on execution. Our broad and diverse neuroscience pipeline is based on our novel, non-systemic, neurocircuitry-focused approaches to treating multiple challenging disorders in high-prevalence markets with inadequate current treatment options. As we head into 2025, we expect data from multiple Phase 3 clinical trials in social anxiety disorder and further advancement of our non-systemic pherine product candidates in Phase 2 programs for treatment of major depressive disorder and hormone-free treatment of menopausal hot flashes, each with potential to set a new standard of care.

30.    During the question-and-answer portion of the same day earnings call, Defendants commented on the PALISADE-3 trial enrollment, stating, in pertinent part:

<Q: Julian Pino – Stifel, Nicolaus & Co. – Analyst> Just wondering if you could provide a little bit of color on the pace of enrollment so far. What are you hearing from investigators about the demand in enrolling in the study? And I was wondering if these parallel studies share trial sites or anything else that you could share about the sites that you've chosen for each study?

<A: Defendant Singh> So there's tremendous excitement across the PIs and the site staff that we've been able now to bring together for PALISADE-3 and PALISADE-4, as you can imagine, on the other side of the PALISADE-2 success. We've got 16 sites now that are activated for PALISADE-3 and another -- and a dozen for PALISADE-4.

*So the color I can give you is, again, we -- this is a very important indication. It's very clear throughout the research community and a lot of these sites, of course, have psychiatrists that have been treating patients for a very long time, and they just haven't seen anything new in a very long time*, let alone something for the acute treatment of social anxiety disorder, which is so important with this disorder is enabling people to engage and not have fear of engaging in the things that stress them in their life, that create anxiety and opportunity costs in their life because they're self-isolating or withholding from engaging.

*            *            *

*We've really enhanced surveillance with our owned assets as well as augmenting that with what we've got as resources from the CRO. So there's a lot of intense training. There's very close surveillance and adherence to the protocols, which is very important, obviously, to control variability. So I think overall, we're happy with how things are going.*

(Emphasis added).

### *February 13, 2025*

31.    On February 13, 2025, Vistagen issued a press release announcing the Company's third quarter 2025 financial results and corporate update. As part of the press release, Defendant Singh, stated, in relevant part:

We had a very productive quarter, with both PALISADE-3 and PALISADE-4 advancing towards expected top-line results later this year….As always, we remain optimistic about the potential of our product candidates to transform standards of care and address multiple significant unmet needs. We continue to believe that 2025 has the potential to be a monumental year, between multiple anticipated data readouts for fasedienol in acute treatment of social anxiety disorder and further advancement of additional pherine product candidates for treatment of major depressive disorder and menopausal hot flashes.

32.    During the question-and-answer portion of the same day earnings call, Defendants reiterated enhancements made to the execution of the PALISADE-3 trial as well as timeline for expected data in 2025, stating, in pertinent part:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<Q: Matthew Barcus – Jefferies LLC – Equity Analyst> And then I guess, is there anything that keeps you up at night in terms of what more could be done on these studies in terms of execution?

<A: Defendant Singh> Interesting question. No, it doesn't keep me up at night because of the enhancements and the team that we've got executing on these studies, especially surveillance associated with rigorous adherence to the protocol. These are all very important, execution-related initiatives that we've got in place, reduced reliance on CRO surveillance, expansion of our internal team, and just the way that we've been seeing the conduct of the studies with rigorous training even upfront of any enrollment at any of the sites. It's just actually been significantly different than what we've seen in the past in a very positive way.

<A: Defendant Prince> It is a very interesting question. And actually, to your point, we have more visibility into what's happening with these studies than we did before running PALISADE-1 and 2 in the pandemic and with the enhancements that we've put in place. And so if anything, I would say it's easier to sleep at night now than it was back then without COVID in place, with masks down, with the review that we have of subject's eligibility, making sure that scales are administered properly, making sure that the rigorous public speaking challenge script is followed to the T, and then having the ability to do quick interaction and retraining with sites if they start to deviate from that protocol. So we feel like we're giving these studies the best chance we could at success with those changes.

*June 2, 2025*

33.     On June 2, 2025, Vistagen published a press release updating the timeline for its ongoing PALISADE-3 Phase 3 program. As part of the release, Defendant Singh stated, in relevant part:

We are very encouraged by the progress of our PALISADE-3 trial, which remains on track for a topline readout in the fourth quarter of this year, and our PALISADE-4 trial, for which we expect topline results in the first half of 2026. Patient and physician enthusiasm for our PALISADE trials continues to be strong, and we remain focused on meticulous patient recruitment. With social anxiety affecting millions and rising, we are energized by fasedienol's potential to meet the clear and growing unmet need and bring meaningful relief to patients, all while delivering long-term value to shareholders.

