**LEVI & KORSINSKY LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, California 94111
Telephone: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAN ELLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VISTAGEN THERAPEUTICS, INC., SHAWN K. SINGH, and JOSHUA PRINCE,<br><br>Defendants. | Case No. 3:26-cv-00427-RS<br><br><u>CLASS ACTION</u><br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................................1

JURISDICTION AND VENUE ................................................................................................6

PARTIES ..................................................................................................................................7

FORMER EMPLOYEES PROVIDING CORROBORATING FACTUAL ALLEGATIONS ............8

RELEVANT BACKGROUND ...................................................................................................9

A. Collection of Data Necessary to Support Regulatory Approval in the U.S. ..................9

B. Relevant Principles of Clinical Trial Design, Execution, and Analysis ......................11

SUBSTANTIVE ALLEGATIONS ...........................................................................................14

A. VistaGen and Its Lead Product Candidate, PH94B, Later Known as Fasedienol .......14

B. Exploratory Analysis of PH94B's Effectiveness Warranting Further Investigation ...14

C. VistaGen Initiates the PALISADE Phase 3 Development Plan for PH94B in SAD...21

D. VistaGen Announces PALISADE-1 Failure and Pauses PALISADE-2 .....................24

E. VistaGen Publicly Commits to a Redefined Phase 3 Development Plan for PH94B and Closes PALISADE-2, As Is, Due to "Methodological Complexities" .................31

F. VistaGen Announces PALISADE-2 Results While Maintaining FEARLESS Course34

G. VistaGen Partially Resurrects the PALISADE Program on PALISADE-2 Results....35

H. VistaGen Cashes in on PALISADE-2 Results and Redefined Development Plan......40

I. VistaGen Abandons FEARLESS to Double Down on Cheaper PALISADE-4 Trial .44

J. Defendants Mislead Investors as to the Material Risks of the PALISADE Program..47

K. VistaGen Raises Much Needed Capital Just Before the Full Fraud is Revealed.........52

L. The Full Fraud is Revealed When VistaGen is Forced to Announce PALISADE-3 Failed to Meet Its Primary Efficacy Endpoint Due to Elevated Placebo Response ....53

M. Relevant Post-Class Period Events and Disclosures..................................................54

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..........................55

ADDITIONAL FACTUAL ALLEGATIONS PROBATIVE OF SCIENTER.................................81

A. Defendants Singh and Prince Were Personally Involved in the Design and Execution of the Phase 3 Clinical Trials of PH94B .........................................................81

B. VistaGen's Dire Financial Condition and Need for Working Capital ........................83

C. The Clinical Development of PH94B Was the Core Focus of VistaGen's Business ..85

LOSS CAUSATION........................................................................................................86

PRESUMPTION OF RELIANCE ....................................................................................89

NO SAFE HARBOR ........................................................................................................90

CLASS ACTION ALLEGATIONS ..................................................................................91

CLAIMS FOR RELIEF ....................................................................................................93

PRAYER FOR RELIEF ....................................................................................................95

DEMAND FOR TRIAL BY JURY ...................................................................................96

Court-appointed Lead Plaintiff Eric Weinberger ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges in this complaint for violations of the federal securities laws (the "Complaint"), the following based upon knowledge with respect to his own acts, and upon facts obtained through the investigation conducted by his attorneys which included, *inter alia*, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, media reports, presentations, investor call transcripts, stock charts, and other publicly available information issued by or about VistaGen Therapeutics, Inc. ("VistaGen" or the "Company"), industry guidance and regulations, expert reports and advisories, interviews with former employees of VistaGen, and other information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons and entities who purchased or otherwise acquired VistaGen securities between August 7, 2023 and December 16, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' (defined below) violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC (the "Class").

2. VistaGen is a clinical-stage biopharmaceutical company with no drugs approved for commercial sale in the U.S. or anywhere else in the world. The only near-term opportunity it had to generate revenue depended on the successful clinical testing of its lead drug candidate, PH94B or fasedienol. Unbeknownst to investors, VistaGen's clinical trial plan for the drug was extraordinarily risky and faced odds that far surpassed what investors were told or should have ordinarily expected when investing in a clinical-stage biopharmaceutical company. This was because Defendants' "PALISADE" trial plan for PH94B was designed around an endpoint measure known to be inadequate and virtually incapable of properly demonstrating a clinical benefit. Defendants went ahead with this trial plan though because it was a cheaper alternative to redesigning the trial and could save time, even

if it amounted to a reckless gamble with public investor money. But Defendants never disclosed this and, as a result, investors were unaware of the risks they truly faced when investing in VistaGen.

3. Biopharmaceutical companies, like VistaGen, must obtain permission from the U.S. Food & Drug Administration ("FDA") before selling a drug to the public. The FDA is prohibited from approving any application to license a product in the U.S. without substantial evidence that the product is "safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C)(i)(I). Accordingly, to obtain regulatory approval, companies must submit substantial evidence indicating that their drug product is both safe and effective, demonstrated through a series of clinical tests performed under strict guidelines and industry standards. This process ensures that patients receive a product that provides the benefits it purports to, that they are protected from dangerous treatments, and that the benefits of the product outweigh its risks.

4. At all relevant times, the Company's lead product candidate was fasedienol, or PH94B, an investigational synthetic neuroactive intranasal spray designed for the acute treatment of social anxiety disorder ("SAD") in adults. SAD is defined as a marked fear or anxiety about one or more social situations in which the individual is exposed to possible scrutiny by others.

5. For people suffering with SAD, triggering social situations are avoided or endured with intense fear or anxiety. Rather than an all-or-nothing condition, SAD exists on a spectrum. Some SAD patients manifest symptoms in certain specific situations like speaking or performing in public, while others can experience symptoms when meeting new people and engaging in small talk, or entering a room when others are already seated, or writing while being observed. In more severe cases, SAD patients can experience symptoms in all forms of social interactions. SAD patients can appear asymptomatic when not exposed to their individualized social stressors. SAD symptoms can also fluctuate over time and are often worse during times of significant stress.

6. A key psychotherapy mechanism by which individuals with SAD overcome this condition, or lessen their symptoms, is by repeated exposure to anxiety-inducing events to desensitize the patient's anxiety response. Through repeated exposure to socially stressful events, SAD patients naturally begin to cognitively separate the negative physiological symptoms of anxiety from specific anxiety-provoking events. When describing the potential real-world benefits of PH94B, if approved, VistaGen explained that, designed to be used on an as-needed basis prior to or during stressful or often-

avoided social or performance situations, PH94B has the potential to reduce the wave of anxiety usually experienced by SAD patients when in a feared situation.

7. Prior to the Class Period, VistaGen initiated two staggered pivotal Phase 3 clinical trials to evaluate the efficacy, safety, and tolerability of PH94B for the acute treatment of SAD, PALISADE-1 in May 2021 and PALISADE-2 in October 2021. Both trials employed a clinic-based public speaking challenge paradigm and measured efficacy using the Subjective Units of Distress Scale ("SUDS"), a patient-rated momentary measure of anxiety from 0 to 100, assessed at discrete points in time.

8. As designed, all qualifying participants in the PALISADE trials determined to exhibit marked signs of SAD at screening, were to return within 3 to 35 days to receive a placebo intranasal spray 15 minutes before undergoing a 5-minute baseline clinical-simulated public-speaking challenge during which patients were asked at one minute intervals to rate their anxiety from 0 to 100. Patients with a mean SUDS score of ≥75 during the first public speaking challenge were to return one week later where they were then randomized 1:1 to receive a self-administered single dose of PH94B or placebo before undergoing a repeat public-speaking challenge. The primary efficacy endpoint was the least squares mean change in SUDS score from baseline at treatment, as compared to placebo.

9. PALISADE-1 completed in June 2022 with 222 participants. One month later, VistaGen was forced to announce that PALISADE-1 had failed to meet its primary efficacy endpoint without further detail as to not influence the ongoing PALISADE-2, according to VistaGen. As later revealed, however, PALISADE-1 failed to show a therapeutic effect due to an elevated placebo response.

10. Following the unfavorable outcome of PALISADE-1, VistaGen paused the sequential PALISADE-2 and undertook an interim analysis. During the ensuing months, Defendants repeatedly acknowledged the challenges associated with scaling a single-assessment public speaking challenge design using the SUDS score as the primary efficacy endpoint to the size necessary for a registrational Phase 3 study and repeatedly discussed the advantages of a patient-tailored, multiple assessment real-world design using the Liebowitz Social Anxiety Scale ("LSAS"), a clinician-administered 24-point assessment tool that measures both the severity of a patient's acute anxiety and avoidance behaviors over time, as the primary efficacy endpoint. Indeed, during this time, Defendants explicitly told investors that the real-world LSAS-driven Phase 3 study was always the preferred design but that it just

was not possible when VistaGen launched the PALISADE program because of COVID-related restrictions and the world being sheltered in place.

11. In support of a redefined Phase 3 development plan for PH94B, Defendants also repeatedly highlighted the fact that the LSAS score was the primary efficacy endpoint used in the registration studies supporting all three FDA-approved drugs for the treatment of SAD and emphasized that the real-world LSAS-driven design better reflected how PH94B was to be used by patients in their daily lives and measured treatment effects across multiple SAD-stressor points as well as over time rather than at a single moment in time during a repeat laboratory-induced public speaking stressor.

12. In March 2023, VistaGen announced that it had received positive feedback from the FDA regarding the use of the LSAS score as the primary efficacy endpoint in future Phase 3 studies designed to evaluate the efficacy of PH94B in a real-world setting. At this time, VistaGen also announced it had "determined the best course of action is to close the PALISADE-2 study given the expense, time, and methodological complexities involved in resuming PALISADE-2, including consistently administering the protocol for the single-dose, clinic-based public speaking challenge study across numerous sites."

13. The Company subsequently unveiled its FEARLESS Phase 3 development program for PH94B. It specifically explained that, in contrast to the PALISADE Phase 3 single administration public speaking challenge studies measured by the SUDS score, the FEARLESS program would align with the LSAS-based study design supporting the precedent-setting NDA-enabling programs for the three drugs currently approved for treatment of SAD. The Company's FEARLESS Phase 3 studies were to be designed to assess multiple administrations of PH94B, on a patient-tailored, as-needed basis in their daily lives, up to six times per day, in a real-world outpatient setting over a multiple-week period, with the clinician-administered LSAS as the primary efficacy endpoint.

14. Then, in August 2023, VistaGen announced the topline results from the 141 subjects who had completed PALISADE-2 prior to the study pause and subsequent early closure. With the PALISADE-2 results indicating a statistically significant therapeutic effect as measured by the SUDS endpoint, Defendants immediately reversed course, portraying these results as validation of the PALISADE design, characterizing PALISADE-1 as a pandemic-driven outlier, and subsequently announcing plans to advance PALISADE-3 as a replicate confirmatory study. Defendants, however,

simultaneously reassured investors that the lower risk FEARLESS program remained part of the Phase 3 development strategy for PH94B and represented that either PALISADE-3 or FEARLESS could serve as the second adequate and well-controlled study necessary to support a potential NDA submission.

15. In reality, Defendants failed to disclose the significant methodological limitations independent of any pandemic-related effects associated with the SUDS-driven single assessment clinical-simulated repeat public speaking challenge paradigm that the Phase 3 PALISADE program was based on. Indeed, the design remained vulnerable to an elevated placebo response arising from the inherent variability in scaling a repeat public speaking challenge assessing the extremely subjective patient-rated reduction in anxiety in a pool individuals who appear asymptomatic when not exposed to their individualized social stressors and whose symptoms naturally fluctuate and are also known to become desensitized through repeated exposure to anxiety-inducing events. The fundamental unpredictability in the individuals being studied is only exacerbated by even minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial at scale and the intrinsic difficulties in identifying and enrolling an optimal patient population. Worse yet, the PALISADE design measured efficacy based on changes in the fleeting SUDS score during repeated exposure to a single clinical-simulated public speaking challenge, an outcome measure that was inherently susceptible to placebo effects and other confounding influences. As a result, the replicate PALISADE-3 was extraordinarily risky and faced odds that far surpassed what investors were told or should have ordinarily expected from purportedly adequate and well-controlled Phase 3 clinical trial.

16. To make matters worse, in October 2023, shortly after raising roughly $135 million through public offerings and securing the much needed capital to advance its Phase 3 development plan for PH94B, VistaGen announced that, in addition to PALISADE-3, it was prioritizing a second replicate PALISADE study, PALISADE-4, while making little mention of its plans for the FEARLESS program.

17. By November 2023, VistaGen had fully abandoned any plans to advance the lower risk FEARLESS program. As a result, the Company's prospects became solely dependent on the success of two replicate PALISADE trials assessing the efficacy of PH94B in SAD through the SUDS-driven single assessment clinical-simulated repeat public speaking challenge paradigm, a Phase 3 design that Defendants had previously acknowledged carried substantial methodological and scalability risks.

18. Throughout the remainder of the Class Period, Defendants repeatedly told investors that the PALISADE design was the most appropriate way to test PH94B's acute reduction in anxiety in patients with SAD, and offered repeated assurances that, through all the experience gained through the execution of the prior two studies, they had done everything they could to enhance the potential for success. Indeed, Defendants repeatedly touted program enhancements made to increase company surveillance of clinical operations, reinforce strict protocol execution, improve site selection, retrain investigators and site staff, and other measures purportedly designed to decrease variability in the PALISADE studies. However, while emphasizing these operational improvements, Defendants failed to disclose that VistaGen's continued reliance on the same fundamentally flawed SUDS-driven repeat public speaking challenge design left it susceptible to significant variability as the underlying aggregating factors relating to the natural history of the condition and unpredictable patient characteristics could not be remedied through protocol and execution enhancements alone.

19. The true nature of the Company's underlying condition and business prospects emerged through a series of partial corrective disclosures and/or materializations of the concealed risk, including when the Company announced its prioritization of two repeat PALISADE Phase 3 clinical trials, followed by its full abandonment of FEARLESS as a meaningful component of its Phase 3 development strategy and, ultimately, when it was forced to reveal that PALISADE-3 failed to meet its primary efficacy endpoint due to an elevated placebo response.

20. As a result of Defendants' wrongful acts and omissions causing a precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. This suit seeks to hold Defendants accountable.

## JURISDICTION AND VENUE

21. Plaintiff brings this action on behalf of himself and other similarly situated investors to recover losses sustained in connection with Defendants' fraud alleged herein.

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5. Accordingly,

this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).

23. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a), as VistaGen's principal executive offices are located in this judicial district; Defendants conduct business in this judicial district; and a substantial portion of the events or actions giving rise to the claims asserted herein, including the dissemination of materially false or misleading statements to the public, took place in this judicial district.

24. In connection with the acts, conduct, or other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, the facilities of a national securities market, and interstate telephonic and digital communications systems.

## PARTIES

25. Lead Plaintiff Eric Weinberger purchased or otherwise acquired VistaGen securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as set forth more fully herein. Plaintiff's previously filed certification evidencing his transaction(s) in VistaGen is hereby incorporated by reference herein. *See* ECF No. 14-3.

26. Defendant VistaGen is a Nevada corporation with its principal executive offices located at 343 Allerton Avenue, South San Francisco, CA 94080. During the Class Period, VistaGen common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "VTGN."

27. Defendant Shawn K. Singh ("Singh") has served as President, Chief Executive Officer ("CEO"), and as a member of the Board of Directors of VistaGen since August 2009. Mr. Singh has over 30 years of experience working with biotechnology, medical device and pharmaceutical companies, both private and public.

28. Defendant Joshua Prince ("Prince") was appointed as Chief Operating Officer ("COO") of VistaGen on October 24, 2023. Prior to his appointment as COO, Mr. Prince served as the Company's Senior Vice President, Business Operations, from November 2021 until October 2023. Mr. Prince has over 20 years of experience in the pharmaceutical industry from early development through commercial launch of pharmaceuticals across a range of therapeutic areas.

29. Defendants Singh and Prince are sometimes referred to herein as the "Individual Defendants" and, together with VistaGen, the "Defendants."

30. The Individual Defendants, because of their position with the Company, possessed the power and authority to control the contents of VistaGen's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of the Individual Defendants.

31. VistaGen is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

32. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to VistaGen under *respondeat superior* and agency principles.

**FORMER EMPLOYEES PROVIDING CORROBORATING FACTUAL ALLEGATIONS**

33. CW1 served as Director of Media and Communications Strategy at VistaGen from August 2021 to July 2024. During CW1's tenure with the Company, CW1 reported to then-Senior Director of Corporate Communications, Caren Scannell, who in turn reported directly to Defendant Singh. In their role at the Company, CW1 was responsible for, among other things, drafting press releases about VistaGen's clinical trials and products, which included PH94B.

34. CW2 was employed as a contract senior medical writer for the Company from January 2024 to June 2024. During CW2's tenure with the Company, CW2 reported to Senior Vice President of Development Operations, Jo Cato. In their role at the Company, CW2 was responsible for, among other

things, writing an abstract for a different drug product and rewriting VistaGen's Phase 3 protocol for PALISADE-2 for the replicate PALISADE-3 Phase 3 study.

## RELEVANT BACKGROUND

### A. Collection of Data Necessary to Support Regulatory Approval in the U.S.

35. The research, development, testing, manufacture, quality control, approval, labeling, packaging, storage, recordkeeping, serialization and tracking, promotion, advertising, distribution and marketing, post-approval monitoring and reporting, and export and import, among other things, of pharmaceutical products are extensively regulated by governmental authorities in the U.S. and abroad.

36. In the U.S., pharmaceutical products are regulated by the FDA under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act"), and its implementing regulations, pursuant to which no drug product may be commercially marketed to the public, and in turn, generate revenue, without first obtaining agency approval to do so.

37. Pursuant to the Public Health Services Act ("PHS"), a pharmaceutical product (like PH94B) cannot be licensed or approved by the FDA unless it is shown to be "safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C)(i)(I). The FDA's implementing regulations interpret the term "potency" to include "effectiveness." *See* 21 C.F.R. § 600.3(s).

38. Accordingly, to market (and sell) a drug or biologic in the U.S., the pharmaceutical developer or sponsor (like VistaGen) must take responsibility for compliance with product and establishment standards and must submit a qualifying New Drug Application (NDA) (for small-molecule chemically synthesized drugs) or Biologics License Application ("BLA") (for large molecule biologics derived from living sources) to the FDA. 21 C.F.R. § 601.2.

39. A properly submitted application provides the FDA with all pertinent information about the pharmaceutical candidate, including data and statistical analyses sufficient to determine whether: (1) the product candidate is safe and provides the benefits it purports to; (2) the benefits of the product candidate outweigh the well-documented risks and safety concerns, if any; (3) the product candidate's proposed labeling is appropriate and specifically identifies what the label should contain; and (4) the methods used in manufacturing the product and the controls used to maintain the product's quality are

adequate to preserve its identity, strength, quality, and purity. Each section must meet the required standards for an NDA or BLA to be approved.

40. The efficacy and safety data necessary to support marketing approval by the FDA is generated in two distinct stages: (i) pre-clinical and (ii) clinical testing. The pre-clinical development stage generally involves laboratory evaluations of the product's chemistry, formulation, and stability, as well as non-human studies to evaluate pharmacological activity and toxicity in animals, which are designed to support subsequent clinical testing.

41. The results of the pre-clinical tests, together with manufacturing information, analytical data, and a proposed clinical trial protocol are then submitted to the FDA as part of the Investigational New Drug ("IND") application. An IND is a request for authorization from the FDA to administer an investigational drug product to humans. An IND must be deemed effective before any human clinical trials may begin. The central focus of an IND submission is on the general investigational plan and the protocols for human trials.

42. The clinical stage of development involves administering the product candidate to the target patient population under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Pharmaceutical developers or sponsors typically subject a new product candidate to a series of three sequential phases of clinical trials designed to accumulate the data necessary to submit a successful NDA or BLA. *See* 21 C.F.R. § 312.21.

43. Phase 1 clinical trials are the initial introduction of an investigational new product to a small pool of human subjects, generally 20 to 80 participants. 21 C.F.R. § 312.21(a). Phase 1 clinical trials typically focus on discovering the product's safety profile, including the determination of its metabolism and pharmacologic actions in humans and the side effects associated with increasing doses. During Phase 1, sufficient information about the product's pharmacokinetics and pharmacological effects should be obtained to permit the design of well-controlled, scientifically valid, Phase 2 studies.

44. Once the safety profile is established and the dosage selected, the product candidate typically progresses to Phase 2 testing. Phase 2 clinical trials usually involve larger patient populations than Phase 1 trials (usually involving no more than several hundred subjects) and are used to evaluate or conduct exploratory analysis of the product's effectiveness for a particular indication or indications

in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the investigational new product. 21 C.F.R. § 312.21(b). Phase 2 clinical trials are typically well-controlled, closely monitored, and designed to provide sufficient evidence of preliminary efficacy for specific indications to warrant further investigation.

45. Finally, if the investigational product has demonstrated sufficiently promising efficacy in a Phase 2 trial, sponsors move forward with confirmatory Phase 3 trials. Phase 3 clinical trials are intended to gather additional information on the product's effectiveness and safety needed to evaluate the overall benefit-risk relationship and to provide an adequate basis for marketing approval for widespread public use. 21 C.F.R. § 312.21(c). Phase 3 studies usually include a substantially larger patient population than Phase 2 trials (*e.g.*, from several hundred to several thousand subjects) and typically involve double-blind comparisons with placebo.

**B. Relevant Principles of Clinical Trial Design, Execution, and Analysis**

46. Clinical trials are conducted under protocols describing, among other details, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety and assess efficacy. Each clinical trial protocol, and any subsequent amendments thereto, must be submitted to the FDA as part of the existing IND.

47. The purpose of conducting adequate and well-controlled clinical investigations is to "distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." 21 C.F.R. § 314.126(a). As such, the final determination of efficacy is typically made based on the pre-specified clinical endpoint(s) as defined in the study protocol. Statistical tests are also predefined before the clinical trial begins.

48. An "endpoint" is a measurement of what happens to patient participants in the trial. When a trial is intended to evaluate the efficacy, safety, and tolerability of a new medical product or a new use of an approved product, its endpoints usually measure benefit such that participants in a trial feel or function better or live longer. The benefit of a therapy, as measured by clinical outcomes (*e.g.*, improvement in symptoms), is then assessed to determine whether it outweighs any adverse effects.

49. In the realm of clinical trials, placebos are necessary tools to provide evidence that a new drug product candidate is more effective than an inert treatment. A placebo-controlled trial consists of

two randomly assigned groups of participants, one group receives the active treatment, while the other control group receives an inactive substance, or placebo. In a double-blind, placebo-controlled trial, neither the researchers nor the participants know who is being given active treatment and who is getting placebo. Everything else in the conduct of the trial is the same between the two groups.

50. "Statistical significance" is a determination made by an analyst that the results in the trial data are not explainable by chance alone. An analyst makes this determination by using statistical hypothesis testing. The test provides a p-value, which is the probability of observing results as extreme as those in the data assuming the results are truly due to chance alone. A p-value of 5% or lower ($\leq p=0.05$) is considered statistically significant. When the p-value is greater than 5%, the results are explainable by chance alone and the data is deemed consistent, proving the null hypothesis.

51. "Variability" refers to all the inconsistencies that arise due to the design of a clinical trial, including those due to human or systematic error during the conduct of the trial. Variability can be introduced by unpredictability in the individuals or populations studied, via discrepancy in measurement or sampling techniques or from inconsistencies in how the study is executed and data is handled.

52. Minimizing variability starts with meticulous planning of the trial at protocol design phase, including careful consideration of all inclusion-exclusion criteria and trial end points. Equally as important are devising a sound strategy for the assessment, measurement, collection, and management of data, the adjudication process for trial endpoints, and statistical analysis.

