JORDAN ETH (CA SBN 121617)
JEth@mofo.com
CHRISTIN HILL (CA SBN 247522)
CHill@mofo.com
MICHAEL KOMOROWSKI (CA SBN 323517)
MKomorowski@mofo.com
CHRISTINA E. DIEROLF (CA SBN 335258)
CDierolf@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

*Attorneys for Defendants*
Vistagen Therapeutics, Inc., Shawn K. Singh, and Joshua Prince

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN ELLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VISTAGEN THERAPEUTICS, INC., SHAWN K. SINGH, and JOSHUA PRINCE,<br><br>Defendants. | Case No. 3:26-cv-00427-RS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: November 19, 2026<br>Time: 1:30 p.m.<br>Place: Courtroom 12, 19th Floor<br>Judge: Honorable Richard Seeborg<br><br>Amended Complaint Filed: June 19, 2026<br>Trial Date: Not yet set |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 19, 2026, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Richard Seeborg of the United States District Court for the Northern District of California, in the San Francisco Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, Courtroom 12, 19th Floor, Defendants Vistagen Therapeutics, Inc. ("Vistagen"), Shawn K. Singh ("Singh"), and Joshua Prince ("Prince" and together with Vistagen and Singh, "Defendants") will, and hereby do, move pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Amended Complaint") filed by Lead Plaintiff Eric Weinberger ("Plaintiff") on June 19, 2026.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, Defendants' Request for Judicial Notice, the Declaration of Christin Hill ("Hill Decl.") and exhibits attached thereto ("Ex. __"), all other pleadings and papers on file herein, and such other argument and materials as may be presented to the Court before this Motion is taken under submission.

## ISSUES TO BE DECIDED

1. **Material falsity.** Whether Plaintiff's claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") should be dismissed on the ground that Plaintiff has failed to plead particularized facts showing that any Defendant made a materially false or misleading statement.

2. **Scienter.** Whether Plaintiff's Section 10(b) claims should be dismissed on the additional, independent ground that Plaintiff has failed to plead particularized facts giving rise to a "strong inference" that any Defendant made any challenged statement with scienter.

3. **Control-person liability.** Whether Plaintiff's control-person claims under Section 20(a) of the Exchange Act should be dismissed on the ground that Plaintiff has failed to plead a predicate violation of the securities laws.

## TABLE OF CONTENTS

Page


INTRODUCTION ........ 1
BACKGROUND ........ 3
I. FACTUAL BACKGROUND ........ 3
  A. The Company and Its Business. ........ 3
  B. Vistagen Conducts Multiple Clinical Trials of Fasedienol. ........ 3
  C. Vistagen's PALISADE-3 Study ........ 5
II. THE AMENDED COMPLAINT ........ 6
ARGUMENT ........ 7
I. PLAINTIFF MUST SATISFY HEIGHTENED PLEADING STANDARDS ........ 7
II. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) ........ 8
  A. Plaintiff Fails to Plead a Materially False or Misleading Statement. ........ 8
    1. Plaintiff Does Not Plead With Particularity That Any Challenged Statement Was Materially False or Misleading When Made. ........ 9
    2. Defendants' Optimistic Statements Are Not Actionable. ........ 19
    3. Defendants' Opinion Statements Are Not Actionable ........ 19
    4. Defendants' Forward-Looking Statements Are Not Actionable. ........ 20
  B. Plaintiff Fails to Plead a Strong Inference of Scienter ........ 22
    1. Management's Involvement in the Clinical Trial Program Does Not Support an Inference of Scienter. ........ 22
    2. The CW Allegations Do Not Support an Inference of Scienter. ........ 23
    3. Plaintiff's Allegations Regarding Vistagen's Need for Capital Do Not Support an Inference of Scienter. ........ 24
    4. Plaintiff Does Not Offer a Cogent and Compelling Theory of Fraud. ........ 25
III. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a) ........ 25
CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) .......... 17

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021).......... 19

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) .......... 25

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) .......... 19

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) .......... 7

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017).......... 19

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024).......... 8, 15

*Colyer v. AcelRx Pharms., Inc.*,
Case No. 14-CV-04416-LHK, 2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .......... 20

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017).......... 23

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010).......... 19, 21

*Espy v. J2 Global, Inc.*,
99 F.4th 527 (9th Cir. 2024).......... 7

*Farhar v. Ontrak, Inc.*,
714 F. Supp. 3d 1198 (C.D. Cal. 2024).......... 21

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008).......... 22

*Kovtun v. VIVUS, Inc.*,
Case No. C 10–4957 PJH, 2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) .......... 20

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002).......... 24

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022)........ 8, 10, 20

*McGovney v. Aerohive Networks, Inc.*,
367 F. Supp. 3d 1038 (N.D. Cal. 2019) ........ 19

*In re Metricom Sec. Litig.*,
Case No. C 01–4085 PJH, 2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ........ 24

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022)........ 7

*In re Nektar Therapeutics Sec. Litig.*,
Case No. 18-cv-06607-HSG, 2020 WL 3962004 (N.D. Cal. July 13, 2020) ........ 12

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020)........ 14

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
Case No.15-cv-02938-HSG, 2016 WL 7475555 (N.D. Cal. Dec. 29, 2016)........ 12

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)........ 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ........ 20

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*,
774 F.3d 598 (9th Cir. 2014)........ 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)........ 8, 19, 20

*In re Read-Rite Corp. Sec. Litig.*,
335 F.3d 843 (9th Cir. 2003)........ 8

*In re Regulus Therapeutics Inc. Sec. Litig.*,
406 F. Supp. 3d 845 (S.D. Cal. 2019) ........ 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)........ 7, 11, 24, 25

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)........ 17

*Sneed v. Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025)........ 12

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ........ 19

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
97 F.4th 634 (9th Cir. 2024) ........ 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ........ 22

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........ 7

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007) ........ 17

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........ 21

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........ 7, 22, 23, 24

**Statutes and Other Authorities**

15 U.S.C.
§ 78j(b) ........ *passim*
§ 78t(a) ........ 7, 25
§ 78u-4(b)(1)–(2) ........ 7
§ 78u-5(c)(1) ........ 21

Fed. R. Civ. P. 9(b) ........ 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Although the names change, fraud-by-hindsight claims like those in Plaintiff's Amended Complaint follow a familiar pattern: the plaintiffs start with disappointing news at the story's end and allege the defendants "knew it all along." This case is no different. Here, the story ends on December 17, 2025, when Vistagen, a clinical-stage biopharmaceutical company, announced that PALISADE-3, a randomized, double-blind, placebo-controlled Phase 3 clinical trial of fasedienol nasal spray for the acute treatment of social anxiety disorder, did not meet its primary efficacy endpoint after an elevated placebo response. Vistagen's stock price fell, and this lawsuit followed. Working backwards from the December announcement, Plaintiff alleges that Vistagen and its executives knew years earlier that the multi-year PALISADE program was "fundamentally flawed," that the positive and statistically significant result of the immediately preceding PALISADE-2 clinical trial of fasedienol was an aberration, and that operational refinements could not adequately reduce variability in PALISADE-3.