*June 17, 2025*

34.     On June 17, 2025, Vistagen issued a press release announcing the Company's fiscal year 2025 financial results and corporate update. The release stated in pertinent part:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- The U.S. registration-directed PALISADE Program evaluating intranasal fasedienol for the acute treatment of SAD continues to progress. The PALISADE-3 Phase 3 trial remains on track for expected topline data in the fourth quarter of this year. Topline results for the PALISADE-4 Phase 3 trial are expected in the first half of 2026.
- Vistagen believes either PALISADE-3 or PALISADE-4, if successful, together with the positive results from PALISADE-2 reported in the second half of 2023, may establish substantial evidence of the effectiveness of fasedienol in support of a potential fasedienol New Drug Application (NDA) submission to the U.S. FDA for the acute treatment of SAD.

35.     On the same day earnings call, Defendant Singh remained confident in delivering top line data from the PALISADE-3 trial in the fourth quarter, stating, in relevant part:

Our PALISADE-3 trial is on track for a top line data readout in the fourth quarter of this year, and we anticipate top line results from PALISADE-4 in the first half of 2026. The enthusiasm of patients and physicians participating in the PALISADE Program continues to be very strong and we remain committed to a rigorous operational execution. If successful, we believe either PALISADE-3 or PALISADE-4, in combination with the positive results from PALISADE-2, could provide the substantial evidence of effectiveness needed to support a new drug application for Fasedienol and its potential to be the first FDA-approved acute treatment for SAD.

*        *        *

At Vistagen, we welcome the conversations with the FDA, as always about policies that speed up in innovation and make drug development more efficient and affordable and most importantly, improve patient outcomes. Overall, we are energized by the potential of all 5 of our clinical stage pherine product candidates. And with our primary focus on delivering top line data from PALISADE-3 in the fourth quarter of this year, doing so has the near-term potential to transform lives and produce remarkable shareholder value.

36.     During the question-and-answer portion of the earnings call, Defendant Singh reiterated the enhancements made to the execution of the PALISADE-3 trial to improve the subject selection and the study execution efficiency, stating, in pertinent part:

<Q: Julian Pino – Stifel, Nicolaus & Co. – Analyst> You alluded to changes with FDA leadership and there's been reports of turnover of staff and medical review teams. I guess in your interactions with the agency, have you noticed any changes or anything that's worth highlighting to sell-side and investors?

<A: Defendant Singh> So back to the PALISADE-4, I think overall, we -- as I think we've talked to you and Paul about in the past and others, the enhancements that we brought to the table related to PALISADE-3, PALISADE-4 from lessons

13

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

learned and improvements that could be implemented to limit variability, to enhance subject selection, to improve study execution efficiency, those kinds of things, in addition to the mask, obviously coming off and eliminating some of the COVID-related disorders, we really have been focused on very stringent subject eligibility requirements. And some of the original projections that we had were based on observations from PALISADE-2 and the recruitment rates in those studies, which steadily increase through the end of the study, especially when the world got a little bit more normal at the end of PALISADE-2.

And the impact of those positive enhancements that we made to PALISADE-3 and 4 wasn't really fully understood at the beginning but it's now very apparent and screening visits have continued to increase. And the more stringent subject eligibility requirements and secondary subject eligibility review that we integrated with developing our own internal team in addition to increasing training and remediation. So bottom line, we've been very, very picky in the way that the study can be executed, the stringent inclusion/exclusion criteria, all in an effort to, of course, replicate the success from PALISADE-2.

So I think we've got a pretty good rhythm now and we've been able to eliminate subjects who we think may be less likely to demonstrate a benefit through that more rigorous eligibility criteria that we've applied and the secondary review of subject eligibility and site conduct that's ongoing and very specific. So overall, all that together has caused a little bit of an adjustment in timing, but we think that benefits the overall potential outcome of the study.

*      *      *

<Q: Lin Tsai – Jefferies LLC – Equity Analyst> And then earlier speaking of variability back in the successful PALISADE-2 study, I think the placebo arm showed a SUDS reduction of 8 points absolute basis. Would you expect that to be the same case for PALISADE-3 and 4? Or with these more enhanced controls could the placebo be lower?