53. The methodology for assessing, measuring, and analyzing pre-specified endpoints is detailed in the trial's statistical analysis plan ("SAP"). The FDA requires the SAP be submitted when considering drugs, biologics, and devices for approval. While the trial protocol describes all primary and secondary endpoints and analyses, the SAP is meant to detail planned statistical analyses, so that they are not selected after the fact to provide a desired outcome. In addition, the SAP defines the population(s) and time point(s) used for each analysis. It defines statistical methodology as well, including multiplicity control, sensitivity analyses, methods used to handle missing data, subset analyses prospectively identified, and the specific analyses performed on each subset of interest.

54. The SAP must be completed before the study data is unblinded (in a blinded trial) or the statistical team has access to the accumulating data (in an unblinded trial). Unless impossible, the FDA guides investigational product sponsors to finalize the SAP before the first patient is enrolled.

55. There are significant benefits to completing the SAP while the study protocol is being developed. For example, the protocol clarity needed by the statistician for the SAP can act as a catalyst to unearth design flaws in a protocol that is still being developed. Otherwise, those flaws can live in the study design until found by the trial implementation team on site or during the data analysis phase. If uncovered during the data analysis phase, it may suddenly dawn on the statistical team that the research question cannot be answered with the trial that was implemented. An additional benefit of co-developing the protocol and SAP is the resulting increase in the likelihood that the trial will end informatively.

56. While there may always be some *post hoc* or exploratory analysis after clinical data is collected, the SAP is supposed to identify all primary, secondary, and pre-specified exploratory analyses and the precise methods to be used for each before the data is unblinded. In doing so, the aim is to avoid the bias inherent where investigators or statisticians, who have seen the data, alter the statistical analysis.

57. "Reports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs[.]" 21 C.F.R. § 314.126(a). Pursuant to 21 C.F.R. § 314.126(b), the FDA considers the following characteristics in determining whether an investigation is adequate and well-controlled for purposes of supporting marketing approval under Section 505 of the FD&C Act:

> (1) There is a clear statement of the objectives of the investigation and a summary of the proposed or actual methods of analysis in the protocol for the study and in the report of its results. In addition, the protocol should contain a description of the proposed methods of analysis, and the study report should contain a description of the methods of analysis ultimately used. If the protocol does not contain a description of the proposed methods of analysis, the study report should describe how the methods used were selected.
>
> (2) The study uses a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect. The protocol for the study and report of results should describe the study design precisely; for example, duration of treatment periods, whether treatments are parallel, sequential, or crossover, and whether the sample size is predetermined or based upon some interim analysis.

(3) The method of selection of subjects provides adequate assurance that they have the disease or condition being studied, or evidence of susceptibility and exposure to the condition against which prophylaxis is directed.

(4) The method of assigning patients to treatment and control groups minimizes bias and is intended to assure comparability of the groups with respect to pertinent variables such as age, sex, severity of disease, duration of disease, and use of drugs or therapy other than the test drug. The protocol for the study and the report of its results should describe how subjects were assigned to groups. Ordinarily, in a concurrently controlled study, assignment is by randomization, with or without stratification.

(5) Adequate measures are taken to minimize bias on the part of the subjects, observers, and analysts of the data. The protocol and report of the study should describe the procedures used to accomplish this, such as blinding.

(6) The methods of assessment of subjects' response are well-defined and reliable. The protocol for the study and the report of results should explain the variables measured, the methods of observation, and criteria used to assess response.

(7) There is an analysis of the results of the study adequate to assess the effects of the drug. The report of the study should describe the results and the analytic methods used to evaluate them, including any appropriate statistical methods. The analysis should assess, among other things, the comparability of test and control groups with respect to pertinent variables, and the effects of any interim data analyses performed.

58. The FDA has interpreted the statutory standard of substantial evidence of effectiveness as generally requiring data from two adequate and well-controlled Phase 3 clinical trials, each convincing on its own, to establish necessary product effectiveness for marketing approval in the U.S.

## SUBSTANTIVE ALLEGATIONS

### A. VistaGen and Its Lead Product Candidate, PH94B, Later Known as Fasedienol

59. VistaGen is a clinical-stage biopharmaceutical company focused on the development and commercialization of new generation medicines for the treatment of multiple central nervous system ("CNS") diseases and disorders with high unmet need. To date, VistaGen has no products approved for commercial sale in the U.S. or elsewhere and has generated no revenue from product sales.

60. In September 2018, VistaGen acquired, on a non-cash basis through the issuance of unregistered shares of common stock, a license from Pherin Pharmaceuticals, Inc. ("Pherin") giving it the exclusive worldwide rights to develop and commercialize PH94B. VistaGen later gained full

ownership of PH94B through its acquisition of Pherin, a privately held drug development company focused on neuropsychiatric and neuroendocrine conditions, completed February 2, 2023.

61. PH94B, later known as fasedienol, is a synthetic neuroactive intranasal steroid spray designed for the as-needed acute treatment of social anxiety disorder ("SAD") in adults. Based on the 2021 National Health and Wellness Survey, over 25 million adults, or 10% of the adult population in the U.S., reported being affected by SAD.

62. The Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"), published by the American Psychiatric Association ("APA") in 2013, defines SAD as a marked fear or anxiety about *one or more* social situations in which the individual is exposed to possible scrutiny by others. Such anxiety-inducing situations vary from person to person, with each person experiencing the condition in unique ways, but all generally suffer from the intense fear of being scrutinized, evaluated, or judged. Triggering social interactions or performance situations considered more common among those with SAD include meeting new people, engaging in small talk, dating, being on a job interview, answering a question in class, asking for help, talking to a cashier in a store, and performing or speaking in front of others. Doing everyday things, such as eating or drinking in front of others or using a public restroom, may also be triggering due to a similar fear of being humiliated, judged, or scrutinized.

63. People suffering with SAD often avoid triggering social or performance situations, and when a situation cannot be avoided, they experience significant anxiety and distress. In triggering situations, the fear or anxiety experienced can manifest in physiological symptoms such as blushing, trembling, sweating, rapid heartbeat, shortness of breath, chest pain, nausea, and/or dizziness. They may also experience certain psychological symptoms such feeling severely self-conscious, overanalyze their performance or identify self-perceived flaws in social interactions, and/or expect the worst possible consequences from a social situation. And may exhibit certain behavioral changes like finding it difficult to speak or speak in a quiet or low voice, avoid eye contact, and/or have abnormally stiff or rigid posture.

64. As recognized by the APA, rather than an all-or-nothing condition, SAD triggers and symptoms exist on a spectrum. Some patients manifest symptoms in certain specific events like meeting new people and engaging in small talk or eating around others, while others can experience symptoms in all forms of social interactions. With the publication of DSM-5, the APA introduced a performance-

only specifier used for individuals whose "fear is restricted to speaking or performing in public" meaning they "do not fear or avoid non-performance social situations." For all people with SAD, symptoms may fluctuate over time and are often worse during times of significant stress or change.

65. The DSM-5 diagnostic criteria for SAD include: (i) the social situations almost always provoke fear or anxiety; (ii) the fear or anxiety is out of proportion to the actual threat posed by the social situation and to the sociocultural context; (iii) the social situations are avoided or endured with intense fear or anxiety; (iv) the fear, anxiety, or avoidance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning; (v) the fear, anxiety, or avoidance is persistent, typically lasting for 6 months or more; (vi) the fear, anxiety, or avoidance is not attributable to the physiological effects of a substance (*e.g.*, a drug of abuse, a medication) or another medical condition; (vii) the fear, anxiety, or avoidance is not better explained by the symptoms of another mental disorder, such as panic disorder, body dysmorphic disorder, or autism spectrum disorder; and (viii) *if performance only*, the fear is restricted to speaking or performing in public.

66. A key psychotherapy mechanism by which individuals with SAD overcome this condition, or lessen their symptoms, is believed to be by exposing themselves to feared or avoided situations. This is the basis of the standard-of-care treatment paradigm for patients with SAD which begins with cognitive behavioral therapy ("CBT"), aiming to improve overall mental health. CBT challenges specific unhelpful cognitive distortions and behaviors associated with SAD. A large proportion of the therapy involves confrontation of anxiety-inducing events and repeated exposure to desensitize the patient's anxiety response. With limited pharmacotherapy treatment options, CBT is often prescribed in combination with a first-line selective serotonin reuptake inhibitor (SSRI).

67. To date, only three chronic oral SSRIs, or antidepressant drugs ("ADs"), have been approved by the FDA specifically for the treatment of SAD (*e.g.*, Sertraline (Zoloft), Paroxetine (Paxil), and Venlafaxine (Effexor)). According to VistaGen, however, these FDA-approved ADs all have slow onset of effect (often multiple weeks or months) and have significant side effects that may make them inadequate or inappropriate treatment alternatives for many individuals affected by acute SAD episodes.

68. Benzodiazepines and beta blockers are also commonly prescribed on an off-label basis by psychiatrists and other physicians for the treatment of SAD. Unlike ADs, which can take several

weeks for full effect, benzodiazepines have a rapid-onset effect by slowing the nervous system. According to VistaGen, however, the safety concerns and side effects of benzodiazepines, many of which are similar to the side effects of alcohol, can also appear rapidly and persist for up to 12 hours. Further, extended use may lead to physical dependence and weaning off these drugs can take several months, often resulting in severe withdrawal symptoms. Worse yet, benzodiazepines users can also build up a tolerance that requires increasingly larger doses over time.

69. Administered as a nasal spray, PH94B is designed to act locally on peripheral nasal chemosensory receptors to trigger rapid activation of the limbic system areas of the brain associated with SAD without the benzodiazepine-like side effects and safety concerns.

70. According the Company, in all Phase 1 and Phase 2 studies completed to date, PH94B's safety profile showed no indication of abuse potential, psychological side effects (such as dissociation or hallucinations), sedation or other side effects and safety concerns that may be associated with the FDA approved ADs for the treatment of SAD, as well as with benzodiazepines and beta blockers. In addition, as described in detail below, exploratory analysis of the product's effectiveness showed PH94B to be well tolerated and demonstrated a rapid onset of effect.

71. Based on PH94B's novel mechanism of action ("MOA") and promising clinical data indicating rapid onset of therapeutic effects, and favorable safety and tolerability profile established, PH94B was VistaGen's most advanced product candidate when licensed in 2018, and by mid-2019 it became the Company's lead development candidate as it focused its operations on designing and executing the first pivotal Phase 3 clinical trial of PH94B for the treatment of SAD to support an NDA.

72. When describing the potential real-world benefits of PH94B, if approved, VistaGen explained that the drug candidate, designed to be used on an as-needed basis prior to or during stressful or often-avoided social or performance situations, has the potential to reduce the wave of anxiety usually experienced by SAD patients when in a feared situation. Through more frequent exposure to socially stressful events, SAD subjects gain new insight about their social and performance situations and begin to cognitively separate the negative physiological symptoms of anxiety from specific anxiety-provoking events. By engaging in new situations previously avoided as a result of less severe and frequent waves of anxiety following treatment with PH94B, subjects experience increased confidence, leading to an

overall reduction in severity of the SAD condition, decreased burden of disease, improved workplace productivity, educational attainment, and satisfaction with social life.

**B. Exploratory Analysis of PH94B's Effectiveness Warranting Further Investigation**

73. Prior to VistaGen's acquisition of PH94B, preliminary efficacy of the drug candidate was demonstrated in a well-controlled, closely monitored Phase 2 trial and a Phase 3 pilot study was conducted to evaluate design features for a larger Phase 3 study that would evaluate the safety and efficacy of PH94B for the acute management of symptoms in subjects with SAD in their daily lives.

74. First, Dr. Michael Liebowitz served as the principal investigator for the Phase 2, one-center, randomized, double-blind, placebo-controlled, single-dose study of PH94B, completed in 2011, by ninety-one women, 19-60 years of age, diagnosed with SAD. The primary efficacy outcome measure for this Phase 2 study was the mean change in the treated patients' Subjective Units of Distress Scale ("SUDS") score taken once before and again 10-15 minutes after intranasal dosing with PH94B spray, and at one-minute intervals during exposure to laboratory-induced challenges, as compared to placebo.

75. The Subjective Units of Distress Scale ("SUDS") is a self-report emotional distress measure commonly used by clinicians during CBT to monitor progress, guide exposure pacing, and assess intervention efficacy. The SUDS score ranges from 0 to 100, reflecting the patient's real-time subjective level of discomfort in a specific moment or situation.

76. In CBT, the SUDS score would likely have different guide points such as: 100 – unbearably upset to the point that you cannot function and may be on the verge of a breakdown; 90 – extremely anxious and desperate; helpless and unable to handle it; 80 – worried and panicky; losing focus and feeling anxious in your body; 70 – discomfort dominates your thoughts and you struggle to function normally; 60 – moderate to strong levels of discomfort; 50 – upset and uncomfortable; still functional; 40 – mild to moderate anxiety and worry; 30 – worried or upset; still able to function; 20 – a little bit sad or distressed; 10 – no distress; alert and focused; and 0 – peaceful and complete calm.

77. The SUDS score is considered subjective because each measurement is unique to the scoring individual, such that different patients may experience the same situation but assign different SUDS scores based on their unique life experiences and perceptions. It is also considered fleeting because it measures the scoring individual's real-time, momentary level of discomfort or distress during

a specific task or exposure which can vary depending on severity of the fear-provoking event, duration of the measured experience, prior exposure, and surrounding circumstances or superseding conditions.

78. For example, if patient A can swim and enjoys water, being pushed into a lake might feel like a SUDS level of 0. If patient B does not know how to swim and has a fear of drowning, the same event might feel like a SUDS level of 100. If patient C can swim but has a fear of open bodies of water, the same event might feel like a SUDS level of 75. If patient D can swim and enjoys water, but is experiencing a leg cramp at that moment, the same event might feel like a SUDS level of 25 where it might have otherwise felt like a SUDS level of 0.

79. This Phase 2 trial of PH94B was designed as a 4-visit clinical assessment. All qualifying patients with a score of ≥60 on the Liebowitz Social Anxiety Scale ("LSAS") (detailed below), determined at screening (visit 1), returned to receive an intranasal placebo spray 15 minutes before laboratory-simulated public speaking and social interaction challenges (visit 2). Patients who experienced significant distress during at least one challenge (a score of >75 on the SUDS), returned one week later to receive either intranasal PH94B or placebo 15 minutes before repeat laboratory-simulated public speaking and social interaction challenges (visit 3). Visit 4 served as follow up.

80. The results showed that patients who received PH94B (n=45) during the second set of public speaking and social interaction challenges had a significantly greater decrease in mean SUDS scores when compared with the first set of challenges, than did patients who received placebo (n=46) for both sets of challenges. Patients treated with PH94B showed an improvement of 26.7 points in the mean score on the SUDS at visit 3 as compared to visit 2 for the public speaking challenge. In comparison, patients randomized to placebo showed an improvement of only 14.0 points in the mean SUDS score across visits; a 12.7-point difference between PH94B and placebo (p=0.002). Similarly, for the social interaction challenge, patients treated with PH94B showed an improvement of 18.3 points in the mean score on the SUDS between visits, while patients randomized to placebo showed only a 6.6-point improvement; an 11.7-point difference between PH94B and placebo (p=0.009).

81. Dr. Liebowitz also served as the principal investigator for a randomized, double-blind, placebo-controlled, crossover Phase 3 study (referred to by VistaGen as a Phase 2 study), completed in 2014, intended to serve as a feasibility trial of a multi-center Phase 3 study protocol of similar design.

The primary objective of this pilot study was to evaluate design features for a larger Phase 3 study that would evaluate the safety and efficacy of PH94B for the acute management of symptoms in subjects with SAD in their daily lives. Careful review of diary entries and measurement of study medication compliance each week were to be used to determine the feasibility of using PH94B on an "as needed" basis for anxiety-provoking social events. Specifically, the frequency of use, variability of SUDS ratings, effect size of differences in average peak SUDS ratings during treatment with PH94B and placebo, and general reliability of the diary recording method were to be evaluated and used to refine inclusion and exclusion criteria as well as provide guidance for designing a larger multi-site study.

82. Patients included in this study were 22 male and female adults, 18-65 years of age, with a current diagnosis of SAD, as defined by DSM-4, a clinician-rated LSAS total score ≥60 at both screening and baseline visits, and a clinician-rated Hamilton Depression Score ("HAM-D17") of less than 18 at both screening and baseline visits. The patient testing period lasted a total of 6-8 weeks with the randomized double-blind treatment period lasting a total of four weeks for all subjects. During the 2-week screening period subjects must have experienced and documented a minimum total of six social interaction or performance events prior to the baseline visit, and for at least three of these events, must have achieved a peak score of ≥60 on the SUDS, as rated in the patient's diary. Subjects were then randomized (double-blind) to two weeks of treatment with PH94B or placebo intranasal spray. After 2 weeks, subjects were crossed over to the opposite treatment for 2 weeks.

83. The primary study endpoint was average peak anxiety level for public performance or social interaction events during the two 2-week double-blind treatment phases. Subjects were asked to self-administer either PH94B or placebo intranasal spray 15 minutes prior to public performance or social interaction events. Following each event, they were asked to record the maximum (peak) subjective anxiety level experienced during the event using the patient-rated SUDS score. Within each 2-week treatment phase, all the SUDS ratings were summed and divided by the number of events recorded. Average peak SUDS during treatment were compared using a paired t-test.

84. Results showed significant differences in favor of PH94B on the primary efficacy outcome measure. The mean peak SUDS change from baseline for all subjects receiving PH94B was 15.6 points versus 8.3 points for placebo (paired t = 3.09, p=0.006, effect size of .658). Looking between

the two groups at just the first 2 weeks of treatment, PH94B also showed trend superiority to placebo on the LSAS (p=0.07) and a significant difference on the Patient Global Impression of Change (p=0.024) and the LSAS Avoidance subtotal (p=0.02).

85. The sufficiently promising efficacy data collected from the Phase 2 and Phase 3 pilot trials of PH94B for the acute treatment of SAD in adults warranted further investigation of the product's efficacy, safety, and tolerability through two adequate and well-controlled confirmatory Phase 3 clinical trials, each providing substantial evidence of effectiveness, necessary for marketing approval in the U.S.

**C. VistaGen Initiates the PALISADE Phase 3 Development Plan for PH94B in SAD**

86. Throughout the calendar year 2019, VistaGen worked with Dr. Liebowitz to prepare a pivotal Phase 3 development plan for PH94B with plans to initiate the first Phase 3 clinical trial in 2020.

87. On December 10, 2019, VistaGen announced that the FDA had granted Fast Track designation for the clinical development of PH94B. The FDA recognizes that speeding the availability of pharmaceuticals that treat serious conditions is in everyone's interest, especially when the product candidate has to the potential to fill an unmet need such that no other therapy exists or it has significant advantages over existing treatments. Accordingly, the FDA developed a series of designations to assist applicants in achieving market approval of such pharmaceuticals expeditiously.

88. Relevant here, a Fast Track designation facilitates the development and expedited review of pharmaceuticals designed to treat serious conditions and fill an unmet medical need. Whether the product is designed to treat serious conditions is generally based on whether it will have an impact on such factors as survival, day-to-day functioning, or the likelihood that the condition, if left untreated, will progress from a less severe condition to a more serious one. With this designation, VistaGen was afforded, among other things, more frequent meetings and written communications with the FDA to discuss PH94B's Phase 3 development plan and the design of any proposed clinical trials to ensure collection of appropriate data needed to support marketing approval.

89. By June 2020, the Company declared it was in final-stage discussions with the FDA regarding key details of its plan for Phase 3 clinical development of PH94B for the treatment of SAD.

90. Then, on July 23, 2020, VistaGen announced the results of a "positive" meeting with the FDA declaring, it and the FDA had "reached consensus on key aspects of a unique initial pivotal Phase

3 clinical trial of PH94B." As designed, this initial pivotal Phase 3 study of PH94B, known as "PALISADE-1", was to be a randomized, double-blind, placebo-controlled, single-dose, parallel comparison study involving a single-event, laboratory-simulated public speaking challenge conducted at approximately 12 to 15 sites across North America, with Dr. Liebowitz as the principal investigator. Initial target enrollment (*i.e*., completed patients) for PALISADE-1 was approximately 182 male and female adult patients, 18-65 years of age, with a current diagnosis of SAD, as defined by DSM-5.

91. Similar to the Phase 2 study completed in 2011, PALISADE-1 was designed to evaluate the efficacy, safety, and tolerability of the acute administration of PH94B to relieve symptoms of SAD during a clinical-simulated public speaking challenge, measured by the mean change in SUDS score from baseline at visit 2 to visit 3 and compared to placebo, a novel primary measure of efficacy for a Phase 3 clinical trial intended to serve as a registrational study.

92. Specifically, all qualifying patients with an LSAS score of ≥70 at screening or visit 1, were to receive a placebo intranasal spray 15 minutes before undergoing a baseline public-speaking challenge at visit 2. Patients with a mean SUDS score of ≥75, measured at one minute intervals in the baseline 5-minute public-speaking challenge at visit 2, were to return for visit 3 where they were then randomized 1:1 to receive a self-administration of a single dose of PH94B or placebo before undergoing a repeat 5-minute public-speaking challenge, with visit 4 being the follow up.

93. Defendant Singh is quoted in the Company's July 23, 2020 press release, solidifying the design plan for the PALISADE Phase 3 clinical trial, as saying, "[n]otably, the FDA concurred that our initial pivotal Phase 3 efficacy study may be conducted in a manner substantially similar to the highly statistically significant Phase 2 study of PH94B… The FDA's specific guidance will enable us to simplify the process of assessing efficacy among SAD patients in our Phase 3 studies and contribute to significant time- and cost-efficiency in the clinic."

94. VistaGen initiated PALISADE-1 in May 2021, with topline data expected in mid-2022. The following month, June 2021, VistaGen announced its plans to launch a second U.S. multi-center Phase 3 clinical study of PH94B ("PALISADE-2"), designed to be substantially similar to the ongoing PALISADE-1 and equally supportive of its NDA goal. Indeed, VistaGen initiated PALISADE-2 in

October 2021, utilizing the same study design as PALISADE-1 but with a target enrollment of 208, and was conducted at different clinical site locations, supervised by different clinical research organizations.

95. Then, on April 13, 2022, VistaGen and AffaMed Therapeutics ("AffaMed"), announced they had completed regulatory preparations to initiate "PALISADE Global," another Phase 3 clinical trial to evaluate the efficacy, safety, and tolerability of PH94B for the acute treatment of SAD. Specifically, the companies announced that, VistaGen had recently submitted the PALISADE Global study protocol to the FDA under its existing IND application for PH94B and AffaMed had recently received regulatory clearance of its Clinical Trial Application from the National Medical Products Administration in China, clearing the way for initiation of PALISADE Global in the U.S. and China during the second half of 2022. At the time, the companies also anticipated initiating this Phase 3 study in Canada, Mexico, and South Korea. According to the companies, the primary purpose of PALISADE Global, the design of which was based on VistaGen's ongoing PALISADE-1 and PALISADE-2, was to support potential commercialization of PH94B in China and other markets outside of the U.S.

96. The plan for PALISADE Global was the result of VistaGen's strategic licensing and collaboration agreement with EverInsight Therapeutics (now AffaMed), executed June 24, 2020, for the Phase 3 clinical development and commercialization of PH94B in Greater China, South Korea, and Southeast Asia. Under the terms of the agreement, AffaMed was responsible for all costs related to developing, obtaining regulatory approval of and commercializing PH94B in the defined territory. In addition to an upfront, non-refundable $5 million licensing fee, paid to the Company in August 2020, upon successful development and commercialization of PH94B in AffeMed's territory, VistaGen was eligible to receive up to $172 million in additional development and commercial milestone payments, plus royalties on commercial sales in the licensed territory. A joint development committee was established between VistaGen and AffaMed to coordinate and review the development, manufacturing and commercialization plans with respect to PH94B in AffaMed's territory.