Simply put, Plaintiff alleges that Vistagen failed to disclose that the PALISADE program was "fundamentally" and "extraordinarily" risky. Putting aside that Defendants may not have used Plaintiff's preferred adverbs, Vistagen repeatedly, and explicitly, warned of the risks in developing pharmaceutical products, and of the specific risks in developing treatments for anxiety disorders that rely on "subjective patient-reported outcomes as key efficacy endpoints," and are susceptible to a "placebo effect." These risks were obvious. As disclosed, Vistagen's PALISADE program involved patients suffering from social anxiety disorder participating in a public speaking challenge where they were asked to report their anxiety levels on a subjective scale following application of a nasal spray. The nature of the study and Vistagen's extensive and repeated public disclosures could leave no doubt that its program, like all clinical trials, faced inherent complexity and risks, regardless of the adverbs used.

In any event, the Amended Complaint is based entirely on hindsight: Plaintiff fails to plead facts—contemporaneous internal reports, analyses, FDA communications, or internal accounts—that bridge the gap between risks expected in biopharmaceutical clinical trials, and

contemporaneous knowledge that PALISADE's risks were extraordinary and unmanageable. The only purportedly internal sources are two confidential witnesses ("CWs"), who allege recruitment and enrollment challenges, but do not identify any contemporaneous fact contradicting Vistagen's public statements, or otherwise offer any basis to conclude that either Individual Defendant believed that the PALISADE design could not succeed. The Amended Complaint nevertheless challenges 44 statements over a more-than-two-year Class Period based on essentially that same inferential leap. The Amended Complaint should be dismissed for two independent reasons.

***First***, Plaintiff does not plead facts to show that any of the 44 challenged statements—the vast majority of which are non-actionable statements of corporate optimism—were materially false or misleading when made. Indeed, there is not a single well-pleaded factual allegation from the CWs or otherwise contradicting Vistagen's statements about the PALISADE studies or otherwise suggesting that the Defendants were aware that the trial design created a heightened risk of variability, let alone trial failure.

***Second***, the Amended Complaint lacks factual allegations giving rise to the required strong inference of scienter. Plaintiff relies on Singh's and Prince's oversight of Vistagen's clinical program, vague allegations from the CWs, the Company's need to raise capital, and the importance of fasedienol to Vistagen's business. But none of those allegations identifies contemporaneous information showing that either Defendant knew any challenged statement was false or misleading when made. The CWs offer no allegations concerning Prince, and their allegations concerning Singh establish only that he, as Vistagen's CEO, oversaw the Company's clinical programs and participated in discussions about routine clinical-development issues such as enrollment—not that he received information contradicting Vistagen's public statements. Taken individually or holistically, these allegations do not support any inference of intent to deceive—let alone one that is cogent and at least as compelling as the far more plausible inference that Defendants believed the PALISADE program could succeed and were actively working to address the risks inherent in clinical development of a novel drug candidate for a serious and life-threatening mental health disorder.

The Amended Complaint should, therefore, be dismissed.

## BACKGROUND

### I. FACTUAL BACKGROUND[1]

#### A. The Company and Its Business.

Vistagen is a Nevada corporation headquartered in South San Francisco, California. (¶ 2.)[2] Shawn K. Singh is Vistagen's President and Chief Executive Officer, and Joshua Prince is its Chief Operating Officer. (¶¶ 27–28.) Vistagen is a clinical-stage biopharmaceutical company developing drug candidates for neurological and psychiatric disorders. Its most advanced drug candidate, fasedienol nasal spray, is being developed for the acute treatment of social anxiety disorder ("SAD"). (¶¶ 4, 59, 61, 69, 72; Ex. 4 at 7–8.)

#### B. Vistagen Conducts Multiple Clinical Trials of Fasedienol.

Vistagen acquired the exclusive rights to develop and commercialize fasedienol (formerly, PH94B) in 2018. (¶ 60.) In July 2020, Vistagen announced that it and the U.S. Food and Drug Administration ("FDA") had "reached consensus on key aspects" of an initial pivotal Phase 3 clinical trial of PH94B. (¶ 90.) In 2021, Vistagen initiated the PH94B Phase 3 development program, known as the PALISADE[3] program, with PALISADE-1, a randomized, double-blind, placebo-controlled, single-dose, parallel comparison study involving a single-event, laboratory-simulated public speaking challenge, designed to evaluate the efficacy, safety, and tolerability of the acute administration of PH94B during a clinically simulated public speaking challenge. (¶¶ 90–91; Ex. 1 at 9.) PALISADE-1 measured efficacy using patient-reported anxiety ratings on the Subjective Units of Distress Scale ("SUDS"). (¶¶ 7, 91.)

In June 2021, while PALISADE-1 was ongoing, Vistagen announced its plans to launch PALISADE-2, a second Phase 3 clinical study of fasedienol with a substantially similar design to PALISADE-1. (¶ 94.) Like PALISADE-1, PALISADE-2 also measured efficacy using the SUDS,

---

[1] The facts set forth herein are derived from the Amended Complaint, the documents cited in and incorporated by reference into the Amended Complaint, and other judicially noticeable documents. *See* Defendants' Request for Judicial Notice, filed concurrently.

[2] Unless otherwise noted, references to "¶ __" are to the Amended Complaint, and references to "Ex. __" are to the exhibits attached to the Declaration of Christin Hill ("Hill Decl.").

[3] Companies often ascribe a name to a Phase 3 clinical trial program for convenience, based on its endpoint and study population. PALISADE refers to the Phase 3 clinical trial of fasedienol based on the SUDS endpoint. A separate clinical trial program called FEARLESS was contemplated to study the same disorder in the same patient population, using a different clinical endpoint.

but was conducted at different clinical site locations, and was supervised by a different clinical research organization. (*Id.*)

On July 22, 2022, Vistagen announced that PALISADE-1 did not achieve its primary efficacy endpoint. (¶ 98.) Vistagen also reported that although the trial failed to meet its primary endpoint, fasedienol's safety and tolerability profile remained favorable and consistent with prior trials. (Ex. 2 at 4.)

On August 10, 2022, Vistagen announced that it had "paused enrollment in [its] PALISADE-2 Phase 3 study and had engaged an independent biostatistician to conduct an interim analysis of data collected to date" while it continued to "examine the results of [its] PALISADE-1 Phase 3 study in social anxiety disorder." (¶ 105; Ex. 3 at 4.) On August 12, 2022, Vistagen submitted certain PALISADE-2 protocol amendments to the FDA to address certain "methodological issues" that may have contributed to the outcome of PALISADE-1. (¶ 112.) While those amendments were pending, Vistagen announced that, based on the independent third-party biostatisticians' review, it would continue PALISADE-2 as planned. (¶ 111.)

On February 7, 2023, Vistagen announced that it had conducted further analysis of the PALISADE-1 results and that it was preparing to meet with the FDA to discuss its broader Phase 3 development plan for fasedienol. (¶ 116.) Vistagen also announced that the development plan included "the possibility of a multiple-administration, randomized, double-blind, placebo-controlled Phase 3 study of PH94B in adults, using the [LSAS] as the primary efficacy outcome measure to support a potential [NDA]." (*Id.*) The next month, on March 30, 2023, Vistagen announced that its Phase 3 development plan for fasedienol using the Liebowitz Social Anxiety Scale ("LSAS") as the primary endpoint had received "positive feedback" from the FDA. (¶ 123.) Vistagen further announced that it was closing the PALISADE-2 study and would provide topline results from the 141 subjects who completed PALISADE-2 in the second half of 2023.

On June 28, 2023, Vistagen announced that it planned to initiate its FEARLESS Phase 3 studies, evaluating fasedienol for the acute treatment of SAD using the LSAS-based primary endpoint. (¶ 127.) The primary difference between the PALISADE and FEARLESS clinical programs was that FEARLESS would involve the acute administration of fasedienol before a

patient-identified triggering event and would use the LSAS score to measure efficacy. (¶ 130.)