<A: Defendant Singh> Well, what we've certainly done, Andrew, is intended to design PALISADE-3 and 4 in a manner to replicate the success we saw in PALISADE-2. Where that actually lands, we'll have to see how the cards flip but everything that we've done has been intended to limit variability. In any way, we can conceive of it after taking a look at PALISADE-1 and PALISADE-2 studies, which were the first two studies, as you know, with this design and this endpoint for the acute treatment of SAD. So a lot has been learned and the rigor matters, and so we'll see. The idea, obviously, is to increased visibility into all aspects of the study and its execution to ensure the highest impossible potential to reduce variability. So hopefully, that falls in the direction that we saw things land with PALISADE-2.

<Q: Lin Tsai – Jefferies LLC – Equity Analyst> nd then my last question is in terms of site conduct and as well as your overall surveillance, are you making sure these PIs are disqualifying patients appropriately when these patients are taking

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

their SUDS tests? And are you looking at these SUDS rating somehow for each patient to make sure all time points make sense with the scoring?

<A: Defendant Singh> Well, the last question, again, whether it makes sense, they are what they are, in terms of the scoring. But what I can tell you in the first hand, I mean, the whole purpose of what we did majorly differently with PALISADE-3 and 4 was to develop and have internally what we call our secondary eligibility review team. This is a team, that internal Vistagen team, not a CRO team or a third-party team, but an internal team that consists of very experienced psychometricians who review eligibility of each subject, and they listen to screening assessments as well as each public speaking challenge to ensure in the proper execution.

So we think, again, that those kinds of enhancements -- and those are some of the things that take a little bit more time, especially with obviously a hyper-focus on rater training upfront, across all the endpoints, not just the SUDS, but the CGI-I and the PGIC so that you have confidence that the study is being run the way it should be run and that we've done everything that we can through all the experience we've gained through the execution of two studies already to enhance the potential for success.

*August 7, 2025*

37.    On August 7, 2025, Vistagen issued a press release announcing the Company's fiscal year 2026 first quarter financial results and corporate update. As part of the release Defendant Singh, stated, in relevant part:

We had another productive quarter, advancing key programs across our pipeline. Our lead program, fasedienol, for acute treatment of social anxiety disorder, continues to progress, with topline results from our PALISADE-3 Phase 3 trial anticipated later this year, and topline results from our PALISADE-4 Phase 3 trial expected in the first half of 2026. With no FDA-approved acute treatment, we remain optimistic about fasedienol's potential to impact the lives of over 30 million U.S. adults affected by social anxiety disorder.

38.    During the question-and-answer portion of the same day earnings call, Defendants were asked about differences in the PALISADE-3 baseline SUDS score from previous trials, stating, in pertinent part:

<Q: Lin Tsai – Jefferies LLC – Equity Analyst> And finally, do you envision PALISADE-3 baseline SUDS score to be any different from the baseline SUDS in PALISADE 1 and 2? And can you remind us what they were as well?

<A: Defendant Prince> Yes, as to 2, I have to look at that. I don't have that off the top of my head, but we would expect them to be similar in terms of those numbers because we have similar inclusion criteria, the post-speaking challenge is set up identically. We would expect it to be the same.

<A: Defendant Singh> So it was different. In PAL-2 was 1 minute -- at least 1 minute in order to move. Because remember, again, as I think we've talked about, enrollment is different in this study design versus randomization. So it's those that advanced to the visit 3 second speech that are included in the data set. Those are the ones who are randomized. So they have to be sufficiently stressed in the first speech in order to qualify for randomization, and that's set at the 2 minutes at least at 75, more than a little uncomfortable, at least 2 minutes of the 5 minutes during that first speech.

<A: Defendant Prince> And Shawn, I would just add to that, we expect baseline to be in that similar range of roughly 80, 85, somewhere in there per SUDS at baseline.

<A: Defendant Singh> Yes. Good point. But what we have seen, of course, is the more severely affected and chronically affected someone is with the disorder, and we do a lot upfront to assess that eligibility -- very strict eligibility criteria even before someone signs an ICF, there's rigorous assessment clinically. And then as they move through the eligibility criteria that we've enhanced a bit in PALISADE-3 and 4 are making a difference, we think, to make sure we ensure that we've got a sufficiently suitable population that ultimately gets randomized. So that's been consistent across the objectives from PALISADE-2, 3 and 4.