97. Notably, AffaMed has yet to initiate any Phase 3 clinical trial of PH94B in any country.

**D. VistaGen Announces PALISADE-1 Failure and Pauses PALISADE-2**

98. One month after VistaGen announced the completion of PALISADE-1, on July 22, 2022, VistaGen was forced to announce that the study had failed to meet its primary efficacy endpoint. It did not, however, provide any details as to not influence the ongoing PALISADE-2, according to VistaGen.

99. As later revealed for the first time on August 10, 2023, the results of PALISADE-1 showed patients treated with PH94B (n=111) had a mean change of 15.6 points on the SUDS score from baseline at visit 3. In comparison, patients randomized to placebo (n=111) showed a mean change of 17.3 points on the SUDS score across visits; a difference of 1.7 points in placebo's favor (p=0.506).

100. The "placebo response," which refers to the degree of clinical improvement reported by patients assigned to the placebo group, is a major factor that can distort the measurement of net treatment effect in a randomized placebo-controlled trial. It has been well-demonstrated through clinical testing that as the placebo response increases the difference between the placebo and active arm decreases, reducing the likelihood that the trial will meet statistical significance of the primary endpoint. Further, evidence has shown that placebo responses have been increasing over time in certain indications (like CNS diseases) without a commensurate increase in response to active treatment. Placebo responses are also known to be especially problematic in studies that rely on subjective patient-reported outcomes.

101. Several factors are known to contribute to the placebo response, including the natural history of the disease, regression to the mean, baseline score inflation, patients and researchers' biases, co-interventions, the Hawthorne effects, and the placebo effect itself. First, the concept of natural history refers to how a disease progresses naturally; that is, without therapeutic intervention. Many conditions (like SAD) can naturally fluctuate between cycles of remission and exacerbation. As a result, patients might naturally experience an upswing during the trial due to a spontaneous change in the course of the disease. Understanding the natural history of the disease being treated is essential for separating genuine drug efficacy from subjective or spontaneous recovery.

102. Second, and strongly related to the first here, many individuals are enrolled in clinical trials while their symptoms are at their worst. Through the course of the trial, the patient's symptoms will gradually return to their usual severity (e.g., regression to the mean), giving the appearance of a placebo response. Third, the placebo response may also be exacerbated due to unreliable ratings as well

as baseline symptom severity inflation if raters are aware of severity criteria for entry to a trial. Next, the Hawthorne effect refers to the phenomenon where participants temporarily modify their behavior or health habits simply because they know they are being observed and receiving attention from researchers. In the context of the placebo response, the Hawthorne effect may influence the patient's responses to subjective or other health-related patient-rated outcome measures.

103. Lastly, the placebo effect is an improvement in outcome due in large part to the expectancies of positive treatment effects that trigger in turn, a chain of neurobiological changes. Common drivers of the placebo effect are anticipation of therapeutic benefit with experimental drug products, and observational and social learning mechanisms. For example, patients can derive their expectancies of positive treatment effects from written or verbal information; social media; discussions with other patients; perceived probability of receiving active treatment and effectiveness of that treatment; as well as expectancies of the provider and research staff, which are transmitted to the patient consciously and unconsciously, verbally and non-verbally.

104. Understanding the participant, trial, subjective and mental disorder-related factors that contribute to the placebo response, it is clear why, as designed, PALISADE-1, a Phase 3 clinical trial of PH94B for the treatment of SAD, failed due to an elevated placebo response. The target demographic for this Phase 3 trial included patients that, if not exposed to their patient-specific SAD-stressors, appeared asymptomatic. And a key component of this disorder is that SAD patients are known to avoid triggering situations. For all SAD patients, symptoms are known to naturally fluctuate depending on the number and severity of anxiety-inducing triggers experienced during a social interaction. Further, repeated exposure to fear-inducing situations is known to desensitize the patient's anxiety response. Yet, the study was designed to assess the efficacy of PH94B, as compared to placebo, during the repeat exposure to one specific performance situation. And the endpoint chosen, a mean change in the SUDS score from baseline at visit 3, was fleeting and highly susceptible to intervening influence caused by the Hawthorne effect, regression to the mean, spontaneous change in the disease, and by the underlying psychological mechanisms driving the placebo effect.

105. Shortly after announcing the negative outcome of PALISADE-1, on August 11, 2022, VistaGen provided a corporate update announcing, in pertinent part, its decision to pause recruitment

and enrollment of patients in PALISADE-2 to allow independent third-party biostatisticians to conduct an interim analysis of available data from subjects randomized in PALISADE-2, up to the date the Company paused the study. In addition, the Company announced its plans to meet with the FDA to "pursue a consensus path forward for further Phase 3 development of PH94B in [SAD]."

106. That same day, when speaking to investors during the Company's conference call to discuss its most recent quarterly financial results, Defendant Singh acknowledged the recent failure of PALISADE-1 as a "setback" but assured the public that VistaGen "remain[ed] focused on getting PH94B back on track" highlighting that, "[i]n previous studies, PH94B has demonstrated potential efficacy as compared to placebo and a favorable safety profile when used acutely as needed before stressors at home, work or elsewhere. For this reason, we've decided to continue late-stage clinical development of PH94B as a potential treatment for [SAD]…" He went on to note that, "[a]s a result of the outcome of PALISADE-1, ***in addition to our interim analysis of PALISADE-2,*** we're currently assessing different study designs for submission to the FDA later this year."

107. Further, Defendant Singh repeated VistaGen's plans to meet with the FDA to "pursue consensus around a clearly defined development plan for further Phase 3 development of PH94B in SAD" expressing, "[t]his development plan will ideally maintain an emphasis on a multiple-use assessment study design, with the LSAS as a primary efficacy endpoint as it was for the three [ADs] previously approved by the FDA for the treatment of SAD, and with SUDS as a secondary end point."

108. Then, when presenting at the Morgan Stanley 20th Annual Global Healthcare Conference, on September 13, 2022, Defendant Singh further distanced VistaGen from the study design chosen for the PALISADE Phase 3 development plan. As he explained during the conference, the alternative trial design presented to the FDA, back in June 2020, was one resembling the Phase 3 pilot study completed in 2014 where "people were given the drug and told to go experience social performance situations in the real world over 2 weeks. And during the course of that study, they were using the drug acutely. That's the important part about PH94B. It's designed to be used acutely." He went on to note that, in addition to meeting its primary endpoint of the mean peak SUDS change from baseline, what they also saw "is that people got better over -- week over week. And what ended up

happening on the Liebowitz scale was we saw people avoiding less frequently the types of social and performance situations that really were real with anxiety for them in the past."

109. According to Defendant Singh, however, "[t]he consensus reached, again, we're in the early days of the [COVID-19] pandemic. We have just seen 92 million scripts of benzodiazepines in a recent report, the world is exceptionally anxious. So what the FDA wanted at that time was the most efficient way possible to assess efficacy of the drug. And their belief, and we went along with it, was that the Phase II study design that was the 4 visits public speaking challenge approach was the best fit at the time. So that's what we went forward with in PALISADE-1 and 2."

110. As a reminder, when the Company was preparing to begin its first pivotal Phase 3 clinical trial of PH94B, in the first half of 2020, the COVID-19 outbreak was declared a worldwide pandemic. The U.S. Secretary of Health and Human Services also declared a public health emergency in response to the outbreak resulting in nationwide shelter-in-place orders, social distancing measures, travel bans and restrictions, and certain business and government closures or reductions in service. Accordingly, based on Defendant Singh's comments, it was these pandemic precautions that led to the selection of a single laboratory-induced public speaking challenge study for the PALISADE Phase 3 development plan, which VistaGen considered inferior to the alternative multi-assessment real-world approach.

111. That same month, September 2022, VistaGen also announced that, based on the independent third-party biostatisticians' review of the unblinded data from the 141 subjects who had completed PALISADE-2 to the study pause, the review team recommended that the Company continue PALISADE-2 as planned, without any changes to the study protocol or enrollment target. Based on the outcome of the interim analysis and the recommendation of the independent biostatisticians, VistaGen claimed it would continue PALISADE-2 as planned to the full enrollment of 208 subjects.

112. The study, however, remained paused because on August 12, 2022, VistaGen chose to submit to the FDA various adjustments and proposed amendments to the PALISADE-2 protocol to address certain "methodological issues" it believed may have contributed to outcome of PALISADE-1, and despite the third party recommendation, it deemed these changes necessary should PALISADE-2 resume to "increase the probability of favorable results in the remaining 1/3 of the trial subjects," as Singh later explained during an investor call held February 7, 2023.

113. Then, in December 2022, two of VistaGen's peer biopharmaceutical companies, Bionomics Ltd. and Vanda Pharmaceuticals Inc., announced that topline results of recently completed Phase 2 studies of their respective drug products (BNC210 and VQW-765) for the acute treatment of *performance-only* SAD using the single assessment public speaking challenge design, with the SUDS as the primary efficacy endpoint, also showed their respective trials did not achieve statistical significance on their primary efficacy endpoint due to an elevated placebo response.

114. The Bionomics trial, initiated in February 2022, completed October 2022, saw 151 participants receive either a 225-mg or 675-mg dose of BNC210 or placebo. The results showed patients treated with 225-mg of BNC210 (n=50) had a mean change of 22.4 points on the SUDS score from baseline at performance phase and patients treated with 675-mg dose of BNC210 (n=51) had a mean change of 24.3 points. In comparison, patients randomized to placebo (n=50) showed a mean change of 29.0 points in the SUDS score.

115. The Vanda trial, initiated in February 2021, completed August 2022, saw 230 participants receive a single dose of VQW-765 or placebo. While Vanda reported that participants who received VQW-765 showed numerically lower SUDS scores from baseline at performance phase when compared to placebo, the change was not deemed statistically significant.

116. Shortly thereafter, on February 7, 2023, VistaGen provided a corporate update announcing, in pertinent part, that through further analysis of PALISADE-1 results, it had identified "several potential explanations" for the study outcome including, "***primarily complexities associated with the single-dose assessment public speaking challenge methodology*** and conducting the study during surges in the COVID-19 pandemic." It went on to add:

> Upon reviewing information and data available this time, the Company believes it is not yet advisable to make a decision about resuming PALISADE-2 before discussing its broader Phase 3 development plan for PH94B with the FDA and before further assessing the potential impact of the proposed adjustments to the PALISADE-2 protocol in light of two recently completed public speaking challenge SAD studies conducted by peers, each of which did not achieve its primary efficacy endpoint.
>
> Vistagen is currently preparing to meet with the FDA to discuss its broader Phase 3 development plan for PH94B, which plan includes the possibility of a multiple-administration, randomized, double-blind, placebo-controlled Phase 3 study of PH94B in adults, using the [LSAS] as the primary efficacy outcome measure to support a potential [NDA]. The LSAS was the primary efficacy endpoint in all registration studies for the

> three currently FDA-approved treatments for SAD. Given that LSAS measures overall improvement in disease severity by measuring the reduction in fear and anxiety over time (rather than from only a single dose assessment), as well as the avoidance of anxiety-provoking social and performance situations in a real-world environment, Vistagen believes the LSAS is appropriate to measure and reflect the true impact of PH94B on patients' lives. The Company expects to announce its plans regarding PALISADE-2 concurrently with other updates to its PH94B Phase 3 development plan.

117. The Liebowitz Social Anxiety Scale (LSAS), introduced by Dr. Liebowitz in 1987, is a psychological assessment tool specifically designed to address the need for a comprehensive measure to adequately reflect the complex nature of SAD by evaluating both the range and severity of SAD symptoms. The LSAS distinguishes itself by assessing not only the fear associated with social interaction and performance situations, but also the avoidance behaviors that often accompany such fears. This dual focus provides a more complete view of SAD, encapsulating both the emotional distress and the consequential behavioral adaptations that characterize the disorder.

118. During the clinician-administered LSAS assessment, respondents are presented with 24 social interactions or performance situations commonly identified as SAD-triggering events, with "giving a prepared oral talk to a group" being just one of the 24 situations identified. The first question asks the respondent to rate their level of fear or anxiety associated with each of these specific social and performance situations on a scale from 0 to 3, with 0 being "none", 1 being "mild", 2 being "moderate", and 3 being "severe". The second question asks them to rate the degree to which they avoid each of these situations on a scale from 0 to 3, with 0 being "never", 1 being "occasionally", 2 being "often", and 3 being "usually". The respondents are instructed that if there is specific situation not ordinarily experienced by them, to imagine "what is you were faced with that situation" and then rate the degree to which they would fear this situation and avoid it. The total LSAS score is calculated by adding the respondent's specific scores for fear/anxiety and avoidance provided for each social interaction and performance situation. The LSAS score is classified into the following severity ranges: 0-29, no significant social anxiety; 30-49, mild SAD; 50-64, moderate SAD; 65-79, marked SAD; 80-94, severe social anxiety; and ≥ 95, very severe SAD.

119. Thus, in comparison, the SUDS is a momentary self-assessment tool used to measure the intensity of distress or anxiety in real-time. While the LSAS is a structured, comprehensive tool

specifically used to diagnose and measure the severity of SAD, combining the measurement of acute anxiety and the avoidance piece of it.

120. During an investor conference call held February 7, 2023, Defendant Singh was asked about how VistaGen decides to proceed with the pivotal Phase 3 development plan for PH94B necessary to support an NDA, whether it be a multi-assessment real-world study using the LSAS endpoint or a single laboratory-induced assessment using the SUDS endpoint, based on the potential outcomes of PALISADE-2 coupled with the negative outcomes of similar peer trials, to which he responded, in pertinent part, "[t]he question is, can you scale [the public speaking challenge methodology] effectively and into the size of a study that's necessary to be a registrational study." He went on to say, "[w]e know the challenges that are associated with the protocol, with the methodology" followed by examples such as "surveillance [or] whether or not you have the right raters that are changed as you move from the different visits," and declared "[t]here's a lot of things that land on that 1 single administration assessment." When referencing the similarly designed Phase 2 peer trials that missed their endpoints, Defendant Singh made a point to note how "it's a whole different ball game when you move into scaling that methodology up to the size and quality necessary to support a registration study. … It may be possible with the changes we proposed to the FDA or it may be something that we say just isn't – isn't worth that risk[.] And isn't necessary[.]"

121. In his same response, Defendant Singh went on to discuss the alternative, being a multi-assessment real-world study using the LSAS endpoint, highlighting how "there are 3 historical comparators that support LSAS as the primary endpoint for all 6 registration studies … for SAD using the LSAS, all of them were positive," supporting his conclusion that, "if the direction forward is a Phase III study with LSAS as the primary[,] [t]he odds set pretty nicely," and declaring "that says a lot as well, right, in terms of downstream, risk assessment, the cash and resources." He concluded by saying, "we'll just have to make a decision about what's the best way to put time, talent and cash towards ultimately what we want. We want an NDA that is approved. We want study designs that fit the way we think the drug best fits, how we think people can be helped by it in the world."

122. The importance of Defendant Singh's specific reference to having "the right raters that are changed as you move from the different visits" when discussing the methodological challenges,

manifested when scaling the chosen design to the size of a study that is necessary to be a registrational study, signals his understanding that SAD is not an all-or-nothing condition, it exists on a spectrum such that the impact may be greater depending on the number and/or form of anxiety-inducing social interactions and the severity of the intrapersonal fear associated with each SAD-trigger experienced. It also indicates that VistaGen was attempting to simulate multiple fear-inducing experiences through this single laboratory-induced public speaking challenge. In the same vein, Defendant Singh's comments signal his understanding of the significant and tangible risk of variability in the chosen design where something as simple as a patient's familiarity with a clinical team member could (and likely did in PALISADE-1) reduce their SUDS scores during the repeat public speaking challenge as the anxiety-inducing event of meeting new people no longer exists.

**E. VistaGen Publicly Commits to a Redefined Phase 3 Development Plan for PH94B and Closes PALISADE-2, As Is, Due to "Methodological Complexities"**

123. On March 30, 2023, VistaGen announced "positive feedback from its recent engagement with the [FDA] regarding the use of the [LSAS] as the primary endpoint for future clinical studies designed to evaluate the efficacy of a treatment for the overall control of symptoms of [SAD]." The Company went on to state that "[w]ith FDA feedback confirming the acceptable use of the LSAS as a primary efficacy endpoint, Vistagen is positioned to finalize key components of its potential [NDA]-enabling development program for fasedienol for treatment of SAD."

124. Like the previous PALISADE program, VistaGen's public commitment to the redefined "FEARLESS" Phase 3 development plan for PH94B in SAD also included a *second* LSAS-based Phase 3 study and an open-label long-term safety study, as well as the potential for a smaller multi-dosing trial. Specifically, the Company's March 30, 2023 announcement provided, in pertinent part, that:

> In addition to the positive FDA feedback regarding the use of the LSAS as the primary endpoint, the FDA also provided guidance on further characterizing the optimal fasedienol dosing strategy. The Company plans to have further protocol discussions with the FDA regarding additional dosing study(s), which the Company plans to conduct in parallel with FEARLESS-1 and potentially prior to commencement of the second LSAS-based Phase 3 study, to provide further foundational information about dosing frequency for purposes of labeling should fasedienol be approved.

125. At this time, VistaGen also announced it had "determined the best course of action is to close the PALISADE-2 study given the expense, time, and methodological complexities involved in resuming PALISADE-2, including consistently administering the protocol for the single-dose, clinic-based public speaking challenge study across numerous sites." Topline results from the 141 subjects who completed PALISADE-2 prior to the study pause, were expected in the second half of 2023.

126. Then, on June 28, 2023, VistaGen announced that analysis of recent positive results from the PALISADE Phase 3 open label study amplified the placebo-controlled Phase 2 studies of PH94B in SAD and had informed the Company's next steps in finalizing the Phase 3 development plan for PH94B. Specifically, the Company reported that exploratory efficacy results from the PALISADE Phase 3 open label study, involving the as-needed administration of 3.2 μg of PH94B, up to four times per day, in a real-world setting, demonstrated clinically meaningful reductions in fear, anxiety and avoidance of anxiety-provoking social and performance situations in daily life, as measured by the LSAS.

127. Based on these results and through further protocol discussions with the FDA, VistaGen confirmed the chosen design for the FEARLESS Phase 3 development plan providing, in pertinent part:

> In contrast to the Company's PALISADE Phase 3 single administration public speaking challenge studies in SAD conducted during the acute stage of the COVID-19 pandemic, the Company's FEARLESS program in SAD will align with the LSAS-based study design supporting the precedent-setting NDA-enabling programs for the three [ADs] currently approved for treatment of SAD. The Company's FEARLESS Phase 3 studies will be designed to assess multiple administrations of fasedienol, on a patient-tailored, as-needed basis in their daily lives, up to six times per day, in a real-world outpatient setting over a multiple-week period, with the clinician-administered LSAS as the primary efficacy endpoint.

128. Later that same day, during an investor conference call, Defendant Singh was asked to explain "why you think the multiple dose assessment real-world study design with the LSAS as the primary endpoint is a better approach than the single dose assessment public speaking challenge with SUDS as the primary" to which he responded, in pertinent part:

> [T]he LSAS, it measures the overall improvement in disease severity by measuring both reduction in fear and anxiety over time about social situations, but also the reduction in avoidance of those anxiety provoking situations.
>
> So you're looking at patient-related dynamics over time over multiple administrations, whereas in the public speaking challenge with the SUDS, that was a single dose in a single anxiety provoking situation in the public speech. ***So we and Dr. Liebowitz and all the***

> ***KOLs that we lean into believe the LSAS is by far the most appropriate endpoint to measure the efficacy potential of Fasedienol*** and really any other potential treatments for SAD ***because it reflects the true impact of the treatment on the patient's daily lives over time in a real-world setting***.
>
> And again, using LSAS is the primary endpoint in our FEARLESS Phase III program is consistent with the design of all the registration trials that supported the FDA's precedent-setting approvals for treatments of SAD. So we met with the FDA in the first quarter because when we met with the FDA in '20, it wasn't possible because of COVID-related restrictions and the world being sheltered in place, it really wasn't possible to do the precedent-based real-world LSAS-driven Phase III study.

129. In a follow-up question, Defendant Singh was asked to elaborate on a prior analogy he made comparing fasedienol to how a rescue inhaler would be used for asthma in a real-world setting, to which he responded, in pertinent part:

> ***[I]t's really important to give patients control. Because sometimes the stressors are predictable, sometimes they're not***. But regardless, what they need is something at hand that they can decide when they need to use it can knock down the symptoms of anxiety that arise in the context of those situations.
>
> And so ***it's a drug candidate that we've long held needs to be used acutely to knock down situations when they arise*** but also over time, similar to cognitive behavioral therapy, where consistent success when exposed to those stressors build the confidence, build the resilience to engage in those situations more frequently and then to do so with less fear and anxiety.
>
> So it's very important, again, to be able to use our drug candidate multiple times in any given day, and some days not have to use it ***because when you are an SAD patient, if you're not exposed to your stressors, you're asymptomatic.*** You don't really want to put drugs in their body, even super safe drugs, when they think -- when they don't think they need it.
>
> ***In the case of Fasedienol, having that drug in your pocket, in your purse, in your backpack***, and being able to have something with onset in about 15 minutes, ***help you through that stressful situation. And*** having that duration of that effect last about an hour, ***to be able to go back to it if the same situation arises or a different situation arises within the same day***.
>
> It's a very important flexible tool, again, all intended to build the confidence of the patient over time, which is exactly what the LSAS captures. And you can't capture that as well at all with the SUDS because that's -- again, that's just in the moment, minute-by-minute assessment of that acute effect. Now, again, use it -- ***using it acutely over time is the way we see this drug will be used if approved in the real-world setting by millions of people who have access to it and in need because of the way their lives are impacted by SAD***.

130. Accordingly, for nearly a year following the announcement of PALISADE-1's failure VistaGen repeatedly expressed concerns with scaling the single assessment public speaking challenge design to the size necessary to serve as a registrational study due to the significantly high risk of clinical variability, especially when measured by the patient-reported SUDS efficacy endpoint, because of the inherent nature of the condition be treated and the unique ways in which it affects each patient depending on the number and severity of stressors present at any given time. In contrast, it presented the now FDA-endorsed patient-tailored, multiple administration real-world study, assessed with the precedent-setting LSAS endpoint, as the study design that best fits the patient population and the intended use of the drug, while still providing data supportive of the desired acute indication. Indeed, the FEARLESS Phase 3 development plan was still designed for the acute administration of PH94B but with the key difference of being done so before a patient-identified triggering event, guaranteeing that each assessment of efficacy of PH94B, measured by the 24-item LSAS score, would be collected when the patient is known to be experiencing SAD-induced fear or anxiety, with the added layer of also measuring the patient's avoidance of those triggers, and therefore, presented a lowering the risk of clinical variability.

**F. VistaGen Announces PALISADE-2 Results While Maintaining FEARLESS Course**

131. On August 7, 2023 (the first day of the Class Period), VistaGen announced top-line results for PALISADE-2, indicating the study "met its primary efficacy endpoint, with fasedienol demonstrating a statistically significant difference in average SUDS score during a public speaking challenge compared to placebo (p=0.015)." Specifically, VistaGen announced PALISADE-2 results showed patients treated with PH94B (n=70) had a mean change of 13.8 points on the SUDS score from baseline (visit 2) at visit 3. In comparison, patients randomized to placebo (n=71) showed a mean change of 8.0 points in the SUDS score across visits; a difference of 5.8 points in PH94B's favor (p=0.015).