On August 7, 2023, Vistagen reported positive topline results from PALISADE-2. (¶ 131.) Specifically, Vistagen announced that PALISADE-2 had "met its primary efficacy endpoint, with fasedienol demonstrating a statistically significant difference in average SUDS score during a public speaking challenge compared to placebo (p=0.015)." (*Id.*) On August 10, 2023, Vistagen provided a further corporate update, announcing that, based on the positive topline results from PALISADE-2, the Company was preparing for its "Phase 3 PALISADE-3 trial, with potential to initiate the trial during the first half of calendar 2024." (¶ 136.) PALISADE-3 was designed to attempt to replicate the success of PALISADE-2. (¶ 137.)

### C. Vistagen's PALISADE-3 Study

On April 1, 2024, Vistagen announced enrollment of the first patient in PALISADE-3, a randomized, double-blind, placebo-controlled Phase 3 public speaking challenge trial of fasedienol for the acute treatment of SAD. (¶ 187.) In this same announcement, Vistagen described the PALISADE-4 trial as a planned replicate of PALISADE-3 that it expected to initiate in the second half of 2024. (*Id.* ¶¶ 187–88.)

In the 10-K filed with the SEC on June 11, 2024, Vistagen emphasized some of the challenges of the PALISADE program:

- "We have focused our research and development efforts on addressing psychiatric and neurological disorders. Efforts by pharmaceutical companies in this field have faced certain challenges in drug development. In particular, many ***neuroscience disorders such as anxiety and depression disorders rely on subjective assessments by clinicians and subjective patient-reported outcomes as key endpoints***. This makes them more difficult to evaluate than indications with more objective endpoints. Furthermore, ***these indications are often subject to a placebo effect***, which may make it more challenging to isolate the beneficial effects of our product candidates. There can be no guarantee that we will successfully overcome these challenges with our product candidates or that we will not encounter other challenges in the development of our product candidates." (Ex. 10 at 41 (emphasis added).)
- "[T]here are limited precedents for trial design, trial endpoints and regulatory pathway for certain therapeutic indications we are pursuing through the development of our product candidates, which may make clinical development and regulatory approval for those product candidates more challenging." (*Id.* at 33–34.)

These types of cautions appeared in Vistagen's public filings throughout the course of its

PALISADE clinical program. (*E.g.*, Ex. 17 at 34, 42.)

During a June 11, 2024 earnings call, Singh explained that although the use of SUDS as the primary efficacy endpoint remained unchanged, notable enhancements and operational changes were built into PALISADE-3 and PALISADE-4 with the intent of optimizing quality enrollment, enhancing monitoring, controlling variability, and promoting adherence to the protocol. (¶¶ 188–89.) Singh further elaborated that refinements made to PALISADE-3 and PALISADE-4 stemmed from observations of PALISADE Phase 3 conduct leading to insights on the proper and consistent administration of the public speaking challenge protocol. (*Id.*) Throughout 2024 and 2025, Vistagen provided updates on enrollment and trial execution, repeatedly cautioning that success remained uncertain. (*E.g.*, Ex. 13 at 4; Ex. 16 at 4–5; Ex. 19 at 4.)

In November 2025, Vistagen announced completion of the PALISADE-3 public-speaking-challenge study and noted that PALISADE-3 and PALISADE-4 used the same public speaking challenge study design and SUDS-based primary efficacy endpoint as in PALISADE-2. (Ex. 22 at 4.) In a November 13, 2025, earnings call, Vistagen communicated that "if everything goes according to plan" and PALISADE-3 was positive, the Company estimated it could submit an NDA around the middle of 2026. (¶¶ 41–42.)

On December 17, 2025, Vistagen announced that the PALISADE-3 trial "did not achieve its primary efficacy endpoint." (¶ 215.) Vistagen described the results as "unexpected" and "inconsistent with positive outcomes observed in Phase 2 and our PALISADE-2 Phase 3 study." (Ex. 23 at 1.) Following this announcement, Vistagen's stock price dropped from $4.36 per share to $0.86 per share. (¶ 216.)

## II. THE AMENDED COMPLAINT

The initial class action complaint was filed on January 15, 2026, four weeks after Vistagen announced the results of PALISADE-3. (ECF No. 1.) On June 19, 2026, Plaintiff filed the Amended Complaint. (ECF No. 36.) Plaintiff purports to bring claims on behalf of "all persons and entities who purchased or otherwise acquired Vistagen securities between August 7, 2023 and December 16, 2025" (the "Class Period"). (¶ 1.) The Amended Complaint asserts two Exchange Act claims: (1) a fraud claim under Section 10(b) against Vistagen, Singh, and Prince and (2) a

control-person claim under Section 20(a) against Singh and Prince. (*Id.*)

The Amended Complaint's theory is unchanged from the original complaint: Defendants knew PALISADE-3 faced risks "far surpass[ing] what investors were told or should have ordinarily expected," yet misled investors by presenting the design and operational refinements as appropriate. (¶ 2.) For the Court's reference, the 44 challenged statements are set forth in Appendix A. References below to statement numbers correspond to Appendix A.

## ARGUMENT

### I. PLAINTIFF MUST SATISFY HEIGHTENED PLEADING STANDARDS

To state a claim under Section 10(b), Plaintiff must plead "(1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Espy v. J2 Global, Inc.*, 99 F.4th 527, 535 (9th Cir. 2024) (citation modified). "Each of these elements must be independently satisfied." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022).

To survive a motion to dismiss, Plaintiff must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the even "more exacting pleading requirements" of the Reform Act, which require that the complaint "plead with particularity both falsity and scienter." 15 U.S.C. § 78u-4(b)(1)–(2); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading fraud by hindsight." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084–85 (9th Cir. 2002) (citation modified).

Where, as here, the complaint relies on confidential witnesses ("CWs"), the Reform Act requires Plaintiff to allege with "particularity" that the "statements of these confidential witnesses are based on [] personal knowledge," and demonstrate that the witnesses were "positioned to know the information alleged." *Zucco*, 552 F.3d at 996; *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) ("For the complaint to survive . . . Plaintiffs must describe with particularity these CWs' roles . . . and that they had personal knowledge of Defendants' accounting

decisions.”).

As discussed below, the Amended Complaint falls far short of meeting these exacting standards.

## II. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)

Plaintiff’s Section 10(b) claim should be dismissed because the Amended Complaint fails to meet the Reform Act’s “exacting” requirements for pleading the essential elements of falsity and scienter.

### A. Plaintiff Fails to Plead a Materially False or Misleading Statement.

To show falsity, Plaintiff must “specify” each “statement alleged to have been misleading” and “what is false or misleading about the purportedly fraudulent statement, and why it is false.” *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (citation modified). The particularized facts must be “necessarily inconsistent” with the challenged statements. *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003). A plaintiff “cannot rely on hindsight; rather, it must explain ‘why the statements were false or misleading at the time they were made.’” *Cloudera*, 121 F.4th at 1187. Providing a “litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false” is insufficient. *Id.* (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008)).

Additionally, in the Ninth Circuit, “vague” and “feel good” statements of “corporate optimism” are not actionable as a matter of law. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). This doctrine applies to statements that are not “capable of objective verification.” *Macomb Cnty. Emps.’ Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022) (citation modified).