### *November 3, 2025*

39.    On November 3, 2025, Vistagen issued a press release announcing completion of its PALISADE-3 Phase 3 public speaking challenge study. As part of the release, Defendant Singh, stated, in pertinent part:

The completion of the PALISADE-3 Phase 3 public speaking challenge study marks an important milestone for Vistagen. As we advance toward our expected topline results later this quarter, we remain encouraged by fasedienol's potential to become the first and only acute treatment for the more than 30 million people living with social anxiety disorder. We are grateful to the individuals who participated in this study, as well as the clinical investigators, site staff, and our contract research organization for their commitment and collaboration.

In August 2023, Vistagen reported positive results from its randomized, double-blind, placebo-controlled PALISADE-2 Phase 3 trial of fasedienol for the acute treatment of social anxiety disorder. The PALISADE-3 trial, and concurrent PALISADE-4 Phase 3 trial, involve the same public speaking challenge study design and primary efficacy endpoint as PALISADE-2, with certain protocol and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

operational enhancements related to site training, surveillance, and subject selection.

*November 13, 2025*

40.    On November 13, 2025, Vistagen issued a press release reporting second quarter 2026 financial results and corporate update. As part of the press release, Defendant Singh, stated, in pertinent part:

> As we conclude the second quarter of our fiscal year, we are encouraged by our progress and remain confident in the path ahead. We are on track to report topline data from the randomized portion of our PALISADE-3 Phase 3 trial of fasedienol for the acute treatment of social anxiety disorder this quarter, followed by the randomized portion of our PALISADE-4 Phase 3 trial in 2026. We have built strong momentum toward the primary goal of our PALISADE program, developing what we hope could be the first FDA-approved acute treatment of social anxiety disorder for the 30 million adults living with this serious and potentially life-threatening condition.

41.    During the question-and-answer portion of the same day earnings call, Defendants commented on the PALISADE-3 trial including patient screen fails and FDA filing stating, in relevant part:

> <Q: Andrew Tsai – Jefferies LLC – Equity Analyst> And then last question is from what you can tell, what have been the top reasons why patients screen failed in PALISADE-3? And are the top reasons different from what you saw in PALISADE-2?
>
> <A: Defendant Singh> So we can unpack that later. But what I can tell you, Andrew, is the reason that we made enhancements to the PALISADE-3 and 4 studies, again, was to make sure that there's very high-quality assessment for subject eligibility. And as a result of that, we had our own teams involved here with our teams for subject eligibility review. We had other enhancements into the execution of the study, of course, throughout the duration of the study.
>
> So I think we've seen generally what we've expected to see and as we've modeled forward for not only screen fail, but also attrition rates throughout the course from enrollment through randomization through the end of the study. So I think we're comfortable with what we've typically seen and maybe more to come on that later. The important piece of the puzzle is -- yes, one more thing is obviously the important piece of the puzzle is that we got to the last patient class visit with the full complement that we had modeled for purposes of the studies. We've noted

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

before, our end target was 236. So last patient class visit reflects our original thought.

<Q: Unknown Analyst> I guess for us, assuming one of PALISADE-3 or PALISADE-4 works, is there anything else gating registration -- gating filing? Is there anything else that you need to complete before then? How soon can you file?

<A: Defendant Singh> So as you know, as we move closer toward completion of the Phase III development program, we always plan to interact with the agency. But we've said this before, obviously, it's the pivotal program data, it's a repeat dose study. It's the open-label data from our long-term safety study, a human factor study, the typical preclinical safety-related studies, reprotox and carc, all those are aspects that we expect to have wrapped up upfront, of course, of an NDA package. So -- and we'll, of course, be meeting with the FDA as we get closer to make sure that we're in line with what's necessary regarding a submission package. So we estimate currently, and if everything goes according to plan that we've been executing on, we could see an NDA submission if PALISADE-3 is positive sometime around the middle of '26.

<Q: Myles Robert Minter – William Blair & Co. – Analyst> And then second is just, I think in late October, you updated clinicaltrials.gov. You terminated a site in Arkansas and Kansas. I'm just curious whether that was because you've completed enrollment and you didn't need those sites anymore or just because of your site vigilance and you're going to see these sites in person? Was it something performance related that you terminated those sites?