132. The Company's August 7, 2023 press release, announcing the results of PALISADE-2, quoted Dr. Liebowitz as saying, in pertinent part, "[f]asedienol demonstrated a rapid and very clinically meaningful reduction in SUDS score, indicating a single administration has the potential to reduce anxiety symptoms during an anxiety-provoking situation[.] … A future Phase 3 study involving multiple administrations of fasedienol over several weeks on a patient-tailored, as-needed basis will build on the body of evidence now demonstrated in PALISADE-2 and multiple Phase 2 studies."

133. This announcement sent Vistagen's stock price soaring. On August 4, 2023, the trading day immediately preceding the Company's news, VistaGen common stock closed at $1.68 per share. On August 7, 2023, VistaGen common stock opened at $21.60 per share, reaching a day high of $24.71, and closed at $13.05 per share, representing an 87.1% increase in a single trading day.

134. That same day, the Maxim Group issued an analyst report upgrading their rating of VistaGen shares to "Buy" from previous rating of "Hold" and established a 12-month price target of $30.00 per share. In doing so, the analyst highlighted how they had lowered the revenue risk adjustment in their model for the Company "to 50%, from 90%, based on the PALISADE-2 result combined with both prior data in the open-label extension study (OLE) and positive interactions with the FDA on the path forward for fasedienol." The report endorsed VistaGen's messaging regarding potential explanations for the outcome of PALASIDE-1 noting, "[t]he PALISADE-2 outcome is supportive of the company's hypothesis that COVID negatively impacted the first trial, and increases our confidence that fasedienol can be successful in the next P3 trial." At the same time, the analyst went on to highlight "several key points to focus on" with a positive PALISADE-2 including, in pertinent part, that it "[s]ets the stage to move from SUDS in the next P3 to the LSAS [ ], which the company has had positive interactions with FDA about[.] … Overall, the path forward for VistaGen is becoming more clear in SAD and the next step is getting the protocol for the next P3 program (FEARLESS)."

135. Likewise, *Bloomberg* issued an article entitled, "*Biotech Firm Pops 677% on Social Anxiety Spray Trial Success*" recounting how "[t]he unexpected success pushed the stock's market value to $104 million, a level it had been trading below for the better part of a year amid a broad market selloff in risky assets and a prior trial setback." The article went on to explain that the "prior late-stage trial of the drug failed to reach its main goal using the same scale measuring patient distress, dubbed SUDS," highlighting that "[a]n additional late-stage study is planned. That will include multiple administrations of the spray over several weeks on what the company said will be 'a patient-tailored, as-needed basis.'"

**G. VistaGen Partially Resurrects the PALISADE Program on PALISADE-2 Results**

136. Then, on August 10, 2023, despite closing PALISADE-2 early due to methodological concerns with resuming to scale and solidifying its plans to de-risk the Phase 3 development plan for PH94B by opting for a multi-assessment real-world study measured by the precedent-setting LSAS as

the primary efficacy endpoint, a more inclusive and better tailored design for evaluating the efficacy of the acute administration of PH94B for the treatment of SAD, as endorsed by the FDA, VistaGen provided a corporate update announcing, in pertinent part, that "[b]ased on the positive top-line results of the Phase 3 PALISADE-2 study, we are currently preparing for our Phase 3 PALISADE-3 trial, with potential to initiate the trial during the first half of calendar 2024."

137. It went on to explain that PALISADE-3 was to be a replicate of PALISADE-1 and PALISADE-2, designed to evaluate the efficacy, safety, and tolerability of the single administration of PH94B to relieve anxiety symptoms in adult patients with SAD during a simulated public speaking challenge in a clinical setting, as measured using the patient-reported SUDS as the primary endpoint.

138. At the same time, VistaGen maintained that preparations for FEARLESS continued providing, in pertinent part:

> To complement our PALISADE Phase 3 Program for fasedienol in SAD, the Company is currently preparing for its Phase 3 FEARLESS trial, with potential to initiate the trial in the second half of calendar 2024 with a study design similar to the registration trials for the three drugs currently approved for the treatment of SAD using the LSAS as the primary efficacy endpoint. … To complement the positive results of PALISDAE-2, we believe the Phase 3 FEARLESS study design also will align with the way SAD patients will use fasedienol in their daily lives, should it be approved, because our planned fasedienol treatment model includes both repeated experiences of acute reduction of anxiety during performance and social events, evidenced by decreased SUDS scores as in PALISADE-2, as well as longer-term overall reduction in severity of SAD evidenced by reductions in LSAS scores, as will be assessed in FEARLESS.

139. VistaGen went on to express that the PALISADE-3 and FEARLESS Phase 3 trials each had the "potential to complement PALISADE-2 as a potential [NDA]-enabling adequate and well-controlled Phase 3 clinical trial of fasedienol for treatment of SAD."

140. Defendant Singh is quoted in the Company's August 10, 2023 press release as saying, "[t]he [PALISADE-2] outcome is a pivotal achievement for fasedienol… We now move forward confidently advancing the Phase 3 program for fasedienol in SAD with planning for initiation of additional Phase 3 studies in 2024." He went on to tout VistaGen's ability to "deliver long-term value for shareholders" based on their "strong understanding of each pherine product candidate's scientific and therapeutic potential."

141. Later that day, the Company held an investor conference call during which Defendant Singh explained away this notable reverse in course on the PALISADE program by blaming the negative outcome of PALISADE-1 entirely on variability introduced by the COVID-19 pandemic.

142. The key difference between PALISADE-1 and PALISADE-2 was the placebo response. The end results in PALISADE-1 showed a mean change in the SUDS score of **15.6** points for fasedienol and **17.3** points for placebo. In comparison, PALISADE-2 showed a mean change in the SUDS score of **13.8** points for fasedienol and **8** points for placebo. When comparing the two studies, Defendant Singh pointed to "systemic variability introduced by the pandemic" as the reason for the different end results providing, in pertinent part:

> As many of you know, it's not uncommon in mental health studies to have both positive and negative studies in separate studies of similar design, particularly true of the subject scales that -- given the subject scales that have to be used in such studies and the potential for high and unexpected variability and placebo effects as we saw in PALISADE-1. This becomes even more likely when you add the task of consistently administering a complex public speaking challenge across numerous sites during an unprecedented pandemic, public health crisis and mental health epidemic.
>
> …A large portion of PALISADE-1 was fielded in 2021 through the height of the second wave of the pandemic. While the vast majority of PALISADE-2 was fielded in 2022 as the acute phase of the pandemic has subsided. This dynamic likely impacted PALISADE-2 disproportionately in terms of patient mindset, study protocol execution and study oversight.
>
> Subjects randomized in 2021 likely were given -- were different given the overall level of anxiety and uncertainty and general unrest, restrictions, mask wearing and the like during the acute phase of the pandemic. The high placebo rate in PALISADE-1 also may have attributed to logistical issues caused by COVID-19 in '21 such as high site and CRO employee turnover, absenteeism, changes in raters, time lapses between visit 2 and visit 3 due to unpredictable and intermittent clinical site closures and patients postponing travel, delayed monitoring visits and the like.
>
> As these dynamics became apparent as the acute phase of the pandemic subsided in early 2022, we also initiated retraining and renewed monitoring of sites as is customary with staggered start replicate studies. And that, too, may have had a much larger impact on PALISADE-2 as it was completed before the majority of patients went through that study.

143. Based on "the aforementioned reasons," Defendant Singh went on to declare "[w]e view the results of PALISADE-1 as an outlier" and called the differing results of PALISADE-2, coupled with this pandemic explanation, "especially meaningful after the recent multiple failures in SAD studies by peers that may have been subject to similar systemic variability from the pandemic."

144. Defendants' comments, however, put the results of PALISADE-2 in a disproportionately positive light, and therefore, created the materially false and misleading impression that VistaGen's plan for PALISADE-3 carried a lower risk of study failure. First, it is important to remember that, as a result of the early closure, PALISADE-2 results were obtained based on an effect size roughly one-third that originally planned for this pivotal Phase 3 trial (target n=208; actual n=141), raising the question of whether it would still be considered sufficiently powered to serve as a registrational study on its own. Next, similar to PALISADE-1 (n=222) (p=0.506), the PALISADE-2 statistical change as compared to placebo (p=0.015) was materially lower than that seen in the Phase 2 trial guiding this study design (n=91) (p=0.002), indicating an incremental increase in placebo response and corresponding decline in the treatment effect as the study scaled in size, contradicting Defendants' claims that "retraining and renewed monitoring of sites" had an outsized effect on the differing results.

145. Additionally, as previously acknowledged by Defendants when explaining all the reasons why FEARLESS was the better design for this drug and patient population, scaling the single assessment public speaking challenge design to the size necessary to serve as a registrational study resulted in the significant and tangible risk of inadvertent and/or unavoidable elimination of condition triggers between the baseline visit 2 and visit 3, which had the potential to mimic or mask the treatment's effect through an elevated placebo response, especially when measured by the patient-reported SUDS efficacy endpoint, because of the inherent nature of the condition and the unique ways in which it affects each patient depending on the number and severity of SAD-stressors present at any given time. Target enrollment for PALISADE-3 was to include nearly 100 more patients than those that completed PALISADE-2, closer in size to PALISADE-1.

146. Further, the timing and size of VistaGen's peer trials undercuts Defendants' pandemic explanation for all prior failures of similar study design. The Bionomics trial of BNC210, one of the two peer therapeutics for the treatment of SAD, that did not achieve statistical significance on its primary efficacy endpoint of a mean change in the SUDS score using the single assessment public speaking challenge design, was comparable in study effect size as PALISADE-2 with 151 patients enrolled and initiated in February 2022, completed October 2022 – e.g., *after* the acute phase of the pandemic, according to Defendants. The second failed peer trial, Vanda's trial of VQW-765, reported

to miss the same primary efficacy endpoint using the same design, was comparable in size to PALISADE-1 with 230 patients enrolled and was initiated in February 2021 but did not reach study completion until August 2022 – e.g., the same month VistaGen paused enrollment for PALISADE-2.

147. Accordingly, when considering the totality of the data available at that time, Defendants knew, or at minimum, recklessly disregarded the fact that PALISADE-2 that was the outlier, not PALISADE-1, and when completed to scale, PALISADE-3 would likely suffer from the same fatal flaw of a nominal difference between the treatment group and placebo given the nature of the condition, the target patient population, and highly problematic subjective patient-reported SUDS outcome measure.

148. During the same investor call, when asked to provide "insight on the rationale behind choosing to pursue both SUDS and LSAS as primary measures in the PAL-3 and FEARLESS studies? Was this decision influenced by any guidance from the FDA?", Defendant Singh attempted to draw a distinction between how the two approaches supported an NDA responding, in pertinent part:

> ***No. no***. … Look, we long held the way that we think fasedienol can help people. It's 2 distinct ways. It can certainly help people, as we've shown in PALISADE-2, in an acute setting. And as they take it out of their pocket or their purse or their backpack and they use it on demand in a patient-tailored way, has the ability to knock down very rapidly those symptoms. That's what PALISADE-2 showed.
>
> We also have placebo-controlled Phase II data and some exploratory data from the open label. Lots of subjects that also when it's used acutely but used over time, it increases the confidence of a person and increases their resilience, and it reduces their tendency to avoid situations that could benefit their lives. It reduces the opportunity costs in their life. And that avoidance -- a reduction in avoidance of engaging in social and performance situations is important. The Liebowitz scale captures both of those.
>
> So we're at a perfect spot right now because we've got 1 successful study in Phase III, and you only need 2 adequate and well-controlled studies to get an approval of a drug. And so it could either be from a PALISADE-3 or it could be from a FEARLESS. Either way, what we're trying to do is look to the most efficient path to get this drug to patients as soon as possible. And it's 1 of those 2 tracks. It could be both, but you only need one other besides the one we've got. At least that's our opinion at this point.
>
> So doing the LSAS-based study, again, it's consistent with the only 3 drugs ever approved for treatment of social anxiety disorder. That was the primary efficacy end point. We needed to make sure, and we did find this out in the first quarter that the FDA still believed that to be a valid and reliable end point and they do. So that provides optionality there.
>
> The other side is, well, we already know what they think about the SUDS end point and the PALISADE program. Importantly, too, we have a keen interest given that social anxiety disorders, normally the onset is typically in adolescence between, say, ages 8 and

> 17. There's a huge number, as we know, of minors who are affected with mental health disorders, especially social anxiety disorder. The Liebowitz Scale, there's an LSAS-CA, which is for children and adolescents, so much easier down the road when we want to extend our treatment opportunity to pediatrics to run a Liebowitz scale-based study using a modified version of that scale similar to the way that the adult study was run.
>
> Difficult to envision a 10-year-old giving a public speech to a group of strangers, just much easier to execute down the road in a pediatric setting as well. So it's really a nice combined set, either 1 of the 2. Ideally, we see both. And then you have a very robust commercial opportunity that extends into the pediatric arena.

149. Notably, when later asked if the label for PH94B would be different depending on whether it was PALISADE-3 or FEARLESS, or both, that succeeded, Defendant Singh said no.

150. The market accepted this pandemic explanation and the resulting hybrid approach to the Phase 3 development plan for PH94B as a comprehensive way to demonstrate the product's ability to treat SAD both acutely and in a real-world setting, based on Defendants' presentation of the data collected to date. For example, on August 11, 2023, the Maxim Group issued an analyst report following VistaGen's announcement to conduct PALISADE-3 in addition to FEARLESS, on the updated schedule of initiation for both in 2024, maintaining its "Buy" rating and 12-month price target for VistaGen highlighting, in pertinent part, that "[b]ased on the totality of the data, including PALISADE-2 [ ] which was successful on the SUDS [ ] endpoint and the open-label extension, which was successful on the LSAS [ ], VistaGen will move forward with two new P3s; one targeting acute SAD (PALISADE-3) using SUDS as the primary, and one targeting chronic SAD (FEARLESS) using LSAS as the primary."

**H. VistaGen Cashes in on PALISADE-2 Results and Redefined Development Plan**

151. Defendants were motivated to engage in a fraudulent course of conduct so that they could sell VistaGen securities at artificially inflated prices during the Class Period. As detailed below, VistaGen capitalized on insider knowledge to engage in multiple stock sales when VistaGen's shares were trading at artificially inflated prices. These equity raises were pursued to generate the working capital required to stay ahead of the Company's formidable cash burn, fund its clinical development, and raise the money needed to pay Defendants Singh and Prince exorbitant annual salaries and bonuses (which between 2023 and 2025 amounted to total compensation of $4,025,599 and $1,626,687, respectively).

152. On March 15, 2021, VistaGen filed a Registration Statement on Form S-3 with the SEC (File No. 333-254299) to register securities with an aggregate maximum offering price of $250 million, deemed effective March 26, 2021 (the "March 2021 Registration Statement").

153. On May 14, 2021, VistaGen filed a prospectus supplement (the "Initial Prospectus Supplement") amending and supplementing the March 2021 Registration Statement based on the Company's Open Market Sale Agreement (the "Sales Agreement") with Jefferies LLC ("Jefferies") with respect to an at-the-market offering program ("ATM"). In accordance with the terms of the Sales Agreement, the Company could offer and sell, from time to time, shares of VistaGen common stock having an aggregate offering price of up to $75 million through Jefferies, as the sales agent. Such shares to be offered, issued and sold under the Sales Agreement were included in the $250 million of securities that may be offered, issued and sold by the Company under the March 2021 Registration Statement.

154. In September 2021 and on October 1, 2021, VistaGen sold an aggregate of 50,593 shares of common stock (as adjusted to reflect VistaGen's 1-for-30 reverse split, effective June 6, 2023) and received gross cash proceeds of approximately $4.45 million under the ATM.

155. From October 2, 2021 through June 11, 2023, VistaGen did not sell any additional shares of common stock under the ATM. Between June 12 and June 28, 2023, VistaGen sold an aggregate of 561,418 shares of common stock at a weighted average price of $2.05 per share and received approximately $1.12 million in net cash proceeds under the ATM.

156. On June 30, 2023, VistaGen filed a prospectus supplement amending and supplementing the information the March 2021 Registration Statement, as supplemented by the Initial Prospectus Supplement. In pertinent part, this prospectus supplement noted that, as of June 28, 2023, the Sales Agreement became subject to the offering limits set forth in General Instruction I.B.6 of Form S-3.

157. Pursuant to General Instruction I.B.6 of Form S-3, in no event could VistaGen sell securities under the March 2021 Registration Statement in a public offering with a value exceeding more than one-third of the aggregate market value of VistaGen common stock held by non-affiliates in any twelve (12)-month period, so long as the aggregate market value of the Company's outstanding common stock held by non-affiliates remained below $75.0 million.

158. The aggregate market value of VistaGen common stock held by non-affiliates pursuant to General Instruction I.B.6 of Form S-3 was approximately $32.8 million, which was calculated based on 7,816,288 shares of the Company's outstanding common stock held by non-affiliates on June 28, 2023 at a price of $4.20 per share, the closing price of VistaGen common stock on June 1, 2023, as adjusted to give effect to the 1-for-30 reverse split.

159. Consequently, because of these limitations, VistaGen was then limited to offering and selling, from time to time, shares of common stock having an aggregate offering price of up to $10.5 million under the ATM. In the event, however, that the Company's public float was to increase above $75 million, it would no longer be subject to the limits in General Instruction I.B.6 of Form S-3.

160. As of June 30, 2023, VistaGen had cash and cash equivalents of just $9.6 million.

161. After June 30 through August 7, 2023, VistaGen sold an aggregate of 761,306 shares of common stock at a weighted average price of $13.79 per share and received gross cash proceeds of approximately $10.5 million under the ATM.

162. Notably, between June 30 and August 4, 2023, VistaGen's stock never traded higher than $2.18 per share, with the average daily close price of $1.81 per share. On August 7, 2023, the day VistaGen announced the PALISADE-2 results, during pre-market hours, VistaGen common stock opened at $21.60 per share and closed at $13.05 per share.

163. Subsequently, on August 8, 2023, VistaGen filed a prospectus supplement amending and supplementing the March 2021 Registration Statement, as previously amended and supplemented on May 14, 2021, and on June 30, 2023, indicating that as of this filing, it was no longer subject to General Instruction I.B.6. of Form S-3. As a result, the Company was once again allowed to offer and sell shares of common stock having an aggregate offering price of up to $58.8 million (the remaining aggregate proceeds available under the Sales Agreement at the time).

164. On August 7, 2023, VistaGen sold approximately 1.3 million shares of stock contemporaneously with its press release announcing "positive" top-line results from the PALISADE-2 trial. These sales amounted to aggregate gross proceeds of approximately $16.1 million. Importantly, the August 7 press release caused VistaGen's market capitalization to swell to such a degree that they the Company was no longer subject to previous shelf registration restrictions applicable to smaller

companies, namely the limitations set out in General Instruction I.B.6. in SEC Form S-3 which limit the amount of capital that smaller public companies can raise. VistaGen immediately took advantage of this by filing a new prospectus supplement on August 8, 2023 increasing the amount of shares it could sell in the open market by another $58 million.

165. Between August 8 and August 10, 2023, VistaGen sold an additional 725,987 shares of common stock at a weighted average price of $8.81 per share and received approximately $6.39 million in gross cash proceeds under the ATM.

166. Then, from August 11 through September 14, 2023, VistaGen sold an aggregate of 2,649,784 shares common stock at a weighted average price of $7.27 per share and received approximately $19.27 million in gross cash proceeds.

167. In total, VistaGen received net cash proceeds of $35.1 million under the ATM during the three months ended September 30, 2023, when the stock price was artificially inflated by Defendants' fraud concerning the Company's pivotal Phase 3 development plan for PH94B. As of September 30, 2023, VistaGen had cash and cash equivalents of approximately $37.6 million.

168. Then, on October 2, 2023, VistaGen completed an underwritten public offering (the "October 2023 Offering"), whereby the Company offered and sold, for gross proceeds of approximately $100 million, a total of 15,010,810 shares of common stock, pre-funded warrants to purchase up to 3,577,240 shares of common stock (the "Pre-Funded Warrants"), warrants to purchase up to 9,294,022 shares of common stock (or pre-funded warrants to purchase up to 9,294,022 shares of common stock in lieu thereof) (the "T1 Warrants") and warrants to purchase 11,265,086 shares of common stock (or pre-funded warrants to purchase up to 11,265,086 shares of common stock in lieu thereof) (the "T2 Warrants"). The combined offering price for each share of common stock, accompanying T1 Warrant and accompanying T2 Warrant was $5.38. The combined offering price per Pre-Funded Warrant, accompanying T1 Warrant and accompanying T2 Warrant was $5.379. The securities sold in the October 2023 Offering were issued pursuant to the March 2021 Registration Statement and a related prospectus supplement filed with the SEC on October 3, 2023. The October 2023 Offering officially closed on October 4, 2023, yielding approximately $93.5 million in net proceeds for the Company.

169. When announcing the closing of the October 2023 Offering, VistaGen claimed it intended to use the net proceeds, together with its existing cash and cash equivalents, for research, development, manufacturing and regulatory expenses associated with development of its product candidates, including, primarily, its Phase 3 development program for fasedienol, and for other working capital and general corporate purposes. It went on to declare that if the Phase 3 program for fasedienol proved successful, the proceeds from the October 2023 Offering, together with its existing cash and cash equivalents, generated primarily through its ATM offerings to date, would be sufficient to fund its operations through its potential submission of an NDA for fasedienol for the acute treatment of SAD.

170. In total, at the start of the Class Period, VistaGen raised a total of $128.6 million in net cash proceeds through strategically timed ATM offerings and the October 2023 Offering. As of December 31, 2023, the Company had cash and cash equivalents of approximately $126.6 million.

### I. VistaGen Abandons FEARLESS to Double Down on Cheaper PALISADE-4 Trial

171. Following the Company's August 2023 announcement of PALISADE-2 results leading to its declared hybrid approach to the Phase 3 development of PH94B, the market believed VistaGen was diligently working to advance both PALISADE-3 and FEARLESS to study initiation in 2024.

172. For example, on September 12, 2023, the Maxim Group issued a report entitled, "*As We Await Next P3 for Fasedienol in SAD, The Pherin Pipeline Continues to Progress (P2a Data for PH80 in PMDD)*" in which the analyst takes the opportunity to recount VistaGen's plans for PH94B when discussing positive phase 2 results for a different product candidate noting, in pertinent part, "[r]ecall in August, the second P3 study, PALISADE-2 was successful on the primary endpoint of SUDS [ ]. Combined with the open label extension P3 data and prior data as well as interactions with the FDA, management plans to move forward with two new P3s; … PALISADE-3 … and … FEARLESS …; updates are expected before year-end."

173. Then, on October 2, 2023, after securing much needed capital to continue its operations, VistaGen filed a Current Report on Form 8-K with the SEC providing "details regarding the Company's development plans for fasedienol," specifically that "utilizing a public speaking challenge clinical trial design similar to PALISADE-2 provides the most efficient path forward to advance the clinical development of fasedienol as a potential acute treatment of anxiety for adults with SAD." It went on to

reveal that instead of moving forward with the hybrid Phase 3 development plan for PH94B, focused on PALISADE-3 and FEARLESS, "the Company plans to launch two similar Phase 3 clinical trials in 2024, PALISADE-3 in the first half of 2024 and PALISADE-4 in the second half of 2024." And declared that "[i]f successful, the Company believes either PALISADE-3 or PALISADE-4, together with PALISADE-2, may establish substantial evidence of effectiveness of fasedienol in support potential submission of a potential fasedienol [NDA] for the acute treatment of anxiety in adults with SAD with the [FDA] in the first half of 2026."