Here, the Amended Complaint challenges 44 statements that fall into four general categories: statements concerning (1) PALISADE-1 and the reasons for its failure to achieve its primary endpoint; (2) PALISADE-2’s reported results; (3) PALISADE-3’s design, risks, and operational refinements; and (4) PALISADE-3’s enrollment. Plaintiff alleges that all challenged statements were misleading because Vistagen failed to disclose that the PALISADE program was “extraordinarily risky,” that its risks were inherent in the design, and that operational changes could

not sufficiently mitigate them. (*E.g.*, ¶¶ 2, 226, 232, 241, 245.)

**1. Plaintiff Does Not Plead With Particularity That Any Challenged Statement Was Materially False or Misleading When Made.**

**a. Statements regarding PALISADE-1 were not false or misleading when made.**

Five of the challenged statements relate to PALISADE-1 and the reasons for its failure to achieve its primary endpoint. (Stmts. 10–12, 14–15.)

- "We firmly believe that ***the systemic variability introduced by the pandemic contributed to these*** very unexpected and ***very different results between these 2 studies*** [PALISADE-1 and PALISADE-2]." (Stmt. 10; ⁋ 231.)
- "As these dynamics became apparent as the acute phase of the pandemic subsided in early 2022, ***we also initiated retraining and renewed monitoring of sites as is customary with staggered start replicate studies. And that, too, may have had a much larger impact on PALISADE-2*** as it was completed before the majority of patients went through that study." (Stmt. 11; ⁋ 231.)
- "***We view the results of PALISADE-1 as an outlier, driven by the aforementioned reasons, and we are highly confident in the potential of fasedienol in future studies given*** multiple positive Phase II studies, efficacy seen on the exploratory end point and the PALISADE open label study and now ***the strong results in our placebo-controlled Phase III PALISADE-2 trial. This is especially meaningful after the recent multiple failures in SAD studies by peers that may have been subject to similar systemic variability from the pandemic***." (Stmt. 12; ⁋ 231.)
- "There's ***a lot of lessons learned that we have been able to gather from deconstruction of PALISADE-1 for sure***, and I suspect we will from PALISADE-2, ***things like subjects will have an olfactory smell test***. They'll have -- will have ***restrictions on use of nasal swabs upfront of the event.*** So ***there are several things that are associated with just modest amendments to the protocol, but they're positive lessons that you typically learn when you stagger start the studies***." (Stmt. 14; ⁋ 234.)
- "***So that, plus the training that we've done, the proprietary training models that we have all up and down every aspect of conducting that type of study,*** I don't think there's anybody better to conduct and more [experienced] to conduct a public speaking challenge in a Phase III setting than we are. I have no reservations about that [. . . . ] ***So yes***, we're excited." (Stmt. 15; ⁋ 235.)

Plaintiff alleges that these statements "[d]isproportionately attributed PALISADE-1's failure to pandemic-related disruptions and created the false impression that PALISADE-2 results sufficiently demonstrated that the PALISADE design could demonstrate PH94B's efficacy at scale." (⁋ 232.) According to Plaintiff, based on these statements, "Defendants created the materially false impression that the elevated placebo response seen in PALISADE-1, and peer trials, were merely pandemic-driven outliers and the results of PALISADE-2 showed variability in

the chosen design could be sufficiently controlled." (*Id.*; *see* ⁋⁋ 14, 326.)

Plaintiff has not alleged with particularity any contemporaneous undisclosed facts, let alone any facts contradicting Defendants' statements regarding the reasons for PALISADE-1's failure or the factors driving the difference in outcome between PALISADE-1 and PALISADE-2. There are, for example, no CW allegations, internal reports, metrics, or statements showing that Vistagen believed that PALISADE-1 was not, in fact, a "pandemic-driven outlier." To the contrary, Plaintiff's argument is nothing more than hindsight-driven speculation that since PALISADE-3 failed to achieve its primary endpoint, the Defendants must have concealed the true reasons for PALISADE-1's similar outcome. Not so.

**b. Statements regarding PALISADE-2's results were not false or misleading when made.**

Plaintiff alleges that six of Defendants' public statements regarding PALISADE-2's positive results were false and misleading. (Stmts. 1–4, 6, 18.)

- "***First positive U.S. Phase 3 study of an investigational therapy for social anxiety disorder in over 15 years.***" (Stmt. 1; ⁋ 225.)
- "***The*** [Phase 3 PALISADE-2] ***trial met its primary endpoint***, with fasedienol demonstrating a statistically significant difference in average SUDS score during a public speaking challenge compared to placebo (p=0.015)." (Stmt. 2; ⁋ 225.)
- "***The*** [Phase 3 PALISADE-2] ***trial also met its secondary endpoint***, demonstrating a statistically significant difference in the proportion of clinician-assessed responders between fasedienol and placebo as measured by the CGI-I scale (p=0.033)." (Stmt. 3; ⁋ 225.)
- "***Based on the positive top-line results of the Phase 3 PALISADE-2 study***, we are currently preparing for our Phase 3 PALISADE-3 trial, with potential to initiate the trial during the first half of calendar 2024." (Stmt. 4; ⁋ 228.)
- "***The positive outcome of our PALISADE-2 study demonstrated that fasedienol significantly reduced the mean Subjective Units of Distress Scale score, reducing anxiety during a stressful public speaking challenge.***" (Stmt. 6; ⁋ 229.)
- "***Like the successful PALISADE-2 study,*** both PALISADE 3 and PALISADE 4 will be multicenter, randomized, double-blind, placebo-controlled Phase 3 clinical trials designed to evaluate the efficacy, safety and tolerability of the acute administration of fasedienol to relieve anxiety symptoms in adult patients with SAD after a single dose of fasedienol during a simulated anxiety provoking public speaking challenge conducted in the clinical setting." (Stmt. 18; ⁋ 240.)

Plaintiff alleges that these statements "misrepresented PALISADE-2's status and results,"

from which "Defendants drew unsupported conclusions to advance the extraordinarily risky replicate PALISADE-3 Phase 3 trial." (⁋⁋ 226, 230, 232, 239, 241, 297.) Importantly, Plaintiff does not allege that any of the reported results were inaccurate or that Vistagen altered the data. Instead, Plaintiff alleges that Vistagen overstated the success of the PALISADE-2 study because the study only enrolled 141 patients, 67 patients short of the 208 patient target outlined in its study protocol.[4] According to Plaintiff, this rendered the above statements materially false and misleading because "the data from the remaining approximate[ly] 60 patients could have materially changed the PALISADE-2 trial results." (⁋ 226.)

Courts routinely dismiss complaints advancing similar theories of falsity. *In re Rigel Pharmaceuticals, Inc. Securities Litigation* is instructive. There, plaintiffs challenged statements related to the results of phase 2 clinical trials for a drug candidate for the treatment of rheumatoid arthritis. 697 F.3d 869, 872 (9th Cir. 2012). The district court rejected plaintiff's argument that it had adequately pled falsity as to statements regarding drug efficacy and reported study results, holding that "disagreements over statistical methodology and study design are insufficient to allege a materially false statement." *Id.* at 877. The Ninth Circuit affirmed, rejecting plaintiff's argument that it "met the pleading requirements by alleging 'false' study results, including allegations of 'statistically "false p-values"' and inaccurate and improper statistical analysis." *Id.* The same is true here. The core of Plaintiff's theory of falsity as to the PALISADE-2 results is Plaintiff's speculation that enrolling additional patients "could have" changed the results. He does not allege that Defendants "inaccurately reported the results of their own statistical analysis" or "had chosen or changed their statistical methodology after seeing the unblinded raw data from the clinical trial." *Id.* As in *Rigel*, "Plaintiff's allegations of 'falsity' essentially are disagreements with the statistical methodology adopted by the doctors and scientists who designed and conducted the study . . . . The allegations therefore concern two different judgments about the appropriate statistical methodology to be used by Defendants" and were "not about false statements." *Id.* at 878.