<A: Defendant Prince> As we've gone through the course of these studies for both PAL-3, PAL-4, it's a constant evaluation of fit with sites. And so we've had a few sites that, for whatever reason with regard to their ability to enroll the appropriate patients, whether it was their recruitment programs or other reasons, just they were not able to enroll. And so at some point, it makes sense to terminate those sites. There's been 1 or 2 like that.

And then also beyond that, as we -- to your point, as we get towards the end of the study, we definitely take a wind-down approach for a soft landing for the study to make sure it's well controlled. We're controlling variability and then making sure that we will be able to get from that end of study last patient out to top line results efficiently in the time line that Shawn mentioned. So for us, it's kind of course of business as we've gone through the process of the studies.

42.    The above statements in Paragraphs 20 to 41 were false and/or materially misleading. Defendants created the false impression that fasedienol's positive results achieved in the previous PALISADE-2 trial, in addition to notable enhancements and operational changes made to the execution of the PALISADE-3 clinical trial supported a strong likelihood of Phase 3

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

success and positioned it as a confirmatory study. In truth, Defendants had knowingly or recklessly omitted the risk of failure inherent in public speaking challenge-based Social Anxiety Disorder clinical trials. Specifically, Defendants were aware from its own Phase 2 experience and published clinical research that public speaking challenge endpoints often exhibit elevated placebo responses, site variability and measurement noise, yet continued to tout modifications made to the Phase 3 trial and presenting PALISADE-3 as likely to succeed.

**The Truth Emerges**

*December 17, 2025*

43.    On December 17, 2025, Vistagen issued a press release reporting that its PALISADE-3 Phase 3 study did not demonstrate a statistically significant improvement on the primary endpoint of change on the SUDS. The press release further stated, in pertinent part:

> The trial did not achieve its primary endpoint, as measured by the least squares (LS) mean change from baseline on the Subjective Units of Distress Scale (SUDS) score for fasedienol (13.6 +/-1.54 standard error, SE) compared with placebo (14.0 +/-1.51 SE), a LS mean difference of 0.4 (p = not significant). There was no treatment difference between fasedienol and placebo for the secondary endpoints. The favorable safety data of fasedienol were consistent with previous clinical trials.

44.    As part of the press release, Defendant Singh added:

> We are disappointed by the unexpected results of this public speaking challenge trial, which are inconsistent with positive outcomes observed in Phase 2 and our PALISADE-2 Phase 3 study. We are thoroughly reviewing the results of the study, evaluating the potential impact of the results on our ongoing studies and plan to seek feedback from the FDA.

45.    The aforementioned press releases and statements made by the Individual Defendant are in direct contrast to statements they made during the press releases and associated earnings calls held on June 11, 2024, August 13, 2024, November 7, 2024, February 13, 2025, June 17, 2025, August 7, 2025, and November 13, 2025. During the earnings calls and related statements, Vistagen's executives continually touted the progress of the Company's PALISADE-

3 Phase 3 study of intranasal fasedienol, including the "notable enhancements" and "operational changes" made to the execution of the trial to position PALISADE-3 as a confirmatory study. In actuality, Defendants had knowingly or recklessly omitted the risk of failure inherent in public speaking challenge-based Social Anxiety Disorder clinical trials. Specifically, Defendants were aware from its own Phase 2 experience and published clinical research that public speaking challenge endpoints often exhibit elevated placebo responses, site variability and measurement noise, yet continued to tout modifications made to the Phase 3 trial and presenting PALISADE-3 as likely to succeed.

46.    Investors and analysts reacted immediately to Vistagen's revelation. The price of Vistagen's common stock declined dramatically from a closing market of $4.36 per share on December 16, 2025 to $0.86 per share on December 17, 2025, a decline of more than 80%.

47.    A number of well-known analysts who had been following Vistagen downgraded their shares in response to Vistagen's disclosures. For example, Jefferies analyst noted "[a] pattern is emerging in that fasedienol's efficacy (absolute) remains fairly consistent across studies, just that placebo remains quite variable. However, PAL-3's outcome raises a question of where the true placebo rate should trend, especially given the limited historical precedents for the novel SUDS endpoint."

48.    Similarly, William Blair analyst downgraded its shares viewing the Phase 3 PALISADE-3 miss as "disappointing" and noting that "we are now uncertain if fasedienol is an active agent for the acute treatment of SAD."

**Additional Scienter Allegations**

49.    During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Vistagen were materially false and misleading at the time they were

20

made. Defendants had actual knowledge of, or access to, non-public information concerning the inherent risks associated with Vistagen's PALISADE-3 Phase 3 public speaking challenge clinical trial design, including its own PALISADE-2 trial results as well as regular internal meetings and updates with principal investigators on enrollment quality, site performance and operational metrics.