174. With regards to the Company's previously discussed and purportedly underway preparations for FEARLESS after positive FDA feedback on the proposed study design using the LSAS as a primary endpoint in a real-world study, the Current Report provided, in pertinent part:

> As a potential future expansion of the Company's PALISADE Phase 3 program for fasedienol in SAD, the Company ***may*** conduct additional clinical trials of fasedienol in adult and/or pediatric populations in a real-world setting over a multiple week period, with the [LSAS] for adult subjects or the LSAS-CA, which is the version of the LSAS the Company believes is suitable for use with subjects who are children or adolescents, as the primary efficacy endpoint. ***If*** conducted, these clinical trials will be part of the Company's potential FEARLESS program for fasedienol … Initiation of all planned clinical trials of fasedienol remains subject to FDA feedback of the Company's proposed study designs.

175. The information provided in the October 2 Current Report, filed with the SEC during pre-market hours, reflected the information provided in the Company's prospectus supplement filed with the SEC on October 3, 2023, during after-market hours, amending and supplementing the March 2021 Registration Statement for the registration of shares offered and sold in the October 2023 Offering.

176. As the market digested the news of prioritizing a fourth PALISADE Phase 3 trial, the Company's stock price dropped from $5.24 per share at close on September 29, 2023 to $4.20 per share on October 2, 2023, before continuing its descent to $3.87 per share at close on October 3, and to $3.43 per share on October 4, 2023, representing a 34.5% decline over three days, on heavy trading volume.

177. VistaGen's stock price, however, continued to trade at artificially high prices as a result of Defendants' materially false and misleading statements regarding the Phase 3 development plan for PH94B and the risks associated therewith, particularly the maintained potential for the plan to include an FDA-endorsed FEARLESS study design using the precedent-setting LSAS as a primary efficacy endpoint in a patient-tailored, as-needed multi-assessment real-world Phase 3 trial.

178. For example, on October 17, 2023, the Maxim Group issued an analyst report lowering its 12-month price target for VistaGen to $12.00 per share, from $30.00 per share, "to factor in dilution from the equity financing," while maintaining its "Buy" rating concluding, "we see VTGN shares as well-positioned to bounce back and see an attractive entry point for investors." With regards to the Phase 3 development plan for PH94B, the report highlighted that VistaGen was "preparing to advance lead asset fasedinol (PH94B) into the P3 PALISADE-3 study in C1H24, following a successful P3 PAL-2 study for which results were announced earlier this year (August)," while also noting "[t]he next step involves … FEARLESS." Referring to the Company's PALISADE and FEARLESS Phase 3 trials, the report went on to note, "[t]hese studies encompass both short-term anxiety reduction during specific events … and long-term reduction in SAD severity …, thereby mirroring how fasedienol will be used by SAD patients, if approved. Together, these results will offer a comprehensive assessment of fasedienol's effectiveness in treating SAD in both acute and everyday situations."

179. By November 9, 2023, the writing on the wall was clear – FEARLESS was no more. That day, VistaGen issued a press release providing a corporate update and reporting its financial results for the quarterly period ended September 30, 2023, filed with the SEC as Exhibit 99.1 attached to the Company's Current Report on Form 8-K. In pertinent part, while the Company repeated its plans to advance the PALISADE Phase 3 program, it made no mention of the FEARLESS Phase 3 program or signal any continued efforts to prepare a study using the LSAS as a primary efficacy endpoint in a real-world study. Indeed, VistaGen's November 9, 2023 press release indicated only that "[t]he Company is preparing for the following milestones for fasedienol in SAD: Initiate PALISADE-3 Phase 3 study in the first half of 2024; Initiate PALISADE-4 Phase 3 study in the second half of 2024; and Initiate fasedienol Phase 2B repeat dose study in the second half of 2024."

180. During an investor call held that evening, Defendant Singh's comments confirmed that VistaGen was no longer looking to expand the Phase 3 development plan for PH94B in SAD to include a design using the LSAS as a primary efficacy endpoint in a real-world study stating, in pertinent part,

> Since our last conference call in August, we've continued to build on the momentum created by our successful PALISADE-2 Phase 3 study of fasedienol for the treatment of anxiety in adults with [SAD]. During the past few months, we've strengthened our balance sheet considerably, securing $137.7 million in gross proceeds from equity financings and

> an exclusive negotiation agreement with Fuji Pharma regarding a potential license to develop and commercialize our PH8 in Japan.
>
> We expect this cash infusion will extend our corporate runway through several important clinical and corporate milestones as we advance our pipeline, including our primary focus on a potential [ ] NDA, for fasedienol and SAD. Given that fasedienol's rapid onset mechanism of action is differentiated from all FDA-approved anxiety drugs, our primary target initial indication for fasedienol remains the acute treatment of anxiety in adults with SAD. And as noted, there is no FDA-approved drug therapy for the acute treatment of SAD. For that acute indication, we've previously aligned with the FDA that a simulated public speaking challenge in a clinical setting is an appropriate study design and that the [SUDS] is an appropriate primary efficacy endpoint to assess the efficacy of fasedienol because it provides a measure of anxiety on a minute-by-minute basis immediately related to the specific stressor.
>
> ***We believe utilizing a simulated anxiety-provoking public speaking challenge study design provides the most appropriate and efficient path for fasedienol to potentially become the first FDA-approved acute treatment of anxiety for adults with S[A]D***.

181. On this news, VistaGen's stock price fell precipitously from $3.08 per share at close on November 8, 2023 to $2.89 per share at close on November 9, before falling further to $2.57 per share at close on November 10, 2023, representing a 16.6% decline over two days, on high trading volume.

182. VistaGen's stock price, however, continued to trade at artificially high prices as a result of Defendants' materially false and misleading statements concerning the Phase 3 development plan for PH94B, particularly the Company's ability to mitigate clinical variability in the PALISADE program.

**J. Defendants Mislead Investors as to the Material Risks of the PALISADE Program**

183. By moving forward with the PALISADE Phase 3 program only, VistaGen suffered from significant clinical development risk due to the interactions of multiple complex factors that are extremely difficult, if not impossible, to control. Given the inherent nature of the condition to be treated, the unpredictability of the target patient population, and the highly susceptible patient-rated SUDS efficacy endpoint, PALISADE-3 suffered from substantial risk of an elevated placebo response due to inadvertent or unavoidable spontaneous changes in condition between baseline and visit 3 depending on, *inter alia*, how severe the simulated social interaction is for each study participant to varying degrees of desensitization to repeat public speaking challenges, each only magnified by any variance in protocol execution across numerous study sites necessary to achieve target enrollment for a registrational study.

184. Throughout the remainder of the Class Period, Defendants materially misled investors as to the fundamental issues and associated risks underlying the study design chosen for the PALISADE Phase 3 development plan for PH94B in SAD, and misrepresented the likelihood that touted program enhancements would be sufficient to reduce the placebo response and/or increase the treatment effect in PALISADE-3, and eventually PALISADE-4, when completed at scale.

185. For example, on February 13, 2024, during an investor conference call, Defendants were asked whether, based on previously discussed "improvements" VistaGen was employing in the PALISADE program, it "could [ ] be fair to assume that the SUDS separation in those studies could be even greater than what [they] saw in PALISADE-2 because as you're mitigating for placebo effect," to which Defendant Singh responded by stating "[c]ertainly, [ ] it's a possibility," explaining that "we've done quite a few things to further derisk the Phase III program" pointing to "things done to improve surveillance, improve and further derisk execution of the program," including "[h]aving the ability to have in-person investigator meetings, have the ability to do things that ensure rigorous adherence to the protocol … across sites. All of those things combined have the potential, of course, to improve even on what we've seen in the past in Phase II and in PALISADE-2."

186. Defendant Prince followed Defendant Singh by adding, in pertinent part, "it's everything that you talked about, but it's also … [w]e're putting feet on the ground in terms of our own monitors going to sites in addition to CRO monitors. We have some additional exclusion criteria to make sure that subjects that are coming into the study have the best chance to have positive results [referring to the olfactory smell test at the screening and restrictions on use of nasal swabs upfront of the event]. And even things such as eligibility review, making sure that subjects are appropriate subjects before they're going into the visit 2 and visit 3 public speaking challenges."

187. On April 1, 2024, VistaGen issued a press release announcing enrollment of the first patient in PALISADE-3. The study was planned to randomize approximately 236 adults with topline results expected by mid-calendar year 2025. At this time, the Company repeated its plans to initiate PALISADE-4 during the second half of 2024.

188. During the Company's investor conference call, held June 11, 2024, Defendant Singh addressed the recent launch of PALISADE-3 as well as the Company's preparations for its upcoming PALISADE-4 trial claiming, in pertinent part:

> While the public speaking challenge design of PALISADE-2 and the use of the [ ] SUDS, is the primary efficacy end point in the studies and are unchanged, we've built some notable enhancements into PALISADE-3 and PALISADE-4 and made some operational changes we believe will help optimize quality enrollment, enhanced surveillance and control potential variability as well as drive rigorous protocol adherence through an execution of PALISADE-3 and PALISADE-4, all against the backdrop of what is now a far more favorable and stable clinical research environment than at any time during the pandemic.

189. During the same investor call, when responding to questions about these "notable enhancements," Defendant Singh highlighted, in pertinent part, that "the enhancements to PALISADE-3 and PALISADE-4 apply primarily to ensuring that we've got optimal subjects in the study, real extensive, precise and universally applied screening, inclusion/exclusion criteria and that the public speaking challenge protocol is administered properly and consistently with limited variability."

190. In addition to the inherent inconsistencies in patient characteristics, only magnifying the known risk that even minor deviations in protocol execution or treatment environments that occur across study sites would skew the statistical outcomes of PALISADE-3, VisaGen had also long struggled with enrollment of the optimal patient population, a problem that went unresolved in PALISADE-3. Again, a key component of this disorder is that SAD patients are known to avoid triggering situations.

191. According to CW1, former Director of Media and Communications Strategy for VistaGen from August 2021 to July 2024, recruitment for the PALISADE program had long been an issue for the Company, year after year. CW1 explained that was one of the Company's biggest riddles with the PALISADE program – getting patients with SAD to be willing to sign up for a trial where the test requires them to go to a clinic to participate in a simulated public speaking challenge. As you can imagine that demographic is not super keen on doing this, CW1 said.

192. CW1 specifically recalled that, during one of their weekly meetings with Defendant Singh, then-Senior Director of Corporate Communications, Caren Scannell, and Senior Vice President of Investor Relations, Mark McPartland, occurring during the last week of March 2024 to discuss the

Company's upcoming announcement of the initiation of PALISADE-3, they discussed the main issues plaguing PALISADE-1 leading to the unfavorable results, including that the quality of enrollment was down due to recruitment issues.

193. According to CW2, a former contract senior medical writer, employed by VistaGen from January 2024 to June 2024, upper Company management involved in the conduct of the trial and who had a say in its design, anticipated that VistaGen was going to have enrollment trouble even before PALISADE-3 began. CW2 recalled speaking with Senior Vice President of Development Operations, Jo Cato, following a principal investigator meeting held by VistaGen officials in preparation for the launch of PALISADE-3. When CW2 asked Mr. Cato how the meeting went, according to CW2, Mr. Cato responded by saying the Company was going to need a lot of study sites. Mr. Cato went on to explain that to get to the power of the study planned for, they were going to have to enroll at more sites, go to more principal investigators across the country, CW2 said.

194. As the Class Period progressed, like a self-fulfilling prophecy, even the Company's unmatched efforts to mitigate clinical variability in PALISADE-3 were derailed by lagging enrollment requiring the engagement of numerous additional study sites further exacerbating the underlying issues with the trial design. According to CW2, it was discussed widely amongst Company insiders that VistaGen was having trouble with enrollment for PALISADE-3. Despite enrollment being open for two or three months, CW2 recalled the Company had only enrolled two or three patients per study site.

195. CW2 explained that, during their tenure at VistaGen, CW2 regularly interacted with their supervisor, Jo Cato, and Vice President of Medical Strategy, Ross Baker. During an informal meeting with one or both individuals, CW2 recalled suggesting VistaGen might resolve its recruitment issue if it used different anxiety-producing stressors but said their suggestion fell on deaf ears.

196. CW1 also recalled this enrollment issue being a big topic of conversation when it came to PALISADE-3, stating the Company was having trouble getting patients to sign up. According to CW1, this enrollment problem led to the Company having to increase the number of study sites to get the enrollment number up to the planned target for completion.

197. Throughout the remainder of the Class Period, Defendants concealed the recruitment and enrollment issues plaguing PALISADE-3 leading to study site expansion to meet enrollment targets and

ultimately increasing the risk of variability, while continuing to push their misleading message of a derisked Phase 3 program due to touted "notable enhancements" including increased surveillance across all study sites with VistaGen's own boots on the ground.

198. For example, during an investor conference call, held August 13, 2024, when Defendants were explicitly asked about the ongoing enrollment of PALISADE-3 whether they were "seeing higher screen failure rates compared to PALISADE-1 and 2?" and if there was "anything else that you might be seeing in real time that gives you that extra boost of confidence you are doing the right thing, enrolling the right patients and executing the study even more rigorously than last time?" Defendant Prince responded by saying: "at this point, what we've seen in terms of screen failure rates in terms of those that have a high enough score in the first public speaking challenge in terms of an anxiety score to move on to the second public speaking challenge, we've been pleasantly surprised that those rates have come in consistent with our projections. So we're seeing, again, progress of the study that's in line with expectations towards the targets that we've established."

199. During the same call, Defendant Singh explained that the plan was to "have about 15, 16 sites per study, and we're not anticipating any overlap in the site from the 2 studies." For comparison, PALISADE-1 was conducted across 21 study sites, and PALISADE-2 involved 15 study sites at the time of its August 2022 pause before its formal closure in March 2023, without additional enrollment, due to "methodological complexities involved in resuming, including consistently administering the protocol for the single-dose, clinic-based public speaking challenge study across numerous sites."

200. As of June 10, 2024, VistaGen employed 39 full-time employees, 25 of which worked in research and development and laboratory support services. At that time, the Company had 10 actively recruiting study sites for PALISADE-3.

201. VistaGen announced the initiation of PALISADE-4 on September 24, 2024. Like PALISASE-3, this Phase 3 U.S. multi-center trial was planned to randomize approximately 236 adults with top-line results expected before the end of 2025.

202. By February 2025, VistaGen had 19 study sites for PALISADE-3 and 12 study sites for PALISADE-4, with just two overlapping sites for these actively recruiting Phase 3 studies.

203. As of May 31, 2025, VistaGen employed 56 full-time employees, 40 of which worked in research and development and laboratory support services.

204. By June 17, 2025, VistaGen had 24 study sites for PALISADE-3 and 18 study sites for PALISADE-4, with three overlapping sites. That same day, Defendants announced that top-line results for PALISADE-4 were now expected to in the first half of 2026 but maintained that "[t]he enthusiasm of patients and physicians participating in the PALISADE Program continues to be very strong and we remain committed to a rigorous operational execution."

205. When VistaGen announced the completion of PALIADE-3 on November 3, 2025, the total number of study sites used for this Phase 3 trial was 24 and the number of study sites for PALISADE-4 had risen to 25, with five overlapping sites between the studies.

206. As of December 31, 2025, VistaGen had 59 full-time employees.

**K. VistaGen Raises Much Needed Capital Just Before the Full Fraud is Revealed**

207. As seen at the start of the Class Period, VistaGen cashes in on insider knowledge through strategically timed ATM offerings just before the full fraud is revealed to the public to generate the working capital required to stay ahead of the Company's formidable cash burn and continue operations.

208. VistaGen filed a Registration Statement on Form S-3 with the SEC (File No. 333-277041) on February 13, 2024, effective February 29, 2024 (the "February 2024 Registration Statement"), to register securities with an aggregate maximum offering price of $350 million, including $100 million of common stock that may be offered, issued and sold by VistaGen pursuant to the Sales Agreement with Jefferies as a follow-up ATM.

209. VistaGen did not, however, sell any shares under the ATM or subsequent follow-up ATM between October 1, 2023 and September 30, 2024. During the three months ended December 31, 2024, VistaGen sold 428,322 shares of common stock under the follow-up ATM, for net cash proceeds of $1.1 million. From January 1, 2025 through February 13, 2025, the Company sold 545,391 shares under the follow-up ATM for net cash proceeds of $1.6 million. And from February 13 through March 31, 2025, VistaGen sold 134,874 shares under the follow-up ATM, for net cash proceeds of $0.3 million. In total, VistaGen received net cash proceeds of $3.0 million during the six months ended March 31, 2025, under the follow-up ATM.

210. On June 17, 2025, VistaGen declared uncertainty about whether the Company's combined cash, cash equivalents, and marketable securities would be sufficient to fund its operations beyond twelve months from date and therefore concluded that substantial doubt existed about its ability to continue as a going concern.

211. That same day, VistaGen filed a prospectus supplement amending and supplementing the February 2024 Registration Statement, increasing the aggregate offering price available under the follow-up ATM to up to $175 million. During the three months ended June 30, 2025, VistaGen sold an aggregate of 190,067 shares under the follow-up ATM, for net proceeds of $0.4 million. As of June 30, 2025, VistaGen had cash and cash equivalents of approximately $49.0 million.

212. Then, during the three months ended September 30, 2025, VistaGen sold 9,608,772 shares under the follow-up ATM, for net cash proceeds of $27.9 million. During the three months ended December 31, 2025, VistaGen sold an additional 604,405 shares for net cash proceeds of $2.3 million. As of December 31, 2025, VistaGen had cash and cash equivalents of approximately $47.4 million.

213. Accordingly, after raising $35.1 million in net cash proceeds through strategically timed ATM offerings, occurring between August 7, 2023 and September 14, 2023, the Company abstained from selling shares for a full calendar year. Over the next nine months, from October 1, 2024 to June 30, 2025, VistaGen sold roughly 1.3 million shares through ATM offerings, for net cash proceeds of $3.4 million. Then, during the last three months of the Class Period, VistaGen sold roughly 10 million shares through ATM offerings, for net proceeds of more than $30 million.

### L. The Full Fraud is Revealed When VistaGen is Forced to Announce PALISADE-3 Failed to Meet Its Primary Efficacy Endpoint Due to Elevated Placebo Response

214. On November 3, 2025, the Company issued a press release announcing that the last patient enrolled in PALISADE-3 had completed the randomized, double-blind, placebo-controlled portion of the study (*i.e.*, visit 3). With the treatment phase complete, the Company announced top-line results for PALISADE-3 were expected by year end.

215. Then, on December 17, 2025, VistaGen was forced to announce that the PALISADE-3 Phase 3 study of fasedienol for the acute treatment of SAD did not achieve its primary efficacy endpoint, as measured by the least squares mean change from baseline on the SUDS score for fasedienol compared

to placebo. The Company also reported that there was no treatment difference between fasedienol and placebo for the secondary endpoints of PALISADE-3. The results of PALISADE-3 showed patients treated with PH94B (n=115) had a mean change of 13.6 points on the SUDS score from baseline at visit 3. In comparison, patients randomized to placebo (n=123) showed a mean change of 14 points in the SUDS score across visits; a difference of 0.4 points in placebo's favor.

216. On this news, VistaGen's stock price fell swiftly and dramatically from a closing price of $4.36 per share on December 16, 2025 to $0.86 per share at close on December 17, 2025, representing a more than 80% decline in a single trading day.

217. That same day, the Maxim Group issued a report noting, "[g]iven the disappointing results of the P3 PALISADE-3 trial in Social Anxiety Disorder (SAD), and uncertainty regarding the path forward for fasedienol and the pipeline, we are downgrading VTGN shares to Hold, from Buy and removing our prior 12-month price target of $12."

**M. Relevant Post-Class Period Events and Disclosures**

218. During an investor conference call on February 12, 2026, Defendant Singh provided, in pertinent part, that VistaGen had "reviewed available data from PALISADE-3 and implemented moderate refinements, including retraining, site rationalization and operational enhancements to PALISADE-4." He went on to explain that the Company had "also been working with third-party collaborators on the implementation of innovative approaches to analyze the available data sets … across the PALISADE program[.] Our objective is to better understand the drivers of both fasedienol and placebo response using the substantial data collected from these studies to potentially inform optimized statistical models that consistently incorporate covariants and explanatory variables across all PALISADE studies, which could anchor future weight of evidence discussions with the FDA."

219. During the Question-and-Answer portion of this call, Defendants were asked to elaborate on the "refinements" and "retraining" done for PALISADE-4 and what was seen in PALISADE-3 that led to that decision. Defendant Prince responded, in pertinent part, by stating:

> [W]e can't go into too much detail given PALISADE-4 is ongoing. But at a high level, one of the things that made PALISADE-3 different than PALISADE-2 was a higher placebo response. So as one example, making sure that our training is reinforced and up to date with sites in terms of potential ways to minimize that, in particular, kind of how the protocol is followed, the script is followed to the writer, ***making sure that there's no***

> ***chatting with the subjects as they come in, anything that could potentially lend to a comfort for a subject that could drive a higher placebo effect***.
>
> Those types of things that we're able to implement quickly based on what we see from PALISADE-3. And also because we're listening to what's happening at each site through the audio recordings that we've talked about previously, it gives us the opportunity, again, to be hyper focused on feedback and any intervention where we see something deviating from the prescript that we've put in place.

220. Then, on May 8, 2026, the Company announced the completion of PALISADE-4 with topline results expected to be announced by June 30, 2026. In pertinent part, the Company also provided:

> As previously announced, Vistagen continues to analyze datasets from the randomized portions of the PALISADE-1, PALISADE-2, and PALISADE-3 Phase 3 studies for fasedienol for the acute treatment of [SAD], including with the assistance of collaborators and proprietary artificial intelligence and machine learning methodologies. Based on these analyses, Vistagen refined the statistical analysis plan (SAP) for PALISADE-4 to incorporate each participant's distress level immediately prior to dosing, as measured by the SUDS (pre-IP SUDS), into the primary efficacy analysis. While there is no guarantee the Company's refinements to the PALISADE-4 SAP will result in a positive outcome for the study, Vistagen believes the refined SAP reflects established statistical principles supporting the use of baseline covariates in randomized clinical trials consistent with U.S. Food and Drug Administration (FDA) guidance regarding adjustments for covariates (Adjusting for Covariates in Randomized Clinical Trials for Drugs and Biological Products, May 2023). The FDA has informed the Company that it has no comments on the refinements to the PALISADE-4 SAP.

221. The change in PALISADE-4's SAP, incorporating baseline pre-dose SUDS scores as a prespecified covariate in the primary efficacy analysis, indicates that the Company is attempting to control or reduce the placebo response in PALISADE-4 based on *post hoc* assessment of the replicate PALISADE-3 indicating potential baseline score inflation.

222. On June 15, 2026, VistaGen reported its financial results for the fiscal year ended March 31, 2026, and provided a corporate update. In pertinent part, the Company indicated that top-line results for PALISADE-4 are expected before the end of month, June 2026.

## <u>DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS</u>

223. As provided more fully below, Defendants made materially false and misleading statements during the Class Period on the topics of: (i) propriety of the PALISADE study design and SUDS endpoint; and (ii) VistaGen's efforts to control variability. Plaintiff asserts that all statements set forth below in bold and italicized text are materially false and misleading for the reasons stated therein

and supported by the factual allegations asserted in the foregoing paragraphs. Unless otherwise noted, statements that are not bolded and italicized are included for context.

224. On August 7, 2023, VistaGen issued a press release entitled, "*Vistagen Announces Positive Top-Line Results from Phase 3 PALISADE-2 Trial of Fasedienol (PH94B) Nasal Spray in Social Anxiety Disorder*." A copy of the August 7, 2023 press release was attached as Exhibit 99.1 to a Current Report filed with the SEC on a Form 8-K on August 7, 2023, signed by Defendant Singh.

225. In pertinent part, the August 7, 2023 press release told investors that the PALISADE-2 trial had achieved positive top-line results and was therefore the "***First positive U.S. Phase 3 study of an investigational therapy for social anxiety disorder in over 15 years***." The press release continued, stating that PALISADE-2 had met both its primary and secondary endpoints, as follows: "***The trial met its primary endpoint***, with fasedienol demonstrating a statistically significant difference in average SUDS score during a public speaking challenge compared to placebo (p=0.015). ***The trial also met its secondary endpoint***, demonstrating a statistically significant difference in the proportion of clinician-assessed responders between fasedienol and placebo as measured by the CGI-I scale (p=0.033)."

226. The foregoing statements identified in ¶225, emphasized in bold and italicized, were materially false and misleading when made because they misrepresented PALISADE-2's status and results. Clinical trials are conducted pursuant to trial protocols approved by the FDA that include statistical analysis plans for the data. The PALISADE-2 protocol and analysis plan called for the enrollment of 208 patients; however, VistaGen stopped enrollment after 141 patients. This left VistaGen with an incomplete set of data from which Defendants drew unsupported conclusions. Thus, while VistaGen's statistical analysis of the incomplete data may have been literally true, it was materially misleading to describe the PALISADE-2 trial as having met its primary and secondary endpoints given that the analysis they conducted deviated from the initial FDA-approved trial protocol and statistical analysis plan. Had they completed the trial as initially planned, the data may from the remaining approximate 60 patients could have materially changed the PALISADE-2 trial results.

227. On August 10, 2023, VistaGen issued a press release entitled, "*Subsequent to the Release of Positive Phase 3 Trial Results, Vistagen Provides Corporate Update and Reports Fiscal 2024 First*

*Quarter Financial Results*." A copy of the August 10, 2023 press release was attached as Exhibit 99.1 to a Current Report filed with the SEC on a Form 8-K on August 10, 2023, signed by Defendant Singh.

228. In pertinent part, the August 10, 2023 press release disclosed VistaGen's plans to initiate the PALISADE-3 clinical trial, a replicate study of PALISADE-1 and PALISADE-2, "***[b]ased on the positive top-line results of the Phase 3 PALISADE-2 study***," while maintaining that "***the Company is currently preparing for its Phase 3 FEARLESS trial, with potential to initiate the trial in the second half of calendar 2024 with a study design similar to the registration trials for the three drugs currently approved for the treatment of SAD using the LSAS as the primary efficacy endpoint***." It concluded by saying, "[t]he Company believes that each of PALISADE-3 and FEARLESS has the potential to complement PALISADE-2 as a potential [NDA]-enabling adequate and well-controlled Phase 3 clinical trial of fasedienol for treatment of SAD."

229. Defendant Singh is quoted in the August 10, 2023 press release as saying:

> ***The positive outcome of our PALISADE-2 study demonstrated that fasedienol significantly reduced the mean [SUDS] score, reducing anxiety during a stressful public speaking challenge.*** The study outcome is a pivotal achievement for fasedienol and our diverse pherine platform. These results mark the first positive U.S. Phase 3 study of an investigational therapy for [SAD] in over 15 years[.] … We believe these results reinforce the promise of our pherine pipeline to address growing unmet treatment needs. ***We now move forward confidently advancing the Phase 3 program for fasedienol in SAD with planning for initiation of additional Phase 3 studies in 2024***.
>
> ***Our strong understanding of each pherine product candidate's scientific and therapeutic potential gives us confidence in our ability to continue to innovate for patients and deliver long-term value for shareholders.*** With a collective body of positive safety and efficacy studies supporting our clinical-stage pipeline, ***we believe there are many strategic paths to accelerate our progress in achieving key clinical and regulatory milestones for each program over the next 12 months***.

230. The foregoing statements identified in ¶¶228-29, emphasized in bold and italicized, were materially false and misleading when made because, as detailed more fully in ¶226, these statements misrepresented PALISADE-2's status and results from which Defendants drew unsupported conclusions to advance the extraordinarily risky replicate PALISADE-3 Phase 3 trial. Defendants omitted material information concerning the risks associated with proceeding under the PALISADE design due to the significant methodological limitations associated with the SUDS-driven single assessment clinical-simulated repeat public speaking challenge used to evaluate treatment effect on a

fundamentally variant and highly impressionable patient population, desensitized to repeat exposure to stressors or appearing asymptomatic when not exposed to their individualized social stressors. The underlying aggregating factors relating to the natural history of the condition being treated and unpredictable characteristics of the patients studied are only exacerbated by even minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial at scale and the intrinsic difficulties in identifying and enrolling an optimal patient population. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from a purportedly adequate and well-controlled Phase 3 clinical trial.

231. On August 10, 2023, VistaGen held an investor conference call to discuss the Company's quarterly financial results for the three months ended June 30, 2023, and provide a corporate update. During his prepared remarks, Defendant Singh addressed the Company's decision to move forward with PALISADE-3, a replicate of the failed Phase 3 PALISADE-1 and of the closed early, but demonstrated statistically significant Phase 3 PALISADE-2, declaring that "***the systemic variability introduced by the pandemic contributed to these … very different results between these 2 studies***." He went on to justify this pandemic explanation for the unfavorable outcome of PALISADE-1, providing:

> A large portion of PALISADE-1 was fielded in 2021 through the height of the second wave of the pandemic. While the vast majority of PALISADE-2 was fielded in 2022 as the acute phase of the pandemic has subsided. This dynamic likely impacted PALISADE-2 disproportionately in terms of patient mindset, study protocol execution and study oversight.
>
> Subjects randomized in 2021 likely were given -- were different given the overall level of anxiety and uncertainty and general unrest, restrictions, mask wearing and the like during the acute phase of the pandemic. The high placebo rate in PALISADE-1 also may have attributed to logistical issues caused by COVID-19 in '21 such as high site and CRO employee turnover, absenteeism, changes in raters, time lapses between visit 2 and visit 3 due to unpredictable and intermittent clinical site closures and patients postponing travel, delayed monitoring visits and the like.
>
> As these dynamics became apparent as the acute phase of the pandemic subsided in early 2022, ***we also initiated retraining and renewed monitoring of sites as is customary with staggered start replicate studies. And that, too, may have had a much larger impact on PALISADE-2*** as it was completed before the majority of patients went through that study.
>
> ***We view the results of PALISADE-1 as an outlier, driven by the aforementioned reasons, and we are highly confident in the potential of fasedienol in future studies given*** multiple positive Phase II studies, efficacy seen on the exploratory end point and

> the PALISADE open label study, and now ***the strong results in our placebo-controlled Phase III PALISADE-2 trial. This is especially meaningful after the recent multiple failures in SAD studies by peers that may have been subject to similar systemic variability from the pandemic***.
>
> ***With the statistically significant and clinically meaningful results of PALISADE-2, we're now positioned to move our Phase III development plan forward with the additional studies needed for a potential NDA submission, including a PALISADE-3 trial and a FEARLESS trial,*** allowing us to not only confirm the acute benefit of fasedienol but to confirm what we've also long believed, that the acute use of fasedienol for SAD events continued over time will lead to a reduction in disease severity. Coupled with the safety and tolerability profile we have already demonstrated, we believe fasedienol will be the ideal approach to SAD treatment in the future. Preparations are now underway to initiate these next studies.

232. The foregoing statements identified in ¶231, emphasized in bold and italicized, were materially false and misleading when made because they disproportionately attributed PALISADE-1's failure to pandemic-related disruptions and created the false impression that PALISADE-2 results sufficiently demonstrated that the PALISADE design could demonstrate PH94B's efficacy at scale. As detailed more fully in ¶226, these statements misrepresented PALISADE-2's status and results from which Defendants drew unsupported conclusions to advance the extraordinarily risky PALISADE-3. Defendants omitted material information concerning the risks associated with proceeding under the PALISADE design due to the significant methodological limitations, independent of any pandemic-related effects, associated with the SUDS-driven single assessment clinical-simulated repeat public speaking challenge used to evaluate treatment effect on a fundamentally variant patient population, known to be desensitized through repeat exposure to stressors or appear asymptomatic when not exposed to their individualized social stressors. Further, they omitted that the underlying aggregating factors relating to the natural history of the condition and highly impressionable patient characteristics are only exacerbated by any minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial and the intrinsic difficulties in identifying and enrolling an optimal patient population. As a result, Defendants created the materially false impression that the elevated placebo response seen in PALISADE-1, and peer trials, were merely pandemic-driven outliers and the results of PALISADE-2 showed variability in the chosen design could be sufficiently controlled.

233. During the Question-and-Answer portion of the same investor call, Defendant Singh was asked whether the potential outcomes of "PALISADE-3 would look similar to what you saw in

PALISADE-2 or something even better because, I don't know, PALISADE-2, there's maybe some COVID going on."

234. Defendant Singh responded, in pertinent part, "I think there's a lot of reasons, of course, to be confident about our next couple of steps in the PALISADE-3 direction. First, certainly, the world isn't really controlled anywhere near to the degree it was in the pandemic, and that obviously impacts the entire ecosystem associated with executing successful clinical studies." He followed these remarks by saying that there were "***a lot of lessons learned … from deconstruction of PALISADE-1 for sure***, and I suspect we will from PALISADE-2," identifying that for PALISADE-3 the inclusion/exclusion criteria would call for "***things like subjects will have an olfactory smell test***" at the screening and would have "***restrictions on use of nasal swabs upfront of the event***," explaining that "***there are several things that are associated with just modest amendments to the protocol, but they're positive lessons that you typically learn when you stagger start the studies***."

235. Reiterating his prepared remarks about enhancements made between PALISADE-1 and PALISADE-2 to address inconsistencies in protocol execution, Defendant Singh added, "***[s]o that, plus the training that we've done, the proprietary training models that we have all up and down every aspect of conducting that type of study***, I don't think there's anybody better to conduct and more [experienced] to conduct a public speaking challenge in a Phase III setting than we are. I have no reservations about that." Defendant Singh concluded his response by saying, "[s]o I really – I like our chances going into the study. I like the expertise we have internally. I like the force extenders that we've got in our network outside the company. Certainly, Dr. Liebowitz plays a key role in our ability to be successful with this clinical program with this drug. ***So yes***, we're excited."

236. The foregoing statements identified in ¶¶234-35, emphasized in bold and italicized, were materially false and misleading when made because they created the materially false impression that VistaGen had identified and addressed the factors responsible for PALISADE-1's failure and that the Company's experience and operational and protocol enhancements had materially reduced the risks facing future PALISADE studies, such as PALISADE-3. In reality, Defendant Singh failed to disclose that PALISADE-3's continued reliance on the same SUDS-driven single assessment clinician-simulated repeat public speaking challenge paradigm exposed the trial to an extraordinarily high risk of study

failure and faced odds that far surpassed what investors were told or should have ordinarily expected from a purportedly adequate and well-controlled Phase 3 clinical trial due to significant methodology limitations, independent of any pandemic-related effects, including heightened susceptibility to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These risks were inherent in the trial design itself and could not be remedied through "modest amendments to the protocol," retraining, or other operational enhancements as Singh represented.

237. During the same call, analyst Joanne Lee of the Maxim Group LLC asked: "given fasedienol achieved positive results in now both PAL-2 and the open label study, could you provide some insight on the rationale behind choosing to pursue both SUDS and LSAS as primary measures in the PAL-3 and FEARLESS studies? Was this decision influenced by any guidance from the FDA?"

238. To which Defendant Singh responded, in pertinent part:

> No, no. … Look, we long held the way that we think fasedienol can help people. It's 2 distinct ways. It can certainly help people, as we've shown in PALISADE-2, in an acute setting. And as they take it out of their pocket or their purse or their backpack and they use it on demand in a patient-tailored way, has the ability to knock down very rapidly those symptoms. That's what PALISADE-2 showed.
>
> We also have placebo-controlled Phase II data and some exploratory data from the open label. Lots of subjects that also when it's used acutely but used over time, it increases the confidence of a person and increases their resilience, and it reduces their tendency to avoid situations that could benefit their lives. It reduces the opportunity costs in their life. And that avoidance -- a reduction in avoidance of engaging in social and performance situations is important. The Liebowitz scale captures both of those.
>
> ***So we're at a perfect spot right now because we've got 1 successful study in Phase III, and you only need 2 adequate and well-controlled studies to get an approval of a drug. And so it could either be from a PALISADE-3 or it could be from a FEARLESS. Either way, what we're trying to do is look to the most efficient path to get this drug to patients as soon as possible. And it's 1 of those 2 tracks. It could be both, but you only need one other besides the one we've got.*** At least that's our opinion at this point.
>
> So doing the LSAS-based study, again, it's consistent with the only 3 drugs ever approved for treatment of [SAD]. That was the primary efficacy end point. We needed to make sure, and we did find this out in the first quarter that the FDA still believed that to be a valid and reliable end point and they do. So that provides optionality there.
>
> The other side is, well, we already know what they think about the SUDS end point and the PALISADE program. …

239. The foregoing statements identified in ¶238, emphasized in bold and italicized, were materially false and misleading when made because, as detailed more fully in ¶226, these statements misrepresented PALISADE-2's status and results from which Defendants drew unsupported conclusions to advance the extraordinarily risky PALISADE-3. Defendant Singh omitted material information concerning PALISADE-3's extraordinary risk of study failure and faced odds that far surpassed what investors were told or should have ordinarily expected from a purportedly adequate and well-controlled Phase 3 clinical trial due to the significant methodological limitations inherent in the trial design itself arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. To the contrary, as repeatedly acknowledged by Defendant Singh, the LSAS score was the primary efficacy endpoint used in the registration studies supporting all three FDA-approved drugs for the treatment of SAD and the LSAS-driven real-world design better reflected how PH94B was to be used by patients in their daily lives and measured treatment effects across multiple SAD-stressor points as well as over time rather than at a single moment in time (*i.e.*, SUDS) during a repeat public speaking stressor only. As a result, these statements created the materially false impression that it was just as likely for the SUDS-driven single assessment repeat public speaking challenge study to provide substantial evidence of effectiveness as the precedent-setting LSAS-driven real-world study. Further, it was unreasonable for Defendant Singh to say the advancement of both PALISADE-3 and FEARLESS was "the most efficient path" to achieving marketing approval.

240. During an investor conference call held November 9, 2023, Defendant Singh confirmed that VistaGen was no longer looking to expand the Phase 3 development plan for PH94B to include a design using the LSAS as a primary efficacy endpoint in a real-world study stating, in pertinent part,

> Given that fasedienol's rapid onset mechanism of action is differentiated from all FDA-approved anxiety drugs, our primary target initial indication for fasedienol remains the acute treatment of anxiety in adults with SAD. And as noted, there is no FDA-approved drug therapy for the acute treatment of SAD. For that acute indication, we've previously aligned with the FDA that a simulated public speaking challenge in a clinical setting is an appropriate study design and that the [SUDS] is an appropriate primary efficacy endpoint to assess the efficacy of fasedienol because it provides a measure of anxiety on a minute-by-minute basis immediately related to the specific stressor.

> ***We believe utilizing a simulated anxiety-provoking public speaking challenge study design provides the most appropriate and efficient path for fasedienol to potentially become the first FDA-approved acute treatment of anxiety for adults with S[A]D***.
>
> So to complement the positive top line results from PALISADE-2. We are currently preparing to launch 2 similar Phase 3 clinical trials in 2024, PALISADE 3 in the first half of 2024 and PALISADE 4 in the second half of 2024. ***Like the successful PALISADE-2 study,*** both PALISADE 3 and PALISADE 4 will be multicenter, randomized, double-blind, placebo-controlled Phase 3 clinical trials designed to evaluate the efficacy, safety and tolerability of the acute administration of faced in or to relieve anxiety symptoms in adult patients with SAD after a single dose of fasedienol during a simulated anxiety provoking public speaking challenge conducted in the clinical setting.

241. The foregoing statements identified in ¶240, emphasized in bold and italicized, were materially false and misleading when made because, as detailed more fully in ¶226, these statements misrepresented PALISADE-2's status and results from which Defendant Singh drew unsupported conclusions from. Defendant Singh failed to disclose that the complete reliance on the same SUDS-driven single assessment clinician-simulated repeat public speaking challenge paradigm exposed VistaGen to an extraordinarily high risk of study failure due to significant methodology limitations when completed at scale including heightened susceptibility to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. To the contrary, as repeatedly acknowledged by Defendant Singh prior to the Class Period, the LSAS score was the primary efficacy endpoint used in the registration studies supporting all three FDA-approved drugs for the treatment of SAD and the LSAS-driven real-world design better reflected how PH94B was to be used by patients in their daily lives and measured treatment effects across multiple SAD-stressor points as well as over time rather than at a single moment in time (*i.e.*, SUDS) during a repeat public speaking stressor only. As alleged herein, advancing the FEARLESS program, however, would have cost the Company significantly more time and money than conducting the replicate PALISADE trials. As a result, Defendant Singh materially misrepresented the factual basis for his assertion that the PALISADE design "provides the most appropriate and efficient path for fasedienol" to achieve marketing approval.

242. On February 13, 2024, the Company held an investor conference call to discuss its third quarter financial results for the fiscal year ended March 31, 2024, and provide a corporate update.

During the Question-and-Answer portion of the call, analyst Lin (Andrew) Tsai of Jefferies LLC, Research Division, posed the following question:

> Maybe the first one on PALISADE-3 -- 4, you're employing, obviously some exciting improvements to those programs. So could it be fair to assume that the SUDS separation in those studies could be even greater than what you saw in PALISADE-2 because as you're mitigating for placebo effect, could you be further maximizing the drug effect?

243. To which Defendant Singh responded:

> As you mentioned, I mean ***we've done quite a few things to further derisk the Phase III program*** and a lot of lessons learned on the other side of the prior studies and obviously, this is not now a study design and an endpoint that sites and investigators are seeing after a pretty long hiatus in the space of a couple of decades.
>
> ***So the things that we've done to improve surveillance, improve and further derisk execution of the program***. Certainly, that's – it's a possibility. But there are a lot of things. If you compare the world in 2022 to where we are today in '24, just at a minimum, taking masks out of the equation is a big difference.
>
> Having the ability to have in-person investigator meetings, have the ability to do things that ensure rigorous adherence to the protocol, very [indiscernible] requirements of that protocol consistently across sites. ***All of those things combined have the potential, of course, to improve even on what we've seen in the past in Phase II and in PALISADE-2***. Josh Prince, do you want to add anything to that?

244. Defendant Prince followed by responding:

> Sure, Shawn. Thank you. Yes, I think we're very optimistic about our ability to execute a well-controlled study post-pandemic. And ***it's everything that you talked about, but it's also the things that we're able to do in terms of how we work with our CRO***. ***We're putting feet on the ground in terms of our own monitors going to sites in addition to CRO monitors. We have some additional exclusion criteria to make sure that subjects that are coming into the study have the best chance to have positive results or opportunity to have positive results with fasedienol***.
>
> ***And even things such as eligibility review, making sure that subjects are appropriate subjects before they're going into the visit 2 and visit 3 public speaking challenges. So you put all those things together***, and it does give us a fair amount of optimism moving into PAL-3 and PAL-4 compared to what we had when we're executing PALISADE-1 and PALISADE-2.

245. The foregoing statements identified in ¶¶243-44, emphasized in bold and italicized, were materially false and misleading when made because while Defendants emphasized purported operational improvements designed to "derisk" the PALISADE program, they failed to disclose that the PALISADE design remained subject to fundamental methodological limitations that those measures

could not remedied. Defendants' assertions that additional monitoring, investigator oversight, eligibility reviews, and exclusion criteria would further "derisk" the Phase 3 PALISADE program created the materially misleading impression that the primary risks facing PALISADE-3 were operational in nature and had been adequately mitigated. In reality, Defendants failed to disclose that VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to high risk of study failure due to the significant methodology limitations including heightened susceptibility to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These risks were inherent in the trial design itself and could not be remedied through additional monitoring, oversight, or other operational enhancements as Defendants represented.

246. On June 11, 2024, the Company held an investor conference call to discuss its financial results for the fourth quarter and fiscal year ended March 31, 2024, and provide a corporate update. During his prepared remarks, Defendant Singh provided an update on the Phase 3 development plan for PH94B stating, in pertinent part, that:

> Building on our success during fiscal '24, our registration-directed PALISADE Phase III program for fasedienol for the acute treatment of SAD is progressing on track, including enrollment in our recently launched PALISADE-3 trial, which is on track for top line data midyear in calendar 2025 as well as preparations for our upcoming PALISADE-4 trial that we expect to initiate in the second half of this year and complete before the end of calendar 2025. Both Phase III trials are designed with the potential to replicate our successful PALISADE-2 Phase III trial.
>
> While the public speaking challenge design of PALISADE-2 and the use of the subjective units of distressed scale, or SUDS, is the primary efficacy end point in the studies and are unchanged, ***we've built some notable enhancements into PALISADE-3 and PALISADE-4 and made some operational changes we believe will help optimize quality enrollment, enhanced surveillance and control potential variability as well as drive rigorous protocol adherence through an execution of PALISADE-3 and PALISADE-4, all against the backdrop of what is now a far more favorable and stable clinical research environment than at any time during the pandemic***.

247. The foregoing statements identified in ¶246, emphasized in bold and italicized, were materially false and misleading when made because, while Defendants touted "notable enhancements" and "operational changes" built into to PALISADE-3, they failed to disclose that those program adjustments were not capable of avoiding or ameliorating the fundamental limitations of the study's

design. These statements materially misled investors by falsely assuring them that the Company had meaningfully addressed the factors that could impede the trials' success. In reality, Defendants failed to disclose that VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to high risk of study failure including heightened susceptibility to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These risks were inherent in the trial design itself and could not be remedied through additional monitoring, oversight, or other operational enhancements as Defendants represented. As a result, the PALISADE program had exceedingly high risk of failure because of how it was designed and measured, regardless of the back-end changes made, as evident by PALISADE-1 and the peer trials.

248. During the Question-and-Answer portion of the same investor call, analyst Julian Pino of Stifel, Nicolaus & Company, Incorporated, Research Division asked Defendants to elaborate on the described "notable enhancements that you made, things like operational changes, enhanced surveillance, et cetera" and explain "why that gives you greater confidence as you continue enrolling PALISADE-3 and soon PALISADE-4?"

249. To which Defendant Singh responded, in pertinent part:

> So the refinements that we made to PALISADE-3 and PALISADE-4 really are based again on experience that we have, very unique and extensive experience, scaling up to a large Phase III study that come from our observations of the conduct of the PALISADE Phase III program from, again, the early, through the late stages of the pandemic, in particular. ***So the enhancements to PALISADE-3 and PALISADE-4 apply primarily to ensuring that we've got optimal subjects in the study, real extensive, precise and universally applied screening, inclusion/exclusion criteria and that the public speaking challenge protocol is administered properly and consistently with limited variability***.
>
> For example, one of the exclusion criteria that's been added is limiting high-frequency smoking or vaping, PHC use, signs of COVID or any recent nasal swabs, all of which could have some sort of an impact possibly on receptors and impact a single-dose public speaking challenge.
>
> Josh, maybe talk about some of the other things that you and the team have been seeing some really significant benefits on as we've seen pre-startup and now as we've gotten into the execution of PALISADE-3.

250. Defendant Prince followed by saying:

> Yes, absolutely. I think two of the key things you touched on, Shawn, are our experience of going through PALISADE-1 and PALISADE-2 but then also being able to operate in a pandemic-free environment as we got PALISADE-3 up and running and as we look forward to getting PALISADE-4 up and running. ***This has allowed us to really drive consistent execution across sites to reduce the potential variability***.
>
> I mean it's really around changing our approach to both study monitoring and our staffing model, right? ***So it gives us rigorous training of sites and then oversight of study conduct. So if you think about where we are with PALISADE-3 compared to PALISADE-1 or PALISADE-2, we had an in-person investigator meeting for PALISADE-3. So we have that face-to-face, in-person training of PIs, raters, study coordinators, which we couldn't do in PALISADE-1 and PALISADE-2***.
>
> And then as we've gotten sites up and running, kind of that start-up process, we've already had more in-person site visits in PALISADE-3 than we did in either PALISADE-1 or PALISADE-2 because of the restrictions of the pandemic. ***And so that new site-facing staffing model is just giving us a lot more oversight and increased level of site communication to make sure that the studies are going the way that we want them to***.

251. And Defendant Singh added, in pertinent part:

> And I'd also add that we've eliminated mask wearing in PALISADE-3 and PALISADE-4 by either the subject or the public speaking audience and also the drug dose will be administered by the health care provider just to ensure, again, proper dosing for the study. ***So a lot of little small things as well as some significant changes, all intended to really enhance and optimize surveillance, control variability, the things that actually make a difference on outcome, but those are some significant mitigators, we think, to some of the risks that are typically associated when you're scaling up to a multiple-center study.***

252. The foregoing statements identified in ¶¶249-51, emphasized in bold and italicized, were materially false and misleading when made because, while Defendants touted various "refinements" and "enhancements" made to "drive consistent execution" and "optimize surveillance" of the conduct of PALISADE-3, they failed to disclose that those program adjustments were not capable of avoiding or ameliorating the fundamental limitations of the study's design. These statements materially misled investors by falsely assuring them that the Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to extraordinarily high risk of an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly

subjectable characteristics of the patient population being studied. These underlying aggregating factors were only exacerbated by even minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial at scale and the intrinsic difficulties in identifying and enrolling an optimal patient population. These compounding risks were inherent in the trial design itself and could not be remedied through additional oversight, training, or other operational efforts alone, as Defendants represented. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from an adequate and well-controlled Phase 3 clinical trial.

253. On August 13, 2024, the Company held an investor conference call to discuss its first quarter financial results for the fiscal year ended March 31, 2025, and provide a corporate update.

254. During the Question-and-Answer portion of the call, analyst Tsai asked about enrollment for PALISADE-3 posing the question, "[a]re you by chance seeing higher screen failure rates compared to PALISADE-1 and 2? And is there anything else that you might be seeing in real time that gives you that extra boost of confidence you are doing the right thing, enrolling the right patients and executing the study even more rigorously than last time?"

255. To which Defendant Prince responded:

> I think at this point, what we've seen in terms of screen failure rates in terms of those that have a high enough score in the first public speaking challenge in terms of an anxiety score to move on to the second public speaking challenge, ***we've been pleasantly surprised that those rates have come in consistent with our projections. So we're seeing, again, progress of the study that's in line with expectations towards the targets that we've established. And so I think in general, really things going as expected there***.

256. Analyst Tsai then asked the follow up question: "[a]nd then can you remind us how long it took for you to start in PALISADE-1 and 2 -- I guess -- maybe PALISADE-1 and whether the enrollment cadence for PALISADE-3 is looking stronger or faster than the first study?"

257. To which Defendant Singh responded:

> ***[T]he enrollment cadence is on track with what we've guided***. I mean look, obviously, the black swan and the pandemic impacted a lot of activity in 1 and 2, although we've been so pleasantly surprised by -- ***not really surprised but expected and happy to see, is how normative the clinical development environment is now*** and how we are able to have a lot more predictability on the things that caused fits and starts in prior studies during the pandemic, especially PALISADE-1. ***So I can tell you that we're comfortable with the cadence*** and we're on track. Josh, anything else you want to add to that?

258. And Defendant Prince followed by adding:

> I think that captures it. The one thing I should have mentioned before was the – there's just a reminder that we have 2 public speaking challenges, right? ***So a key part of this study is the screen out in -- at visit 2 and the first public speaking challenge of those subjects who don't have a high enough anxiety level to really show improvement***. It's one of the things that differentiates our study. ***And it's not inclusion/exclusion, but it's a key piece of making sure that we have the right subjects moving forward to the randomization portion of the study. And those rates, those are critical for study execution. Those rates have been similar to what we observed in PALISADE-1 and PALISADE 2***.

259. The foregoing statements identified in ¶¶255, 257-58, emphasized in bold and italicized, were materially false and misleading when made because they misrepresented the factual basis for which their assertions of met screening expectations and on track enrollment cadence were made. According to CW1, recruitment for the PALISADE program had long been an issue for the Company, year after year. According to CW2, Company management involved in the conduct of PALISADE-3, anticipated that VistaGen was going to have the same enrollment trouble even before trial began. As confirmed by CW1 and CW2, at the time these statements were made, the Company was already having trouble getting patients to sign up for PALISADE-3. And as confirmed by CW1 and CW2, the Company already anticipated that this recruitment issue would require it to increase the number of study sites to get the enrollment number up to the planned target for completion, undermining Defendants' touted efforts to minimize clinical variability through consistent protocol execution across sites. As a result, these statements materially misled investors by falsely assuring them that VistaGen was operating a properly designed, well-controlled trial, enrolling the optimal patient population and therefore, the trial did not exhibit any acute risks of failure when, in fact, the opposite was true.

260. On November 7, 2024, VistaGen held an investor conference call to discuss its second quarter financial results for the fiscal year ended March 31, 2025, and provide a corporate update.

261. During the Question-and-Answer portion of the call, Defendants were asked to provide "color on the pace of enrollment so far" for PALISADE-3, "[w]hat are you hearing from investigators about the demand in enrolling in the study?", and "anything else that you could share about the sites that you've chosen for each study?"

262. Defendant Singh responded, in pertinent part, by saying:

> ***So there's tremendous excitement across the PIs and the site staff that we've been able now to bring together for PALISADE-3*** and PALISADE-4, as you can imagine, on the other side of the PALISADE-2 success. We've got 16 sites now that are activated for PALISADE-3 and another -- and a dozen for PALISADE-4.
>
> ****
>
> …So I'd say, overall, we are really excited to work with our CRO, with the sites, with our internal team.
>
> ***We've really enhanced surveillance with our owned assets as well as augmenting that with what we've got as resources from the CRO. So there's a lot of intense training. There's very close surveillance and adherence to the protocols, which is very important, obviously, to control variability***. So I think overall, we're happy with how things are going.

263. To which Defendant Prince followed up by saying:

> I'd love to add a little bit of color to the PI excitement that you mentioned. ***We've now had in-person investigator meetings for both PALISADE-3 and PALISADE-4. And what really comes out there is we have the opportunity to speak with PIs that are there and really express their excitement and enthusiasm to participate in a study like this that's really unlike any other study that they've done before or kind of have come across their plates now***.
>
> So I just want to add that color that ***we really do see that excitement, enthusiasm, engagement from the PIs and the desire to do these studies***.

264. Prompting Defendant Singh to respond:

> It's a good point, and that just came out. We had a recent town hall with the sites. It's something that we do from time to time where it's sort of like a fireside chat with me and with the rest of the team. ***So keeping the momentum is always key when you're trying to execute efficiently a program, especially with parallel studies in motion.*** And it always helps when what you're working on is at the leading edge of trying to treat people who've been dealing with this disorder for decades.

265. The foregoing statements identified in ¶¶262-64, emphasized in bold and italicized, were materially false and misleading when made because they created the materially false impression that the Company was not experiencing any issues with recruitment or enrollment for PALISADE-3. As confirmed by CW1 and CW2, at the time these statements were made, the Company was already having trouble getting patients to sign up for PALISADE-3. And as confirmed by CW1 and CW2, the Company already anticipated that this recruitment issue would require it to increase the number of study sites to

get the enrollment number up to the planned target for completion, undermining Defendants' touted efforts to minimize clinical variability through consistent protocol execution across sites. As a result, by repeatedly emphasizing "excitement across the PIs and the site staff", Defendants materially misled investors to believe that VistaGen was operating a properly designed, well-controlled trial, enrolling the optimal patient population and therefore, the trial did not exhibit any acute risks of failure when, in fact, the opposite was true.

266. During the same investor call, analyst Tsai posed the following question, noting now that PALISADE-3 and PALISADE-4 were both underway, "what are you seeing on the front lines that gives you the confidence it's definitely different this time for fasedienol? Maybe talk about how sites are operating, the rigor of these study protocols, whether public speaking challenge is being done correctly and so forth."

267. To which Defendant Singh responded:

> One thing, of course, is significantly different now than where we were even during PALISADE-2, let alone earlier than that during the pandemic is just the ability to have person-to-person contact, to have in-person training, like Josh mentioned. In-person investigators meetings mean a tremendous amount to be able to regularly and predictably have site visits and also have subjects schedule each phase and each visit during their challenge sequence.
>
> ***It is all different. It is just fundamentally different***. The attrition rates that we typically saw before at sites with site staff, we're just not seeing. Same thing with CROs. ***You're not seeing the kinds of things that would have been frustrating variability coming into a protocol that the recipe is pretty clear. And when it's followed, it helps tremendously***.
>
> So that plus things that you -- that we've talked about before, right? No masks involved, no COVID-related potential with the subjects in the study. ***So there's just fundamental things that are different on a macro basis and then site by site on a micro basis***. And just having the ability for the protocol to not be novel. This is something, of course, now that's on the third and the fourth lapse within the research community. So the study design isn't new, the endpoint isn't new.
>
> ***So all the things have really helped, I think, with the pace of play and with the ability really to surveil*** and to hopefully make sure that we've got rigorous adherence to the protocol across all the sites.

268. And Defendant Prince followed up, adding:

> We could add to what you said, and it kind of builds on the in-person piece. ***In addition to the in-person investigator meetings, we've had an in-person site initiation visit for every site***, right? So it's kind of the double reinforcement of training at an investigator

> meeting and then a good 3 to 4 hours with the study staff in their site location, again, ***hitting all the key details and pieces and components of what it takes to properly execute a public speaking challenge***.
>
> ***And then through the monitoring that Shawn mentioned, there have been specific examples where we've identified something that wasn't being done quite right. And the next day, there's an intervention or a discussion or a retraining or a reminder. So those are the kinds of things that could not happen in our prior PALISADE studies and are happening now, which gives us, again, that confidence that we're getting the right patients and that we're reducing variability as much as possible across sites for the public speaking challenge***.

269. The foregoing statements identified in ¶¶267-68, emphasized in bold and italicized, were materially false and misleading when made because, while Defendants touted PALISADE-3 was "just fundamentally different" from prior PALISADE studies based on how it was being executed, they failed to disclose that their efforts to increase monitoring, training, and intervention were not capable of avoiding or ameliorating the fundamental limitations of the study's design. These statements materially misled investors by falsely assuring them that the Company had meaningfully addressed the factors that could impede the trials' success. In reality, Defendants failed to disclose that VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to high risk of study failure including heightened susceptibility to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These risks were inherent in the trial design itself and could not be remedied through these back-end changes, as evident by PALISADE-1 and the peer trials.

270. On February 13, 2025, VistaGen held an investor conference call to discuss its third quarter financial results for the fiscal year ended March 31, 2025, and provide a corporate update.

271. During the Question-and-Answer portion of this call, Defendants were asked about the progress of PALISADE-3 and PALISADE-4, specifically "is there anything that keeps you up at night in terms of what more could be done on these studies in terms of execution?"

272. To which Defendant Singh responded:

> Interesting question. ***No, it doesn't keep me up at night because of the enhancements and the team that we've got executing on these studies, especially surveillance associated with rigorous adherence to the protocol. These are all very important,***

> ***execution-related initiatives that we've got in place, reduced reliance on CRO surveillance, expansion of our internal team, and just the way that we've been seeing the conduct of the studies with rigorous training even upfront of any enrollment at any of the sites. It's just actually been significantly different than what we've seen in the past in a very positive way.***

273. Defendant Prince followed Defendant Singh's remarks by saying:

> It is a very interesting question. And actually, to your point, ***we have more visibility into what's happening with these studies than we did before running PALISADE-1 and 2 in the pandemic and with the enhancements that we've put in place. And so if anything, I would say it's easier to sleep at night now than it was back then without COVID in place, with masks down, with the review that we have of subject's eligibility, making sure that scales are administered properly, making sure that the rigorous public speaking challenge script is followed to the T, and then having the ability to do quick interaction and retraining with sites if they start to deviate from that protocol. So we feel like we're giving these studies the best chance we could at success with those changes.***

274. The foregoing statements identified in ¶¶272-73, emphasized in bold and italicized, were materially false and misleading when made because, while Defendants touted the "enhancements" built into PALISADE-3, they failed to disclose that operational adjustments made were not capable of avoiding or ameliorating the fundamental limitations of the study's design. By expressing that executing the replicate Phase 3 trial, utilizing the same design and endpoint shown to fail 3 out of the 4 times used previously, "doesn't keep [Defendants] up at night because of the enhancements" materially misled investors to believe that the Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to extraordinarily high risk of an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These underlying aggregating factors were only exacerbated by even minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial at scale and the intrinsic difficulties in identifying and enrolling an optimal patient population. These compounding risks were inherent in the trial design itself and could not be remedied through additional oversight, training, or other operational efforts alone, as Defendants represented. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from an adequate and well-controlled Phase 3 clinical trial.

275. On June 17, 2025, VistaGen held an investor conference call to discuss its financial results for the fourth quarter and fiscal year ended March 31, 2025, and provide a corporate update.

276. During his prepared remarks, Defendant Singh provided an update on the PALISADE program stating, in pertinent part: "[o]ur PALISADE-3 trial is on track for a top line data readout in the fourth quarter of this year, and we anticipate top line results from PALISADE-4 in the first half of 2026. ***The enthusiasm of patients and physicians participating in the PALISADE Program continues to be very strong and we remain committed to a rigorous operational execution.***"

277. During the Question-and-Answer portion of this call, Defendant Singh was asked to elaborate on his prior remarks about "patient demand being quite strong" for the PALISADE program and "[w]hat led to the modest slip back of timing for P-4?"

278. Defendant Singh responded by stating, in pertinent part, that:

> ***[T]he impact of those positive enhancements that we made to PALISADE-3 and 4 wasn't really fully understood at the beginning but it's now very apparent and screening visits have continued to increase.*** And the more stringent subject eligibility requirements and secondary subject eligibility review that we integrated with developing our own internal team in addition to increasing training and remediation. So bottom line, we've been very, very picky in the way that the study can be executed, the stringent inclusion/exclusion criteria, all in an effort to, of course, replicate the success from PALISADE-2.
>
> ***So I think we've got a pretty good rhythm now and we've been able to eliminate subjects who we think may be less likely to demonstrate a benefit through that more rigorous eligibility criteria that we've applied and the secondary review of subject eligibility and site conduct that's ongoing and very specific. So overall, all that together has caused a little bit of an adjustment in timing, but we think that benefits the overall potential outcome of the study.***

279. The foregoing statements identified in ¶¶276, 278, emphasized in bold and italicized, were materially false and misleading when made because they created the materially false impression that the Company was not experiencing any issues with recruitment or enrollment for PALISADE-3. As confirmed by CW1 and CW2, at the time these statements were made, the Company was already having trouble getting patients to sign up for PALISADE-3. And as confirmed by CW1 and CW2, the Company already anticipated that this recruitment issue would require it to increase the number of study sites to get the enrollment number up to the planned target for completion, undermining Defendants' touted efforts to minimize clinical variability through consistent protocol execution across sites. Indeed,

at the time these statements were, VistaGen had 24 study sites for PALISADE-3 and 18 study sites for PALISADE-4, up from the originally planned 15-16 site per study.

280. Additionally, while Defendants touted "more rigorous eligibility criteria" and "secondary review" built into PALISADE-3, they failed to disclose that those changes were not capable of avoiding or ameliorating the fundamental limitations of the study's design. These statements materially misled investors to believe that the Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to extraordinarily high risk of an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied, known to be desensitized through repeat exposure to stressors or appear asymptomatic when not exposed to their individualized social stressors. These risks were inherent in the trial design itself and could not be remedied through additional eligibility review, or the olfactory smell test at the screening and restrictions on use of nasal swabs upfront of the event, as Defendants represented.

281. Analyst Tsai asked the follow up question, "speaking of variability back in the successful PALISADE-2 study, I think the placebo arm showed a SUDS reduction of 8 points absolute basis. Would you expect that to be the same case for PALISADE-3 and 4? Or with these more enhanced controls could the placebo be lower?"

282. To which Defendant Singh responded:

> Well, what we've certainly done, Andrew, is intended to design PALISADE-3 and 4 in a manner to replicate the success we saw in PALISADE-2. Where that actually lands, we'll have to see how the cards flip but ***everything that we've done has been intended to limit variability. In any way, we can conceive of it after taking a look at PALISADE-1 and PALISADE-2 studies***, which were the first two studies, as you know, with this design and this endpoint for the acute treatment of SAD. ***So a lot has been learned and the rigor matters***, and so we'll see. The idea, obviously, is to increase[] visibility into all aspects of the study and its execution ***to ensure the highest impossible potential to reduce variability***. So hopefully, that falls in the direction that we saw things land with PALISADE-2.

283. The foregoing statements identified in ¶282, emphasized in bold and italicized, were materially false and misleading when made because they materially misled investors to believe that the

Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to extraordinarily high risk of an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These underlying aggregating factors were only exacerbated by even minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial at scale and the intrinsic difficulties in identifying and enrolling an optimal patient population. These compounding risks were inherent in the trial design itself and could not be remedied through Defendants' back-end efforts to improve execution. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from an adequate and well-controlled Phase 3 clinical trial.

284. Analyst Tsai then asked, "in terms of site conduct and as well as your overall surveillance, are you making sure these PIs are disqualifying patients appropriately when these patients are taking their SUDS tests? And are you looking at these SUDS rating somehow for each patient to make sure all time points make sense with the scoring?"

285. To which Defendant Singh responded:

> Well, the last question, again, whether it makes sense, they are what they are, in terms of the scoring. But what I can tell you in the first hand, I mean, ***the whole purpose of what we did majorly differently with PALISADE-3 and 4 was to develop and have internally what we call our secondary eligibility review team.*** This is a team, that internal Vistagen team, not a CRO team or a third-party team, but an internal team that consists of very experienced psychometricians who review eligibility of each subject, and they listen to screening assessments as well as each public speaking challenge to ensure in the proper execution.
>
> So we think, again, that ***those kinds of enhancements*** -- and those are some of the things that take a little bit more time, especially with obviously a hyper-focus on rater training upfront, across all the endpoints, not just the SUDS, but the CGI-I and the PGIC ***so that you have confidence that the study is being run the way it should be run and that we've done everything that we can through all the experience we've gained through the execution of two studies already to enhance the potential for success***.

286. The foregoing statements identified in ¶285, emphasized in bold and italicized, were materially false and misleading when made because, while Defendants touted the Company's

"secondary eligibility review team" built into PALISADE-3, they failed to disclose that back-end operational changes were not capable of avoiding or ameliorating the fundamental limitations of the study's design. These statements materially misled investors to believe that the Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to extraordinarily high risk of an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied, known to be desensitized through repeat exposure to stressors or appear asymptomatic when not exposed to their individualized social stressors. These risks were inherent in the trial design itself and could not be remedied through additional eligibility review or increased assessment surveillance, as Defendants represented. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from an adequate and well-controlled Phase 3 clinical trial.

287. On August 7, 2025, VistaGen held an investor conference call to discuss its first quarter financial results for the fiscal year ended March 31, 2026, and provide a corporate update.

288. During the Question-and-Answer portion of the call, Defendants were asked if they "envision PALISADE-3 baseline SUDS score to be any different from the baseline SUDS in PALISADE 1 and 2?" to which Defendant Prince indicated an expectation that the results would be "similar in terms of those numbers because we have similar inclusion criteria, the post-speaking challenge is set up identically." In pertinent part, Defendant Singh followed up adding:

> ***But what we have seen, of course, is the more severely affected and chronically affected someone is with the disorder***, and we do a lot upfront to assess that eligibility -- very strict eligibility criteria even before someone signs an ICF, there's rigorous assessment clinically. And then ***as they move through the eligibility criteria that we've enhanced a bit in PALISADE-3 and 4 are making a difference, we think, to make sure we ensure that we've got a sufficiently suitable population that ultimately gets randomized. So that's been consistent across the objectives from PALISADE-2, 3 and 4***.

289. The foregoing statements identified in ¶288, emphasized in bold and italicized, were materially false and misleading when made because they materially misled investors to believe that the Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-

based single assessment repeat public speaking challenge paradigm exposed the trial to extraordinarily high risk of an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied, known to be desensitized through repeat exposure to stressors or appear asymptomatic when not exposed to their individualized social stressors. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from an adequate and well-controlled Phase 3 clinical trial.

290. During this same call, Defendants were asked their opinion on the design chosen for the only other competing Phase 3 trial (AFFIRM-1) being conducted by Neuphoria Therapeutics Inc. (formerly Bionomics) for BNC210, one of the two peer therapeutics for the treatment of *public-speaking only* SAD, that did not achieve statistical significance on its primary efficacy endpoint of a mean change in the SUDS score using the single assessment public speaking challenge design for its Phase 2 trial.

291. AFFIRM-1 screened patients with the LSAS, before collecting the patient's baseline SUDS score (approximately 5 minutes pre-dose) and then conducted a single public speaking challenge (approximately one hour after dosing), with change from baseline to average SUDS score collected during the performance phase of the 225mg dose arm versus placebo being the primary efficacy endpoint. Hence, AFFIRM-1 had no learning effect on the repeat public speaking challenge.

292. Defendant Singh responded to the question posed during the Company's August 7, 2025 investor conference call by saying:

> So look, as we've talked about, you and I have had good conversations, there's not always ever really one size fits all in mental health. So we're fans of anybody who can make an impact to the 30-plus million people affected by the disorder. Obviously, what we like about the potential of fasedienol is that it's nonsystemic and that it's rapid onset and that we don't have to drive a drug through the body and into the brain to achieve the therapeutic effect that we've seen in PALISADE-2 and in Phase II.
>
> That program you noted, and again, it's admirable that they're focused on the same sort of study design that we are, which is a public speaking challenge. It's different and that there really isn't a baseline setting first speech as we have in ours. And it's also an oral alpha-7 nicotinic. So a bit different in that it's systemically delivered versus the way we're dealing with fasedienol's potential to activate neurons in the nodes in about 25 milliseconds and the olfactory bulb hub in about 250 milliseconds.

> So just a different approach to a widespread problem, and we wish everybody success. I think we have a significant first-mover advantage regardless of however we look at this disorder with existing therapies and anything that might be in the pipeline. ***But I'm confident that we've got the right study design for our drug and its unique specific MOA,*** and they must think the same about their study design. So -- but we are happy that -- of course, the FDA must have acknowledged it. At the same time, they moved into Phase III with our design.
>
> That's comforting because it is – ***there's no doubt in our mind that the public speaking challenge and the SUDS are not only the most appropriate study design to provoke anxiety consistently across sites, but also the best way to measure efficacy in an acute setting with the subjective in distress scale as a patient-reported outcome***. So...

293. The foregoing statements identified in ¶292, emphasized in bold and italicized, were materially false and misleading when made because they materially misled investors to believe that the Company was operating a properly designed, well-controlled Phase 3 trial that did not exhibit any acute risks of failure when, in fact, the opposite was true. VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed its Phase 3 development plan to extraordinarily high risk of study failure due to the significant methodological limitations inherent in the trial design making it highly susceptible to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied, known to be desensitized through repeat exposure to stressors or appear asymptomatic when not exposed to their individualized social stressors. These underlying aggregating factors were only exacerbated by even minor variation in protocol execution across numerous study sites needed to conduct a registrational Phase 3 trial at scale and the intrinsic difficulties in identifying and enrolling an optimal patient population, as evident by PALISADE-1 and the prior peer trials. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from an adequate and well-controlled Phase 3 clinical trial.

294. Notably, on October 20, 2025, Neuphoria announced that the Phase 3 AFFIRM-1 study of BNC210 failed to meet its primary SUDS efficacy endpoint. The results of AFFIRM-1 showed patients treated with 225mg of BNC210 (n=185) had a mean change of 27.2 points on the SUDS score from baseline at performance phase. In comparison, patients randomized to placebo (n=185) showed a

mean change of 26.0 points on the SUDS score. Based on the results from AFFIRM-1, the company also announced the discontinuation of further development of its SAD program.

295. On November 3, 2025, the Company issued a press release entitled, "*Vistagen Completes PALISADE-3 Phase 3 Public Speaking Challenge Study for the Acute Treatment of Social Anxiety Disorder: Topline results for the trial are expected by year end*." A copy of the Company's November 3, 2025 press release was attached as Exhibit 99.1 to a Current Report filed with the SEC on a Form 8-K on November 4, 2025, signed by Defendant Singh.

296. In announcing the completion of the treatment phase, the November 3, 2025 press release quoted Defendant Singh as saying, "[t]he completion of the PALISADE-3 Phase 3 public speaking challenge study marks an important milestone for Vistagen[.] … As we advance toward our expected topline results later this quarter, we remain encouraged by fasedienol's potential to become the first and only acute treatment for the more than 30 million people living with social anxiety disorder." Immediately following Defendant Singh's comments, the press release provided, in pertinent part:

> ***In August 2023, Vistagen reported positive results from its randomized, double-blind, placebo-controlled PALISADE-2 Phase 3 trial*** of fasedienol for the acute treatment of social anxiety disorder. ***The PALISADE-3 trial***, and concurrent PALISADE-4 Phase 3 trial, ***involve the same public speaking challenge study design and primary efficacy endpoint as PALISADE-2, with certain protocol and operational enhancements related to site training, surveillance, and subject selection***. The topline results for PALISADE-4 are anticipated in the first half of 2026.

297. The foregoing statements identified in ¶296, emphasized in bold and italicized, were materially false and misleading when made because, as detailed more fully in ¶226, these statements misrepresented PALISADE-2's status and results. While Defendants touted "certain protocol and operational enhancements related to site training, surveillance, and subject selection" built into PALISADE-3, they failed to disclose that those program adjustments were not capable of avoiding or ameliorating the fundamental limitations of the study's design. These statements materially misled investors to believe that the Company had meaningfully addressed the factors that could impede the trials' success. In reality, Defendants failed to disclose that VistaGen's continued reliance on the same SUDS-based single assessment repeat public speaking challenge paradigm exposed the trial to high risk of study failure due to significant methodology limitations when completed at scale including

heightened susceptibility to an elevated placebo response arising from the natural history of the condition being treated and the fundamentally unpredictable and highly subjectable characteristics of the patient population being studied. These risks were inherent in the trial design itself and could not be remedied through additional operational enhancements as Defendants represented. As a result, PALISADE-3 faced odds that far surpassed what investors were told or should have ordinarily expected from a purportedly adequate and well-controlled Phase 3 clinical trial.

## ADDITIONAL FACTUAL ALLEGATIONS PROBATIVE OF SCIENTER

298. As detailed more fully above, the Individual Defendants received information reflecting the true facts regarding VistaGen and its operations and business practices and had control over and/or received the Company's materially misleading statements before they were issued to the investing public. Accordingly, the Individual Defendants acted with scienter because at the time they issued public documents and other statements in VistaGen's name, they knew, or were severely reckless in not knowing, that such statements were materially false and misleading.

299. Indeed, the ongoing fraud described herein could not have been perpetrated without the knowledge and/or severe recklessness and complicity of personnel at the highest level of VistaGen, including the Individual Defendants. The Individual Defendants knew such statements would be disseminated to the investing public, knew that investors were likely to rely upon those material misrepresentations and omissions, and knowingly or recklessly participated in the dissemination of such statements and documents to the investing public. Thus, the Individual Defendants were active and culpable participants in the fraudulent conduct alleged herein.

300. These facts, in conjunction with the additional indicia of scienter alleged below, collectively and holistically support a strong inference that, throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading when made.

### A. Defendants Singh and Prince Were Personally Involved in the Design and Execution of the Phase 3 Clinical Trials of PH94B

301. Throughout the Class Period, Defendants Singh and Prince repeatedly admitted that they were personally involved in the design and execution of the Phase 3 clinical trials of PH94B and the

efforts to identify and remediate the material weaknesses identified in prior PALISADE studies leading to missed endpoints and an elevated placebo response.

302. For example, during the Company's investor conference call, held June 11, 2024, when responding to questions about the "notable enhancements" reportedly built into the PALISADE program for PALISADE-3 and PALISADE-4, Defendant Singh provided, in pertinent part, that "[w]e've been able to achieve a lot of the things that reflect and leverage the lessons learned through the course of the prior execution of studies of this particular design, leading all the way back to Phase II time." He went on to say, "[s]o the refinements that we made to PALISADE-3 and PALISADE-4 really are based again on experience that we have, very unique and extensive experience, scaling up to a large Phase III study that come from our observations of the conduct of the PALISADE Phase III program from, again, the early, through the late stages of the pandemic, in particular."

303. Defendants Singh and Prince had personal access to information regarding enrollment criteria, eligibility compliance, and study execution and were accessing this information regularly, discussing and making assessments of their effectiveness. Indeed, the Individual Defendants were active, constant participants in VistaGen's internal review team, and thus would have been aware of the inherent weaknesses in PALISADE-3 Phase 3 trial as well as the impact, or lack thereof, of the purported program enhancements advanced to combat variability and control the placebo response.

304. For example, during an investor conference call held August 13, 2024, Defendants were asked to "provide any color on the types of patients that are currently enrolling for the Phase III trials for fasedienol." Defendant Singh responded initially by stating, "Josh [Prince], do you want to address that? Josh is on top – primarily on top of our execution of the PALISADE program."

305. Likewise, during an investor conference call held November 7, 2024, Defendant Singh described a "recent town hall with the sites," referring to an in-person meeting with all the principal investigators and site staff for both PALISADE-3 and PALISADE-4, explaining "[i]t's something that we do from time to time where it's sort of like a fireside chat with me and with the rest of the team" where they discussed, among other things, study enrollment.

306. CW1 explained that, during their tenure at VistaGen (August 2021 to July 2024), CW1 had weekly meetings with Defendant Singh, their supervisor, Caren Scannell, and Senior Vice President

of Investor Relations, Mark McPartland, to discuss the Company's clinical trials and drug products. CW1 described Defendant Singh as "super, super involved in the trials."

307. Moreover, Defendants' pre-Class Period experience with the very same material weaknesses in the PALISADE design, contributing to the elevated placebo response in PALISADE-1, that would later be disclosed to have continued to exist during the Class Period is probative of scienter.

308. For example, during an investor conference call held June 23, 2022, attended by Defendant Singh, following the announced completion of PALISADE-1, an analyst posed the following question: "[l]ooking to the PALISADE data, can you provide any additional clarity on the degree of difference on SUDS that you think would be a home run scenario? And what is the minimum difference that you'd view as clinically meaningful?"

309. To which, Mark A. Smith, VistaGen's then-Chief Medical Officer, responded:

> Yes. So now if you look -- what we're interested, of course, is in significance between placebo and drug. And with the drug in Phase II, we saw about -- I think it was about a 26-point difference on placebo. There was a 14-point difference. And that's to be expected that there would be some placebo response as they go through the public speaking challenge twice. So they kind of know what to expect the next time. So whether you call that placebo effect or just familiarity with the procedure, but we're looking for about a 12-point change. That's what we powered to 90% powered. With -- but we also powered for -- or anticipated there could be more variance because we have 20 sites now compared to the smaller Phase II study. But -- so yes, that's what we're looking for.

### B. VistaGen's Dire Financial Condition and Need for Working Capital

310. Time and money were the deciding factors for Defendants' calculated risk. VistaGen was at risk of running out of cash at the start of the Class Period. As of June 30, 2023, VistaGen had cash and cash equivalents of just $9.6 million and an accumulated deficit of $333.8 million. VistaGen had not generated any revenue to date, and no revenue was expected for the foreseeable future. Indeed, the Company's future operations and financial prospects were dependent on the success of Phase 3 development plan for PH94B, as well as its ability to secure additional financing.

311. Based on the Company's cash on hand as of June 30, 2023, VistaGen reported in public filings with the SEC that it did not have sufficient funding for its planned operations for the next twelve months, which raised substantial doubt regarding its ability to continue as a concern. The Company went on to explain that its future working capital requirements would depend on many factors,

including, *inter alia*, the scope and nature of opportunities related to its success or failure, including the development and commercialization of its current product candidates, and the availability of, and its ability to enter into financing transactions.

312. During the first round of the PALISADE program, VistaGen expended roughly $113.7 million on Research and Development, attributing such costs "primarily [] to the preparation, initiation and continuation of the various clinical trials in the Company's PALISADE Phase 3 Program for PH94B in SAD" and later to "nonclinical development and outsourced manufacturing and regulatory activities for fasedienol and itruvone." As a reminder, PALISADE-2 also closed early due, in part, to admitted cost concerns with resuming. That said, by conducting replicate PALISADE studies, utilizing an already FDA-accepted study design, protocol and SAP, with only minor amendments to the overall execution, and overlap from prior study sites, the Company could save time and money from study launch through the conduct of the trial.

313. In contrast, the FEARLESS program did not yet have an established and FDA-accepted protocol or SAP; it would have required new training and training models all up and down every aspect of conducting that type of study; and would have required vetting of potential new study sites – all requiring significantly more time and money. When asked about a timeline if VistaGen were to proceed with Phase 3 clinical trials using the LSAS as the primary efficacy endpoint in a real-world study, during the investor conference call held February 7, 2023, Defendant Singh responded, in pertinent part, that for that type of study, "in an optimal scenario, we would be in a mode in about 6 months … to launch."

314. Conducting the FEARLESS Phase 3 trial also would have cost more than a PALISADE trial as it would have required more product for its multiple administrations, on a patient-tailored, as-needed basis in their daily lives, up to six times per day, and the real-world setting of FEARLESS would not change the clinical staffing and review personnel necessary to complete the trial as the design called for the clinician-administered LSAS as the primary efficacy endpoint. Further, the FEARLESS trial inevitably would have taken longer to complete as the design called for the assessment of multiple administrations in a real-world outpatient setting over a multiple-week period.

315. As described in detail above ¶¶151-70, after cashing in on the Company's touted positive results of PALISADE-2, supporting its redefined and derisked hybrid Phase 3 development plan for

fasedienol, as of the close of the October 2023 Offering, VistaGen had amassed cash and cash equivalents of approximately $131.1 million.

316. When announcing the closing of the October 2023 Offering, VistaGen declared that if the Phase 3 development program for fasedienol, then prioritizing PALISADE-3 and PALISADE-4, proved successful, the proceeds from the October 2023 Offering, together with its existing cash and cash equivalents, generated primarily through its ATM offerings to date, would be sufficient to fund its operations through its potential submission of an NDA for fasedienol for the acute treatment of SAD. As of December 31, 2023, the Company had cash and cash equivalents of approximately $126.6 million.

317. Based on the foregoing, VistaGen was under immense pressure to raise working capital from its strategically timed ATM offerings and the October 2023 Offering. Without this capital, the Company would have been unable to continue operations, as admitted by VistaGen in its filings with the SEC. Thus, its ability to maintain a façade of a derisked Phase 3 development plan for its lead product candidate was paramount; disclosing the immense risk of conducting multiple replicate PALISADE Phase 3 studies would have severely jeopardized VistaGen's ability to obtain working capital (if not killed it altogether).

318. As described in detail above ¶¶207-13, VistaGen also cashed in on insider knowledge through strategically timed ATM offerings just before the full fraud is revealed to generate the working capital required to stay ahead of the Company's formidable cash burn and continue operations. This included raising enough money to continue paying significant annual compensation to both Defendant Singh and Prince (which between 2023 and 2025 amounted to total compensation of $4,025,599 and $1,626,687, respectively).

319. Accordingly, VistaGen's need for working capital and, in turn, the need to maintain a successful image with investors provided Defendants with motive and opportunity to commit the fraud alleged herein. Given VistaGen's financial straits, this motive surpassed any ordinary or generic corporate motive to raise funds.

**C. The Clinical Development of PH94B Was the Core Focus of VistaGen's Business**

320. Defendants' scienter is also strongly inferable because their materially false and misleading statements concerned the clinical development of PH94B, VistaGen's lead product

candidate, and the PALISADE design deficiencies can be inferred because these facts were critical to VistaGen's core operations.

321. Given the scale of this investment, it is absurd to suggest Defendants were ignorant to the inherent inconsistencies in patient characteristics in PALISADE-3 and the risks associated therewith while supervising trial execution. Accordingly, Defendants either knew of or were deliberately reckless to PALISADE-3's weaknesses and risk of failure.

**LOSS CAUSATION**

322. At all relevant times, VistaGen securities traded in an open, well-developed, and efficient market that promptly digested new information regarding the Company from all reasonably accessible public sources and reflected such information in the price of VistaGen securities.

323. As described above, throughout the Class Period, Defendants made false and misleading statements that misrepresented and/or failed to disclose the adverse facts detailed herein. Defendants' false and misleading statements caused VistaGen securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiff and other members of the Class who purchased or otherwise acquired such securities before such the inflation was removed.

324. As detailed herein, the price of VistaGen securities fell precipitously on high trading volume in response to information released to the public on October 2, 2023, November 9, 2023, and December 17, 2025. The price of VistaGen securities fell in response to each such corrective disclosure and/or materialization of a concealed risk by revealing information that removed part of the inflation introduced by Defendants' previous misstatements and material omissions, causing real economic loss to Plaintiff and other members of the Class who purchased VistaGen securities during the Class Period at inflated prices.

325. As detailed more fully above ¶¶173-81, 215-17, investors learned through a series of partial disclosures about the true facts or risks concealed by Defendants' misstatements. Each of these disclosures revealed, for the first time, new information about Defendants' fraud that was previously unknown to the market. Investors had been in the dark about these undisclosed facts or concealed risks, and, thus, as the news was released and investors were able to consider the ramifications for VistaGen,

its business and financial prospects, the price of the Company's securities dropped precipitously, thereby damaging Plaintiff and other members of the Class who had invested in those securities.

326. As detailed more fully above ¶¶131-50, based on the purportedly positive outcome of PALISADE-2 and recast of PALISADE-1 as pandemic-driven outlier, VistaGen informed investors that it intended to pursue a hybrid development strategy for PH94B, consisting of both the PALISADE-3 and FEARLESS Phase 3 trials. Unlike PALISADE-3 which relied on a clinic-based public speaking challenge paradigm and measured acute anxiety using SUDS at discrete points in time, FEARLESS was designed to evaluate PH94B in a real-world setting using the LSAS, a well-established measure of acute social anxiety symptoms as well as avoidance over time. Investors understood this dual-track approach to diversify VistaGen's Phase 3 development program and reduce the risk associated with relying exclusively on a single clinical methodology, particularly one based on SUDS, which was unproven and had not produced positive results in comparable Phase 3 studies, completed at scale.

327. On October 2, 2023, VistaGen, however, disclosed that it would proceed with PALISADE-3 and a second replicate PALISADE Phase 3 study, PALISADE-4, while providing little discussion of the previously announced FEARLESS study. This increased the risk that any flaws, limitations, or failures associated with the PALISADE design would jeopardize the entire development program for PH94B. This disclosure revealed, for the first time, that VistaGen had effectively re-concentrated its Phase 3 development strategy on two trials employing the same clinic-based public speaking challenge paradigm, as measured by the SUDS efficacy endpoint, rather than prioritizing a diversified approach that also evaluated PH94B's effectiveness in real-world social situations using the precedent-setting LSAS efficacy endpoint. As a result, the near-term success of PH94B became increasingly dependent on a single clinical methodology, heightening the risk that any flaws, limitations, or failures associated with the PALISADE design would jeopardize the entire NDA-enabling Phase 3 development program for the Company's lead product candidate.

328. As the market digested this news, the Company's stock price dropped from $5.24 per share at close on September 29, 2023 to $4.20 per share on October 2, 2023, before continuing its descent to $3.87 per share at close on October 3, and to $3.43 per share on October 4, 2023, representing a 34.5% decline over three days, on heavy trading volume.

329. Next, as detailed more fully above ¶¶179-81, it became increasingly clear by November 9, 2023, that VistaGen was no longer advancing the FEARLESS Phase 3 trial. That day, in a press release providing a corporate update and reporting its financial results for the quarterly period ended September 30, 2023, filed with the SEC as Exhibit 99.1 attached to the Company's Current Report on Form 8-K, Vistagen reiterated plans for the PALISADE Phase 3 program but omitted any reference to FEARLESS or any ongoing efforts to initiate an LSAS-measured, real-world study. This omission, together with Defendant Singh's remarks during the same evening's investor call, which referenced only the PALISADE program, confirmed that FEARLESS had been abandoned. VistaGen's Phase 3 development strategy for PH94B was effectively confined to the PALISADE program, further increasing the risk that any inherent flaws or limitations in the PALISADE design would jeopardize the entire NDA-enabling Phase 3 development program for the Company's lead product candidate.

330. On this news, VistaGen's stock price fell precipitously from $3.08 per share at close on November 8, 2023 to $2.89 per share at close on November 9, before falling further to $2.57 per share at close on November 10, 2023, representing a 16.6% decline over two days, on high trading volume.

331. Finally, as detailed more fully above ¶¶214-17, on December 17, 2025, VistaGen was forced to announce that the PALISADE-3 Phase 3 study of fasedienol for the acute treatment of SAD did not achieve its primary efficacy endpoint, as measured by the least squares mean change from baseline on the SUDS score, as compared to placebo. The Company also reported that there was no treatment difference between fasedienol and placebo for the secondary endpoints of PALISADE-3.

332. On this news, VistaGen's stock price fell swiftly and dramatically from a closing price of $4.36 per share on December 16, 2025 to $0.86 per share at close on December 17, 2025, representing a more than 80% decline in a single trading day.

333. Analysts and investors alike drew a link between this decline and the disclosure of PALISADE-3's failure. For example, that same day, the Maxim Group issued a report noting, in pertinent part, "[t]his morning, VistaGen announced that the P3 PALISADE-3 study of fasedienol for acute treatment of social anxiety disorder (SAD) failed on the primary endpoint of change in Subjective Units of Distress (SUDS) and there was no treatment difference vs. placebo for secondary endpoints. VTGN shares are down 80% on the news."

334. Each decline in the price of VistaGen securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud. The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein. Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiff and other Class members to suffer economic losses, *i.e.*, damages under the federal securities laws.

**PRESUMPTION OF RELIANCE**

335. Plaintiff and other members of the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established by the U.S. Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1998). Such a presumption is appropriate because, among other things:

(a) during the Class Period, Defendants made public representations that contained untrue statements of material fact or failed to disclose material facts necessary to make the statements that were made not misleading;

(b) the misrepresentations and/or omissions were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased VistaGen securities between the time Defendants misrepresented or failed to disclose material facts necessary to make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

336. At all relevant times, the market for VistaGen securities was efficient for the following reasons, among others:

(a) VistaGen common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, VistaGen filed periodic public reports with the SEC;

(c) VistaGen regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d) VistaGen was followed by securities analysts employed by brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(e) Unexpected company-specific news was reflected and incorporated into the price for VistaGen securities.

337. As a result of the foregoing, the market for VistaGen securities promptly digested current information regarding the Company from publicly available sources and reflected such information in VistaGen's securities prices. Under these circumstances, all purchasers and/or acquirers of VistaGen securities during the Class Period suffered similar injury through their purchase and/or acquisition of VistaGen securities at artificially inflated prices, and the presumption of reliance applies.

338. In addition, a Class-wide presumption of reliance is also appropriate under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims center, in large part, upon Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated by law to disclose—positive proof of reliance is not a prerequisite to recovery.

**NO SAFE HARBOR**

339. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

340. None of the statements alleged herein to be false or misleading are forward-looking statements. Such statements addressed facts and conditions existing at the time the statements were made. Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

341. To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as "forward-looking statements" when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when the risks were not merely hypothetical. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance. In addition, Defendants are liable for any forward-looking statements because at the time each statement was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of VistaGen who had actual knowledge that the statement was materially false or misleading.

## CLASS ACTION ALLEGATIONS

342. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class. Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

343. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of June 10, 2025, the Company had 29,157,733 shares of Class A common stock outstanding and 357 shareholders of record. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

344. Plaintiff's claims are typical of the claims of members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

345. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

346. Common questions of law and fact that exist as to all members of the Class predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the acts alleged herein violated the federal securities laws and/or SEC rules promulgated thereunder;

(b) whether Defendants' statements during the Class Period misrepresented material facts or omitted material facts necessary to make the statements that were made, in the circumstances under which they were made, not misleading;

(c) whether Defendants made such statements;

(d) whether Defendants acted with the requisite level of scienter;

(e) whether the Individual Defendants were controlling persons of VistaGen; and

(f) whether and to what extent the material misstatements and omissions alleged herein artificially inflated the market price of VistaGen's securities;

(g) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

347. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

## COUNT I

***For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder***

**(Against All Defendants)**

348. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

349. This Count is brought against all Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

350. Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, by use of the means or instrumentalities of interstate commerce, including but not limited to the mails and the internet, and/or the facilities of NASDAQ, engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

351. As alleged herein, Defendants made or otherwise caused VistaGen to issue the materially false or misleading statements specified above. Specifically, the Individual Defendants participated directly or indirectly in the preparation, approval and/or issuance of public disclosures specified above that contained untrue statements of material fact and/or omitted material facts necessary to make the statements therein not misleading. Such scheme was intended to, and did, as alleged herein: (i) deceive the investing public, including Plaintiff and other Class members; (ii) artificially inflate and maintain the market price of VistaGen securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire VistaGen common stock at artificially inflated prices.

352. As set forth above, the Individual Defendants knew or were reckless in not knowing that such statements, when made, were false or misleading, in that they contained material

misrepresentations or otherwise failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

353. VistaGen is liable for the acts of its executives, directors, officers, and agents, including the Individual Defendants, at common law and under the doctrine of *respondeat superior* because all the wrongful acts and omissions complained of herein were carried out within the scope of such person's employment. The scienter of VistaGen's executives, directors, officers, and agents, including the Individual Defendants, is similarly imputed to VistaGen under established agency principles.

354. As a result of the foregoing, the market price for VistaGen securities was artificially inflated during the Class Period. Plaintiff and other members of the Class relied on the integrity of the market price for VistaGen securities during the Class Period and paid prices for such securities that were artificially inflated as a result of the false and misleading statements described herein. Plaintiff and members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities was artificially inflated by Defendants' false and misleading statements.

355. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class have suffered damages in connection with their purchases or otherwise acquisitions of VistaGen securities during the Class Period.

356. By reason of the foregoing, Defendants are liable to Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

***For Violations of Section 20(a) of the Exchange Act***

**(Against the Individual Defendants)**

357. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

358. This Count is brought against Defendants Singh and Prince pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

359. As alleged above, Defendants VistaGen, Singh, and Prince, individually and in concert, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making

materially false and misleading statements and omitted material information in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

360. Throughout the Class Period, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of VistaGen and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

361. As officers and/or directors of a publicly owned company, the Individual Defendants also had a duty to disseminate accurate and truthful information with respect to VistaGen's business, operations, financial condition, and prospects. In this capacity, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

362. Thus, by virtue of their positions as senior officers of VistaGen, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged herein to give rise to the primary violations alleged herein. Indeed, the Individual Defendants exercised their power and authority to cause VistaGen to engage in the wrongful acts alleged herein or personally participate in the unlawful conduct alleged.

363. By reason of the foregoing, the Individual Defendants are liable to Plaintiff and members of the Class for violations of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

A. Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as a class representative;

B. Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying experts; and

D. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 19, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*

Adam M. Apton (SBD 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
aapton@zlk.com

*Attorneys for Lead Plaintiff and the Class*