Plaintiff's allegations again ignore Vistagen's detailed disclosures of the very issues that

---

[4] Plaintiff does not allege that Vistagen did anything wrong or unprecedented by stopping enrollment early. For good reason. The FDA does not prohibit clinical study sponsors from stopping trials early for business reasons.

were allegedly concealed. Indeed, the very press release that Plaintiff challenges as misleading because of enrollment challenges explicitly addresses the enrollment challenges:

> A total of 141 patients were enrolled in the U.S. multi-center trial. The total enrollment reflects the pause in enrollment after receiving top-line results from PALISADE-1 to allow for independent third-party biostatisticians to conduct an interim analysis of the 141 patients randomized in the trial up to the date of pause. Although the results of the independent interim analysis indicated that continuation of PALISADE-2 would not be futile, Vistagen determined the best course of action was to close the PALISADE-2 study given the expense, time and methodological complexities involved in resuming PALISADE-2.

(Ex. 5 at 6.) Plaintiff had access to the very information that formed the basis of Defendants' statements that PALISADE-2 returned "positive top-line results" and "achieved" its primary and secondary endpoints. Even when a company has not disclosed information an investor may consider relevant, the Ninth Circuit holds that "[t]o decide whether a misstatement or omission can mislead, we need to look at 'the context surrounding the statement[.]'" *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025). "Context matters because we presume that a reasonable investor—who has money on the line—acts with care and seeks out relevant information." *Id.* Here, Plaintiff did not even need to "seek[] out" information—he just needed to read the Company's press release.

Courts in this district regularly dismiss complaints against biotechnology companies that are alleged to have made similar statements regarding their products or clinical trial outcomes. For example, in *In re Nektar Therapeutics Securities Litigation*, plaintiffs challenged statements regarding the company's clinical trial results, alleging that the company made false or misleading statements regarding the positive effects of the drug that misrepresented the patient population that the results were obtained from. 2020 WL 3962004, at *3–6 (N.D. Cal. July 13, 2020). The court rejected plaintiffs' argument that "[d]efendants committed fraud by publicly reporting results that they knew or should have known were either so incomplete or so statistically flawed as to lack clinical significance" because plaintiffs "failed to explain why or how the data was so 'incomplete' or 'statistically flawed' as to be misleading on its face." *Id.* at *11 (citation modified); *see also Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (dismissing complaint because "facts purportedly inconsistent with Defendants' representations do

not plausibly support an inference that the representations were false or misleading"). So too here. Plaintiff's conclusory speculation that Defendants' statements were false or misleading because "the data [] from the remaining approximately 60 patients could have materially changed the PALISADE-2 trial result" is woefully insufficient to plead falsity of Statements 1–4, 6, and 18.

**c. Statements regarding PALISADE-3's clinical trial design and potential risks were not false or misleading.**

Twenty-eight of the challenged statements relate to PALISADE-3's study design and potential risks. (Stmts. 5, 7–9, 13, 16, 17, 19–26, 31–37, 39–44.) For example:

- "***With the statistically significant and clinically meaningful results of PALISADE-2, we're now positioned to move our Phase III development plan forward with the additional studies needed for a potential NDA submission, including a PALISADE-3 trial and a FEARLESS trial,*** allowing us to not only confirm the acute benefit of fasedienol but to confirm what we've also long believed, that the acute use of fasedienol for SAD events continued over time will lead to a reduction in disease severity." (Stmt. 13; ⁋ 231.)

- "***We believe utilizing a simulated anxiety-provoking public speaking challenge study design provides the most appropriate and efficient path for fasedienol to potentially become the first FDA-approved acute treatment of anxiety for adults with S[A]D***." (Stmt. 17; ⁋ 240.)

- "***So the enhancements to PALISADE-3 and PALISADE-4 apply primarily to ensuring that we've got optimal subjects in the study, real extensive, precise and universally applied screening, inclusion/exclusion criteria and that the public speaking challenge protocol is administered properly and consistently with limited variability.***" (Stmt. 22; ⁋ 249.)

- "***So a lot of little small things as well as some significant changes, all intended to really enhance and optimize surveillance, control variability, the things that actually make a difference on outcome, but those are some significant mitigators, we think, to some of the risks that are typically associated when you're scaling up to a multiple-center study.***" (Stmt. 26; ⁋ 251.)

Plaintiff advances two primary theories as to why statements regarding PALISADE-3's study design were false or misleading: (1) Defendants falsely led investors to believe that the PALISADE study design, based on the SUDS endpoint, was "the most appropriate and efficient path for fasedienol" to "achieve marketing approval," and (2) Defendants misrepresented that "operational improvements" would sufficiently "derisk" the PALISADE program. (*E.g.*, ⁋⁋ 241, 245.) Neither theory pleads falsity.

First, Plaintiff's preference for the LSAS-based FEARLESS program does not show that any statement Defendants made with respect to the clinical program they did use was false. Plaintiff

offers no contemporaneous undisclosed facts, let alone any facts contradicting Defendants' statements regarding Vistagen's decision to proceed with the PALISADE study design based on a SUDS endpoint, over the FEARLESS study design based on an LSAS endpoint.[5] And, this potential need to adjust and select one course over the other is entirely consistent with what Vistagen warned:

> Due to the significant resources required for the development of our product candidates, we must decide which product candidates and indications to pursue and advance and the amount of resources to allocate to each. Our decisions concerning the allocation of research, development, collaboration, management and financial resources toward particular product candidates, therapeutic areas or indications may not lead to the development of viable commercial products and may divert resources away from better opportunities. If we make incorrect determinations regarding the viability or market potential of any of our product candidates or misread trends in the pharmaceutical industry, in particular for psychiatric and neurological disorders, our business, financial condition and results of operations could be materially and adversely affected.

(Ex. 17 at 32.) The Company weighed the options and determined that it was the best use of investor dollars to proceed with the PALISADE program rather than abandon the proven study design in pursuit of a hypothetical study design alternative. Plaintiff cannot allege securities fraud based on his own second-guessing of the Company's study design.

*Nguyen v. Endologix, Inc.* is on point. There, plaintiff alleged that defendant, a medical device company, "misled the investing public about whether the Food and Drug Administration (FDA) would approve the company's new aneurysm sealing product." 962 F.3d 405, 407 (9th Cir. 2020). The court rejected plaintiff's theory, concluding that "plaintiff's core theory—that the company invested in a U.S. clinical trial and made promising statements about FDA approval, yet knew from its experience in Europe that the FDA would eventually reject the product—has no basis in logic or common experience." *Id.* at 408. As the court concluded, "the more plausible inference is that the company made optimistic statements about its prospects for FDA approval because its U.S. testing looked promising, not because the company was quixotically seeking FDA approval for a medical device application it knew was destined for defeat." *Id.* The same is true here.

[5] Plaintiff's assertion that Defendants knew that "FEARLESS was the better design for this drug and patient population" is baseless. (*See* ¶ 145.) As the very statements that Plaintiff cites show, Defendants were considering two trial designs: PALISADE and FEARLESS. (Stmts. 5, 13, 16.) And, in any event, all of the statements that Plaintiff cites in support of this assertion precede the favorable PALISADE-2 results.

Plaintiff offers no explanation for why the Company should have disregarded the positive outcome of PALISADE-2 and abandoned the PALISADE program study plan.

Second, Plaintiff does not dispute that Vistagen actually implemented the operational measures it described, including additional monitoring, investigator meetings, enhanced eligibility review, refined inclusion and exclusion criteria, retraining, and more direct site oversight. (*E.g.*, ¶¶ 243–52, 267–74, 282–89, 296–97.) Plaintiff instead asserts that these measures could not overcome risks "inherent in the trial design itself." (¶ 245.) But no contemporaneous internal report, analysis, CW allegation, or other well pleaded fact says that management believed those measures could not overcome such risks. Statements accurately describing measures that were implemented, or management's belief that they could improve execution, do not become false because they failed to guarantee a successful trial.

The Complaint thus substitutes a retrospective judgment for contemporaneous falsity. Plaintiff may disagree with Vistagen's decision to continue the PALISADE program after PALISADE-2, but the securities laws do not convert that disagreement into a false statement without particularized facts showing a contemporaneous contradiction. *Cloudera*, 121 F.4th at 1186 (Plaintiff must show that each alleged misstatement "directly contradict[s] what the defendant knew at that time or omits material information." (citation modified).

**d. Statements regarding PALISADE-3's enrollment were not false or misleading when made.**

Five of the challenged statements relate to PALISADE-3 enrollment. (Stmts. 27–30, 38.)

- "***So we're seeing, again, progress of the study that's in line with expectations towards the targets that we've established. And so I think in general, really things going as expected there***." (Stmt. 27; ⁋ 257.)
- "***[T]he enrollment cadence is on track with what we've guided***. I mean look, obviously, the black swan and the pandemic impacted a lot of activity in 1 and 2, although we've been so pleasantly surprised by -- ***not really surprised but expected and happy to see, is how normative the clinical development environment is now*** and how we are able to have a lot more predictability on the things that caused fits and starts in prior studies during the pandemic, especially PALISADE-1. ***So I can tell you that we're comfortable with the cadence*** and we're on track." (Stmt. 28; ⁋ 255.)
- "***So a key part of this study is the screen out in -- at visit 2 and the first public speaking challenge of those subjects who don't have a high enough anxiety level to really show improvement***. It's one of the things that differentiates our study. ***And it's not inclusion/exclusion, but it's a key piece of making sure that we have the right subjects***

***moving forward to the randomization portion of the study. And those rates, those are critical for study execution. Those rates have been similar to what we observed in PALISADE-1 and PALISADE 2.***" (Stmt. 29; ⁋ 258.)

- ***So there's tremendous excitement across the PIs and the site staff that we've been able now to bring together for PALISADE-3 and PALISADE-4,*** as you can imagine, on the other side of the PALISADE-2 success." (Stmt. 30; ⁋ 262.)

- "***The enthusiasm of patients and physicians participating in the PALISADE Program continues to be very strong and we remain committed to a rigorous operational execution***." (Stmt. 38; ⁋ 276.)

Plaintiff alleges that these statements were false or misleading because they "misrepresented the factual basis for [] [Defendants'] assertions of met screening expectations and on track enrollment cadence" and "created the materially false impression that the Company was not experiencing any issues with recruitment or enrollment for PALISADE-3." (⁋⁋ 259, 265.) Here, Plaintiff's primary support consists of statements from two CWs. The CW allegations, however, all suffer from two fatal defects: (1) none of the allegations contradict any of the challenged statements regarding enrollment or recruitment; and (2) far from the Company insiders with firsthand knowledge of the specific practices that allegedly misled investors that Plaintiff tries to portray, both CWs worked at the Company in limited capacities, for a subset of the Class Period, with little, if any, access to relevant information or decision making concerning Phase 3 clinical development of fasedienol or any other candidate in Vistagen's pipeline.

CW1, a former "Director of Media and Communications Strategy" at Vistagen, is not alleged to have *any* involvement in clinical trial design or development, statistical analyses, or other relevant aspects of the Company's business. To the contrary, CW1 "draft[ed] press releases about Vistagen's clinical trials and products." (⁋ 33.) CW2, a "contract senior medical writer" employed by Vistagen for less than six months, is alleged to have "writ[ten] an abstract for a different drug product and [to have] rewrite[ten] Vistagen's Phase 3 protocol for PALISADE-2 for the replicate PALISADE-3 Phase 3 study." (⁋ 34.) CW2 is not alleged to have had any contact with either of the Individual Defendants.

CW1 offers vague assertions that the Company discussed the "quality of enrollment," "recruitment issues," and potential solutions to the enrollment issues, such as potentially increasing

the number of study sites. (⁋⁋ 192, 196, 259.) These allegations are too vague to plead falsity. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 944 (N.D. Cal. 2010) (vague CW allegations "cannot substitute for the specific facts necessary to plead falsity").

In fact, the very "riddle[]" that CW1 identifies is entirely consistent with the challenged statements. Specifically, CW1 alleges that "recruitment for the PALISADE program had long been an issue for the Company" and that "was one of the Company's biggest riddles with the PALISADE program – getting patients with SAD to be willing to sign up for a trial where the test requires them to go to a clinic to participate in a simulated public speaking challenge." (⁋ 191.) This is entirely consistent with the Company's public statements during the Class Period. CW1's allegations simply show that Vistagen encountered routine clinical development challenges that it was working through. That is not securities fraud. "Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001); *see also Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 954 (D. Ariz. 2007) (CW statements "merely reflect matters that companies deal with on a daily basis," which "do not show . . . a fraudulent scheme.").

CW2's assertions fare no better. CW2 offers similarly vague assertions that "it was discussed widely amongst Company insiders that Vistagen was having trouble with enrollment for PALISADE-3." (⁋ 194.) And the only even remotely concrete allegation offered by CW2 is that he/she "recalled suggesting Vistagen might resolve its recruitment issue if it used different anxiety-producing stressors" during an "informal meeting" with "one or both" of his/her supervisor and Vistagen's Vice President of Medical Strategy. (⁋ 195.) That Vistagen did not scrap the PALISADE program and change the fundamental nature of the clinical program for its lead Phase 3 candidate based on the "informal" "suggestion" of a contractor who was at the Company for less than six months does not show that any challenged statement was false when made.

Plaintiff's CW allegations are similar to those recently rejected by the court in *Feldman v. Alto Neuroscience Inc.*, Case No. 5:25-cv-06105-NW (N.D. Cal. Aug. 7, 2026) (Ex. 24). There, plaintiffs alleged that the company and certain of its officers and directors made misleading statements regarding the Phase 2b trial of the company's "lead product candidate," "a small-

molecule called ALTO-100, which Alto believed would be effective in treating Major Depressive Disorder." (*Id.* at 2.) The plaintiffs' claims were based primarily on statements from seven CWs "with varying degrees of knowledge about the operation of the Phase 2b trial" with "particular reliance" on a former "Clinical Trial Specialist" and former "Senior Clinical Trial Specialist." (*Id.* at 4–5.) Specifically, the plaintiffs pointed to CW statements to show that the company "struggled to find trial participants for Phase 2b," "advertised on social media and elsewhere to recruit patients for the trial," "did not verify pertinent information through medical records or proof of a doctor's diagnosis of MDD when screening patients," and that one of the sites was "poorly operated and difficult to manage." (*Id.* at 5.) The court concluded that the CW allegations were "not particularized enough" because they failed to show that "[d]efendants were experiencing 'difficulty in finding and enrolling sufficient qualified patients'" at the time the statement was made. (*Id.* at 9–10.) The same is true here. Unlike in *Alto* where the CWs had firsthand knowledge of the clinical trials, the CWs here are, at best, one step removed from the trials. Both CWs worked at Vistagen in limited capacities, for a subset of the Class Period, with little, if any, access to relevant clinical development information or decision making. None of the CW allegations renders any of the challenged statements false or misleading.

Here too, Plaintiff's allegations ignore Vistagen's repeated, detailed disclosures of the very issues allegedly "concealed." Far from concealing uncertainty around recruitment and enrollment, Vistagen explicitly warned investors of these risks in its public statements before and during the Class Period. For example:

- "[W]e are focused on neuroscience drug development, a field that has seen very limited success. The ability to successfully develop product candidates in this field is extremely difficult and is subject to a number of unique challenges" (Ex. 17 at 27);
- "Successful development of pharmaceutical products is highly uncertain and is dependent on numerous factors, many of which are beyond our control. Product candidates that appear promising in the early phases of development may fail to reach the market for several reasons, including: delays or difficulties in enrollment and completion of any of our clinical trials" (*id.* at 28);
- "We have, and may continue to experience difficulties in patient enrollment and randomization in our clinical trials for a variety of reasons, including the stringent entry criteria for our clinical trials. The timely completion of clinical trials requiring rigorous adherence to clinical trial protocols depends, among other things, on our ability to enroll and randomize a sufficient number of patients who qualify for and remain in the trial

> until its conclusion [….] We may also experience challenges in recruiting principal investigators and patients to participate in ongoing and future clinical trials for our product candidates if we are unable to sufficiently demonstrate the potential of such product candidates to them." (*Id.* at 37.)

These disclosures again address the very "facts" that Plaintiff alleges were concealed and are fatal to Plaintiff's claims. *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (dismissing complaint where defendant "disclose[d] exactly what Plaintiffs claim [defendant] omitted"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (analysis of falsity of a statement "'always depends on the context,' which includes 'all its surrounding text, including hedges, disclaimers, and apparently conflicting information'").

**2. Defendants' Optimistic Statements Are Not Actionable.**

Most of the challenged statements are not actionable for the additional reason that they are not "objectively verifiable." The Ninth Circuit has repeatedly held that such statements—which may be described as "corporate optimism" / "puffery," "vague," or "aspirational"—are not actionable because reasonable investors do not rely on them. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708–09 (9th Cir. 2021); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

Plaintiff challenges 34 statements of corporate optimism. (Stmts. 7–9, 12–28, 30–43.) These statements are not actionable as a matter of law. *Cutera*, 610 F.3d at 1111; *see also In re SolarCity Corp. Sec. Litig.,* 274 F. Supp. 3d 972, 995 (N.D. Cal. 2017) (statements that the company was "growing extremely well" and executives were "happy with [the company's] ability to scale and [unbelievably] incredibly strong sales" were non-actionable); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) (statement that the company was "well positioned to succeed" was non-actionable).

**3. Defendants' Opinion Statements Are Not Actionable.**

To the extent any of the challenged statements go beyond inactionable optimism, they are statements of opinion conveying Defendants' subjective beliefs and expectations about Vistagen's future and their hopes for Vistagen's clinical trial program. (Stmts. 7–17, 19–26, 28–43.)

There are three ways to state a claim based on an allegedly misleading statement of opinion. The first theory requires that Plaintiff plead both that "the speaker did not hold the belief she professed" and that the belief was objectively untrue. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184–86 (2015). The second theory requires Plaintiff to identify embedded statements of fact in the opinion statement and allege with particularity facts showing that "the supporting fact [the speaker] supplied [is] untrue." *Align*, 856 F.3d at 615–16. The third theory requires Plaintiff to (1) "identify particular (and material) facts going to the basis for the [defendant's] opinion," (2) show that the facts were material, and (3) show that the omission of the facts rendered the opinion statement misleading to a reasonable person reading it "fairly and in context." *Omnicare*, 575 U.S. at 194, 196.

Plaintiff has not done so here. Plaintiff pleads no facts, let alone "particular" and "material" facts, going to the basis of any of the opinions expressed in the challenged statements or showing any "embedded fact" that was untrue. Nor does Plaintiff allege anything about any Defendant's subjective beliefs at the time the statements were made. Plaintiff fails to show how any reasonable investor would have been misled, particularly in the context of Vistagen's disclosures. There was good reason for optimism about the clinical trials and Defendants warned of the risks. Defendants' expression of their opinions is not fraud.

**4. Defendants' Forward-Looking Statements Are Not Actionable.**

Statements 5, 7–9, 13, 16, 19–23, 25, 35, and 38–43 are also forward-looking and therefore protected by the Safe Harbor provision of the Reform Act. The Safe Harbor protects statements regarding "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Intuitive Surgical*, 759 F.3d at 1058 (quoting *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)). Courts in this district have dismissed nearly identical statements as forward-looking. *See, e.g.*, *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *12 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) (statements about a drug's prospects for regulatory approval "are assumptions related to the company's plan for its product" and are therefore forward-looking);

*Colyer v. AcelRx Pharms., Inc.*, 2015 WL 7566809, at *10 (N.D. Cal. Nov. 25, 2015) (statements such as "[A]ssuming successful approval of our NDA…, we anticipate launching the commercial sale of Zalviso in the United States in the first quarter of 2015" were forward-looking).

These statements are inactionable under both prongs of the Safe Harbor. "[A] defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)); *see also* 15 U.S.C. § 78u-5(c)(1). Defendants identified all of these statements as forward-looking.

Statements 5 and 7–9 appear in Vistagen's SEC filings, while Statements 13, 16, 19–23, 25, 35, and 38–43 are from transcripts of the Company's quarterly earnings calls. The SEC filings identified the statements as forward-looking statements, directing investors to a series of risk factors, and a company representative prefaced each of the earnings calls with a caution that the Company will "make forward-looking statements regarding our business" and referred investors to additional information about the relevant risk factors contained in the Company's SEC filings. (Ex. 6 at 8; Ex. 7 at 4; Ex. 9 at 4; Ex. 11 at 4; Ex. 14 at 4; Ex. 18 at 4; Ex. 10 at 4.) Where, as here, forward-looking statements are accompanied by meaningful cautionary language, the statements are not actionable and "defendants' state of mind is not relevant." *Cutera*, 610 F.3d at 1113.

The statements are not actionable under the Safe Harbor's second prong for the additional independent reason that the Amended Complaint contains no facts alleging that *any* defendant had "actual knowledge" that the statements were false or misleading when made. 15 U.S.C. § 78u-5(c)(1); *see Cutera*, 610 F.3d at 1112. There are, for example, no facts alleged to show that the Individual Defendants knew the PALISADE program was incapable of success. *See Tesla*, 985 F.3d at 1193–94 (affirming dismissal on Safe Harbor grounds where there were no particularized allegations that the executive "knew that 'it was impossible' to meet the company's forward-looking projections, and 'not merely highly unlikely'"); *Farhar v. Ontrak, Inc.*, 714 F. Supp. 3d 1198, 1211 (C.D. Cal. 2024) (dismissing complaint that lacked particularized facts showing that it was a "foregone conclusion" that company would not achieve its goal).

### B. Plaintiff Fails to Plead a Strong Inference of Scienter

Plaintiff's Section 10(b) claim fails for the additional, independent reason that Plaintiff fails to adequately plead scienter under the heightened pleading requirements of the Reform Act.

To plead scienter, a plaintiff must allege particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind"—an "intent to deceive, manipulate, or defraud." *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 639–40 (9th Cir. 2024) (citation modified). The inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). This "inquiry is inherently comparative" and requires the Court to "take into account plausible opposing inferences." *Zucco*, 552, F.3d at 991 (citation modified).

Scienter must be alleged with respect to each of the Individual Defendants. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607–08 (9th Cir. 2014). The failure to plead scienter for any individual defendant will defeat a claim of corporate scienter. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).[6] Plaintiff's allegations of scienter are based on the Individual Defendants' involvement in the design and execution of the Company's clinical trials, certain CW allegations, the fact that the Company needed capital, and that the clinical development of the Company's "lead product candidate" was "critical to Vistagen's core operations." (¶¶ 298–321.) These allegations do not support a "cogent" and "compelling" inference of fraud, let alone one that is "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

#### 1. Management's Involvement in the Clinical Trial Program Does Not Support an Inference of Scienter.

Plaintiff repeatedly alleges that Singh and Prince were "personally involved" in the design and execution of the Company's Phase 3 clinical trial program, and the "efforts to identify and remediate the material weaknesses identified in prior PALISADE studies leading to missed

[6] To the extent Plaintiff tries to plead a theory of collective scienter, "circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication," this is not accepted in the Ninth Circuit. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743–45 (9th Cir. 2008).

endpoints and an elevated placebo response." (*E.g.*, ⁋⁋ 301–06.) But, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (citation modified). That Singh and Prince were involved in the clinical program for Vistagen's lead drug candidate does not support an inference of scienter.

**2. The CW Allegations Do Not Support an Inference of Scienter.**

The CW allegations do not support any inference of scienter. (*See* ⁋⁋ 33–34, 191–96, 259, 265, 279, 306.) CW allegations must be based on the CW's "personal knowledge," and those statements "must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. "Vague hearsay" is not enough. *Id.* at 997.

The CWs offer no allegations regarding Prince, and therefore provide no basis from which scienter may be inferred as to him. As to Singh, the Amended Complaint alleges that CW1 (1) "had weekly meetings with Defendant Singh, their supervisor, Caren Scannell, and Senior Vice President of Investor Relations, Mark McPartland, to discuss the Company's clinical trials and drug products" and "described Defendant Singh as 'super, super involved in the trials,'" (⁋ 306), and (2) "specifically recalled" a meeting with Singh, Scannell, and McPartland in March 2024 where "they discussed the main issues plaguing PALISADE-1 leading to the unfavorable results, including that the quality of enrollment was down due to recruiting issues," (⁋ 192).[7] But Plaintiff fails to explain how *any* inference of scienter may be inferred for Singh from the fact that members of management met to discuss the Company's clinical trial program, including routine issues such as how to improve enrollment in a clinical trial (including during a global pandemic), and that the Company's CEO was "super, super involved in the trials."

[7] The Amended Complaint contains a number of vague assertions attributed to the CWs, such as "[recruitment] was one of the Company's biggest riddles with the PALISADE program," (⁋ 191), "it was discussed widely amongst Company insiders that Vistagen was having trouble with enrollment for PALISADE-3," (⁋ 194), and that "enrollment issue[s] [were] a big topic of conversation when it came to PALISADE-3, (⁋ 196). The unremarkable assertion that, consistent with the Company's public filings and statements on earnings calls, that it was concerned about adequate enrollment does not support an inference of scienter. And, in any event, they say nothing about information specifically provided to the Individual Defendants.

### 3. Plaintiff's Allegations Regarding Vistagen's Need for Capital Do Not Support an Inference of Scienter.

Plaintiff's allegations that "the Company's future operations and financial prospects were dependent on the success of [the] Phase 3 development plan for PH94B, as well as its ability to secure additional financing" are unremarkable and do nothing to establish scienter. (⁋⁋ 310–19.) Plaintiff tries to craft something nefarious of the fact that, as the Company repeatedly disclosed, the Company's ability to continue operating depended on its ability to "successfully complete clinical development, obtain regulatory approval for or commercialize one or more of our product candidates, or if [the Company] experience[s] delays in doing so, [the Company's] business will be materially harmed." (Ex. 17 at 29.) But that does not transform Plaintiff's allegations regarding the Company's need for capital into an inference of scienter. "Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). "As numerous courts have recognized, the desire to raise capital is a generic motive held by all companies, and is therefore insufficient to establish scienter." *In re Metricom Sec. Litig.*, 2004 WL 966291, at *35 (N.D. Cal. Apr. 29, 2004), *aff'd sub nom. Young v. Dreisbach*, 182 F. App'x 714 (9th Cir. 2006). In fact, the Ninth Circuit has repeatedly confronted and rejected similar allegations against a clinical-stage biopharmaceutical company that allegedly released false clinical results while raising capital, holding that "allegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 884 (citation modified); *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 859–61 (S.D. Cal. 2019) (rejecting plaintiff's attempt to distinguish company's motive to raise additional funds as unique because company would not have been able to secure a loan if it disclosed the omitted information as "illusory because [that] argument could be made as to any company that sought financing after having purportedly made a material misrepresentation to the public as to any aspect of its business").[8]

[8] Plaintiff notes that Singh and Prince received annual compensation during the Class Period. (⁋ 318.) Courts "will not conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes." *In re Rigel Pharms., Inc.*, 697 F.3d at 884. This allegation cannot support an inference, let alone a strong inference, of scienter. *See Zucco*,

#### 4. Plaintiff Does Not Offer a Cogent and Compelling Theory of Fraud.

Considering the scienter allegations holistically, Plaintiff fails to offer a theory of fraud that is coherent, let alone cogent and compelling. Vistagen is a clinical-stage, pre-revenue, biotechnology company, operating in a complex, high risk, and constantly changing industry. It is implausible that the Defendants would spend considerable time and resources on the PALISADE program knowing it was doomed to failure. Instead, it is far more plausible that Vistagen faced routine challenges with its Phase 3 clinical development and had to make decisions that balanced investor expectations with scientific and business judgments. That Vistagen's PALISADE-3 Phase 3 trial failed to achieve its primary endpoint reflects the inherently unpredictable nature of clinical trials. Pharmaceutical development is not linear and outcomes are never guaranteed. As is the case with every clinical trial in this area, the Company learned from and made improvements to its clinical trial program through a series of trials. That is not fraud.

### III. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a)

Plaintiff's claims against the Individual Defendants under Section 20(a) should be dismissed because Plaintiff has failed to plead a violation under Section 10(b). *See Rigel*, 697 F.3d at 886.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety.

---

552 F.3d at 1005 (compensation allegations fail to support a strong inference of scienter where "a complaint fails to provide specifically, with comparisons to prior years['] bonuses, the correlation between [defendants'] compensation and [the company's] bottom line"). Plaintiff does not allege any insider stock sales, for instance. This too undercuts an inference of scienter. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 884; *see also Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) (holding scienter not alleged where "no allegation of improper stock sales by any individual defendant during the class period").

Dated: August 18, 2026

MORRISON & FOERSTER LLP

*/s/ Christin Hill*

Christin Hill
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.268.7000
CHill@mofo.com

*Attorneys for Defendants*
Vistagen Therapeutics, Inc., Shawn K. Singh, and Joshua Prince