50.    Despite such knowledge, Defendants repeatedly conveyed to investors that its PALISADE-3 Phase 3 study was on track to produce positive results. similar to the prior. In fact, Defendants knew about the risks associated with public speaking challenge trial design from its previous PALISADE-2 study, specifically that endpoints often exhibit elevated placebo responses and that patient selection criteria and trial sites vary enough to materially affect results.

51.    Defendants' knowledge concerning the faulty design of the trial and extraordinary risks related to the endpoints is also evident from the fact that they made "notable enhancements" and "operational changes" to the execution of the trial in an effort to correct and/or avoid the issues that presented internally (but were not disclosed publicly).

## **Loss Causation and Economic Loss**

52.    During the Class Period, as detailed herein, Vistagen and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Vistagen's common stock and operated as a fraud or deceit on Class Period purchasers of Vistagen's common stock by materially misleading the investing public. Later, when Vistagen and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Vistagen's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Vistagen's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

53.    Vistagen's stock price fell in response to the corrective events on December 17, 2025, as alleged *supra*. On December 17, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Vistagen's PALISADE-3 phase 3 public speaking challenge study of fasedienol for the acute treatment of social anxiety disorder.

54.    In particular, on December 17, 2025 Vistagen issued a press release announcing that the PALISADE-3 Phase 3 study of intranasal fasedienol for the acute treatment of social anxiety disorder did not demonstrate a statistically significant improvement on the primary endpoint of change on the Subjective Units of Distress Scale (SUDS). In pertinent part, Defendants announced the trial did not achieve its primary endpoint and there was no treatment difference between fasedienol and placebo for the secondary.

### **Presumption of Reliance; Fraud-On-The-Market**

55.    At all relevant times, the market for Vistagen's common stock was an efficient market for the following reasons, among others:

(a)    Vistagen's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Vistagen communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Vistagen was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Vistagen was reflected in and incorporated into the Company's stock price during the Class Period.

56.    As a result of the foregoing, the market for Vistagen common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Vistagen's stock price. Under these circumstances, all purchasers of Vistagen's common stock during the Class Period suffered similar injury through their purchase of Vistagen's common stock at artificially inflated prices, and a presumption of reliance applies.

57.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with materially misleading statements about its financial growth and stability while at the same time omitting then existing material adverse information concerning the Company's advertising practices. Defendants provided the public with information about their operations that failed to account for negative realities concerning their undisclosed conduct.

59.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

60.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Vistagen who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Vistagen's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vistagen's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Vistagen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 12, 2025, there were 39.4 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

63.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Vistagen;

(c)     whether the Individual Defendants caused Vistagen to issue false and misleading financial statements during the Class Period;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Vistagen's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud

in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vistagen's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Vistagen's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vistagen's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

71.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

72.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior manager and/or director of the Company, the Individual Defendant had knowledge of the details of Vistagen's internal affairs.

73.     The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of the Company. As officer and/or director of a publicly-held company, the Individual Defendant had a duty to disseminate timely, accurate, and truthful information with respect to Vistagen's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Vistagen's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Vistagen's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

74.     During the Class Period, Vistagen's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Vistagen's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them

at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Vistagen's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Vistagen's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II

***Against the Individual Defendants***
***for Violations of Section 20(a) of the Exchange Act***

77.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.    During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his senior position, he knew the adverse non-public information about Vistagen's misstatements.

79.    As officer and/or director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Vistagen which had become materially false or misleading.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

80.     Because of his positions of control and authority as senior officer, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which Vistagen disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause Vistagen to engage in the wrongful acts complained of herein. The Individual Defendant therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Vistagen's common stock.

81.     The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of his senior management positions and/or being director of the Company, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, Vistagen to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82.     By reason of the above conduct, the Individual Defendant and/or Vistagen are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated: January 15, 2026                    Respectfully Submitted,

                                           **LEVI & KORSINSKY, LLP**


                                           /s/ Adam Apton
                                           Adam M. Apton (SBN 316506)
                                           1160 Battery Street East, Suite 100
                                           San Francisco, CA 94111
                                           Tel: (415) 373-1671
                                           Email: aapton@zlk.com

                                           *Attorneys for Plaintiff Dan Eller*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS